1  Robert V. Prongay (SBN 270796)
     *rprongay@glancylaw.com*
2  Charles Linehan (SBN 307439)
     *clinehan@glancylaw.com*
3  Pavithra Rajesh (SBN 323055)
     *prajesh@glancylaw.com*
4  GLANCY PRONGAY & MURRAY LLP
5  1925 Century Park East, Suite 2100
   Los Angeles, California 90067
6  Telephone: (310) 201-9150
   Facsimile: (310) 201-9160
7
8  *Attorneys for Plaintiff Ben Brownback*
9  [Additional Counsel on Signature Page]

10              **UNITED STATES DISTRICT COURT**

11             **NORTHERN DISTRICT OF CALIFORNIA**

12

| | |
|---|---|
| BEN BROWNBACK, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | **JURY TRIAL DEMANDED** |
| APPLOVIN CORPORATION, ADAM FOROUGHI, HERALD CHEN, And MATTHEW STUMPF, | |
| Defendants. | |

Plaintiff Ben Brownback ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by AppLovin Corporation ("AppLovin" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by AppLovin; and (c) review of other publicly available information concerning AppLovin.

## NATURE OF THE ACTION AND OVERVIEW

1.    This is a class action on behalf of persons and entities that purchased or otherwise acquired AppLovin securities between May 10, 2023 and February 25, 2025, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    AppLovin is an advertising technology company in the mobile gaming space. The Company operates through two reportable segments: Software Platform and Apps. The Company's apps are generally free-to-play mobile games, and AppLovin generates revenue from in-app purchases made by users. The Company's Software Platform is composed of a suite of services sold to other mobile app advertisers purportedly to grow and monetize their respective apps. In the second quarter of 2024, the Company rolled-out its e-commerce pilot program, which purportedly gave e-commerce website owners the ability to purchase in-app mobile game video ad inventory.

3.    On February 26, 2025, before the market opened, Culper Research published a report alleging among other things, that AppLovin's app segment relies on the "systematic exploitation of app permissions" to "illicitly inflate the Company's mobile gaming results." Culper Research further alleged AppLovin's e-commerce program is a "rigged game" which relies on "steal[ing] attribution" for advertising from Meta to bolster the Company's results.

4.    Also on February 26, 2025, at approximately 10 AM EST, Fuzzy Panda Research published a report which further detailed the manner in which AppLovin's e-commerce rigged

results by "reverse engineer[ing] Meta's targeting methods" in order to "steal" referral credits for targeting advertisers. Fuzzy Panda Research further detailed the manner in which the Company's "impossibly high CTRs (click-thru rates) of 30-40%, 10x the industry norms" are the product of what industry experts can only describe as "Ad Fraud."

5.    On this news, the Company's share price fell $46.06, or 12.2%, to close at $331.00 per share on February 26, 2025, on unusually heavy trading volume.

6.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that AppLovin's app segment relied on the systematic exploitation of fraudulent advertising practices including 'clickjacking' and 'click spoofing'; (2) that AppLovin's advertising and e-commerce program relied on intercepting and appropriating advertising attribution credit; (3) that AppLovin employed a backdoor installation scheme to force unwanted apps on customers; (4) that as a result of the foregoing, AppLovin's revenue was falsely inflated; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

7.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein,

including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

11.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## **PARTIES**

12.     Plaintiff Ben Brownback, as set forth in the accompanying certification, incorporated by reference herein, purchased AppLovin securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.     Defendant AppLovin is incorporated under the laws of Delaware with its principal executive offices located in Palo Alto, California. AppLovin's common stock trades on the NASDAQ exchange under the symbol "APP."

14.     Defendant Adam Foroughi ("Foroughi") was the Company's Chief Executive Officer ("CEO") at all relevant times.

15.     Defendant Herald Chen ("Chen") Herald Chen was the Company's CFO from November 2019 until his resignation, effective December 31, 2023.

16.     Defendant Matthew Stumpf ("Stumpf") has been the Company's Chief Financial Officer ("CFO") since January 1, 2024.

17.     Defendants Foroughi, Chen, and Stumpf (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.   The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to

material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

18.     AppLovin is an advertising technology company in the mobile gaming space. The Company operates through two reportable segments: Software Platform and Apps. The Company's Apps are generally free-to-play mobile games; AppLovin then generates revenue from in-app purchases made by users. The Company's Software Platform is composed of a suite of services sold to other mobile app advertisers to, purportedly to grow and monetize their respective apps. In the second quarter of 2024, the Company rolled-out its e-commerce pilot program which purportedly gave e-commerce website owners the ability to purchase in-app mobile game video ad inventory.

### Materially False and Misleading

### Statements Issued During the Class Period

19.     The Class Period begins on May 10, 2023.[1] On that day, the Company published a shareholder letter announcing the Company's financial results for the first quarter ended March 31, 2023. The shareholder letter reported the Company's financial results and touted the Company's revenue growth and the alleged factors which lead to those results. Specifically, the shareholder letter stated the following, in relevant part:

> In the first quarter of 2023 we continued to execute against our growth initiatives and exceeded the top end of our guidance. After substantially completing our cost and Apps portfolio optimization projects, our team is focused on three key growth initiatives within our Software Platform segment: 1) upgrading our core machine learning AXON technology; 2) expanding our ad solutions into Connected-TV; and 3) extending our marketing platform to carriers and OEMs. ***Our solid financial performance in the first quarter was driven by our market leading solutions which led to record quarterly Software Platform revenue of $355 million, an increase of 16% over the prior quarter.***
>
> Total revenue for the first quarter grew to $715 million, above the top end of our quarterly guidance by $10 million. Our net loss was $5 million, net margin was (1)%,

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

and Adjusted EBITDA was $274 million, slightly above the top end of our quarterly guidance, at a 38% Adjusted EBITDA margin. During the quarter, we generated $289 million of net cash from operating activities and $283 million of Free Cash Flow, both of which primarily benefited from several large customer payments from prior periods.

\*                              \*                              \*

### 1Q23
## Financial Overview

ALL COMPARISONS ARE TO 1Q22 UNLESS OTHERWISE NOTED. WE ACCOUNTED FOR $210 MILLION IN PUBLISHER BONUSES AS A CONTRA-REVENUE ADJUSTMENT IN 1Q22. THIS AMOUNT IS REFLECTED IN FIGURES BELOW BUT IS ADDED BACK TO ADJUSTED EBITDA.

**Revenue** was $715 million, an increase of 14%. Software Platform revenue increased to 50% of total revenue compared to 19%.

**Software Platform** revenue grew 199% to $355 million. Segment Adjusted EBITDA declined 7% to $219 million, a 62% margin.

**Net Loss** was $5 million, a net margin of (1)% compared to net loss of $115 million and a net margin of (18)%.

**Apps** revenue declined 29% to $361 million. Segment Adjusted EBITDA grew 35% to $55 million, a 15% margin.

**Adjusted EBITDA**[1] decreased 1% to $274 million and Adjusted EBITDA margin increased to 38% from 33% excluding publisher bonuses.

**Cash Flow:** We generated $289 million of net cash from operating activities and $283 million of Free Cash Flow[1].

\*                              \*                              \*

### Software Platform Update

***In the first quarter, we achieved our highest quarterly Software Platform revenue at $355 million, growing 199% year-over-year (8% growth after excluding the impact of publisher bonuses in the prior year period). The 8% increase in revenue was primarily driven by partial stabilization in the mobile app ad market and continued improvements in our core advertising technology resulting in higher revenue per install from our advertising solutions,*** and a modest contribution from our acquisition of Wurl. Software Platform revenue increased 16% sequentially, performing above our expectations while Software Platform Adjusted EBITDA grew 18% to $219 million at an Adjusted EBITDA margin of 62%.

20.    On May 10, 2023, the Company submitted its quarterly report for the period ended March 31, 2023, on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The report described the Company's purported revenue sources and corresponding disaggregated revenue as follows, in relevant part:

**Revenue**

***Revenue from Contracts with Customers***

The Company generates Software Platform and Apps revenue. Software Platform revenue is generated primarily from fees collected from advertisers and advertising networks who use the Software Platform. Apps revenue consists of in-app purchase ("IAP") revenue generated from in-app purchases made by users within the Company's apps ("Apps"), and in-app advertising ("IAA") revenue generated from advertisers that purchase ad inventory from Apps.

<u>*Software Platform Revenue*</u>

The vast majority of the Software Platform Revenue is generated through AppDiscovery and MAX, which provide the technology to match advertisers and owners of digital advertising inventory ("Publishers") via auctions at large scale and microsecond-level speeds. The terms for all mobile advertising arrangements are governed by the Company's terms and conditions and generally stipulate payment terms of 30 days subsequent to the end of the month. Substantially all of the Company's contracts with customers are fully cancellable at any time or upon short notice.

Software Platform Revenue is generated by placing ads on mobile applications owned by Publishers. The Company's performance obligation is to provide customers with access to the Software Platform, which facilitates the advertiser's purchase of ad inventory from Publishers. The Company does not control the ad inventory prior to its transfer to the advertiser, because the Company does not have the substantive ability to direct the use of nor obtain substantially all of the remaining benefits from the ad inventory. The Company is not primarily responsible for fulfillment and does not have any inventory risk. The Company is an agent as it relates to the sale of third-party advertising inventory and presents revenue on a net basis. The transaction price is the product of either the number of completions of agreed upon actions or advertisements displayed and the contractually agreed upon price per advertising unit with the advertiser less consideration paid or payable to Publishers. The Company recognizes Software Platform Revenue when the agreed upon action is completed or when the ad is displayed to users. The number of advertisements delivered and completions of agreed upon actions is determined at the end of each month, which resolves any uncertainty in the transaction price during the reporting period.

Software Platform Revenue also includes revenue generated by the Company's mobile application tracking and attribution solutions that is recognized ratably over the subscription period, generally up to twelve months.

&ast;    &ast;    &ast;

### *In-App Advertising Revenue*

IAA Revenue is generated by selling ad inventory on the Company's Apps to third-party advertisers. Advertisers purchase ad inventory either through the Software Platform or through third-party advertising networks ("Ad Networks"). Revenue from the sale of ad inventory through Ad Networks is recognized net of the amounts retained by Ad Networks as the Company is unable to determine the gross amount paid by the advertisers to Ad Networks. The Company recognizes revenue when the ad is displayed to users.

The Company presents taxes collected from customers and remitted to governmental authorities on a net basis.

### *Disaggregation of Revenue*

The following table presents revenue disaggregated by segment and type (in thousands):

| | Three Months Ended March 31, | |
|---|---|---|
| | 2023 | 2022 |
| Software Platform Revenue | $ 354,758 | $ 118,840 |
| In-App Purchase Revenue | 251,328 | 339,472 |
| In-App Advertising Revenue | 109,319 | 167,109 |
| Total Apps Revenue | 360,647 | 506,581 |
| Total Revenue | $ 715,405 | $ 625,421 |

21.    On August 9, 2023, the Company published a shareholder letter announcing the Company's financial results for the second quarter ended June 30, 2023. Specifically, the shareholder letter stated the following, in relevant part:

*We had a strong second quarter, exceeding the high end of our revenue, A*djusted EBITDA and margin guidance. ***Outperformance was driven primarily by the successful roll-out of our latest AI- based advertising engine, AXON 2.0 which powers our AppDiscovery platform. The Software Platform business achieved record revenue, increasing a solid 14% from last quarter to $406 million, and record Adjusted EBITDA, increasing 25% from last quarter to $273 million,*** yielding a 67% Adjusted EBITDA margin and generating over 80% of total Adjusted EBITDA. Additionally, our Apps business continued to deliver stable Adjusted EBITDA during the quarter of $61 million with a healthy 18% Adjusted EBITDA margin.

Total revenue for the second quarter was $750 million, our net income was $80 million at a net margin of 11%, and Adjusted EBITDA expanded to $334 million equal to a 44% Adjusted EBITDA margin. During the quarter, we generated $230 million of net cash from operating activities and $221 million of Free Cash Flow.

\*                    \*                    \*

## 2Q23
## Financial Overview
ALL COMPARISONS ARE TO 2Q22 UNLESS OTHERWISE NOTED.

**Revenue** was $750 million, a decrease of 3%. Software Platform revenue increased to 54% of total revenue compared to 41%.

**Software Platform** revenue grew 28% to $406 million. Segment Adjusted EBITDA increased 39% to $273 million, a 67% margin.

**Net Income** was $80 million, a net margin of 11% compared to net loss of $22 million and a net margin of (3)%.

**Apps** revenue declined 25% to $344 million. Segment Adjusted EBITDA declined 17% to $61 million, an 18% margin.

**Adjusted EBITDA**[1] increased 24% to $334 million and Adjusted EBITDA margin increased to 44% from 35%.

**Cash Flow:** We generated $230 million of net cash from operating activities and $221 million of Free Cash Flow[1]

\*                    \*                    \*

**Software Platform Update**

Given the success of our AI-related investments, our Software Platform revenue has grown 2.8x over the past two years (2Q21 to 2Q23), an*d thanks to the continued efficiency of this business, our Software Platform Adjusted EBITDA expanded 3.0x over the same period.* This quarter, we achieved 67% Software Platform Adjusted EBITDA margin, and as our revenue continues to grow, we expect further margin improvement.

***In the second quarter, we once again achieved record quarterly Software Platform revenue at $406 million, growing 28% year-over-year and 14% from the first***

***quarter. This increase was driven by the rollout of our AI advancements to AXON (read about it HERE), which drove higher installs and revenue per install from the first quarter,*** paired with improved returns for advertisers. Software Platform Adjusted EBITDA grew 39% year-over-year to $273 million at an Adjusted EBITDA margin of 67%. As we look forward, we are very excited about the increased efficiency and better return on ad spend our advertisers are seeing, and we believe this will lead to more opportunities and growth for our partners.

22.     On August 9, 2023, the Company submitted its quarterly report for the period ended June 30, 2023 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The report described the Company's purported revenue sources and corresponding disaggregated revenue as follows, in relevant part:

**Revenue**

***Revenue from Contracts with Customers***

The Company generates Software Platform and Apps revenue. Software Platform revenue is generated primarily from fees collected from advertisers and advertising networks who use the Software Platform. Apps revenue consists of in-app purchase ("IAP") revenue generated from in-app purchases made by users within the Company's apps ("Apps"), and in-app advertising ("IAA") revenue generated from advertisers that purchase ad inventory from Apps.

<u>*Software Platform Revenue*</u>

The vast majority of the Software Platform Revenue is generated through AppDiscovery and MAX, which provide the technology to match advertisers and owners of digital advertising inventory ("Publishers") via auctions at large scale and microsecond-level speeds. The terms for all mobile advertising arrangements are governed by the Company's terms and conditions and generally stipulate payment terms of 30 days subsequent to the end of the month. Substantially all of the Company's contracts with customers are fully cancellable at any time or upon short notice.

Software Platform Revenue is generated by placing ads on mobile applications owned by Publishers. The Company's performance obligation is to provide customers with access to the Software Platform, which facilitates the advertiser's purchase of ad inventory from Publishers. The Company does not control the ad inventory prior to its transfer to the advertiser, because the Company does not have the substantive ability to direct the use of nor obtain substantially all of the remaining benefits from the ad inventory. The Company is not primarily responsible for fulfillment and does not have any inventory risk. The Company is an agent as it relates to the sale of third-party advertising inventory and presents revenue on a net basis. The transaction price is the product of either the number of completions of agreed upon actions or advertisements displayed and the contractually agreed upon price per advertising unit with the advertiser less consideration paid or payable to Publishers. The Company recognizes Software Platform Revenue when the agreed upon action is completed or when the ad is displayed to users. The number of advertisements delivered and completions of agreed upon actions is determined at the end of each month, which resolves any uncertainty in the transaction price during the reporting period.

Software Platform Revenue also includes revenue generated by the Company's mobile application tracking and attribution solutions that is recognized ratably over the subscription period, generally up to twelve months.

*                    *                    *

*In-App Advertising Revenue*

IAA Revenue is generated by selling ad inventory on the Company's Apps to third-party advertisers. Advertisers purchase ad inventory either through the Software Platform or through third-party advertising networks ("Ad Networks"). Revenue from the sale of ad inventory through Ad Networks is recognized net of the amounts retained by Ad Networks as the Company is unable to determine the gross amount paid by the advertisers to Ad Networks. The Company recognizes revenue when the ad is displayed to users.

The Company presents taxes collected from customers and remitted to governmental authorities on a net basis.

Disaggregation of Revenue

The following table presents revenue disaggregated by segment and type (in thousands):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| Software Platform Revenue | $ 406,063 | $ 317,540 | $ 760,821 | $ 436,380 |
| In-App Purchase Revenue | 233,625 | 303,268 | 484,953 | 642,740 |
| In-App Advertising Revenue | 110,477 | 155,423 | 219,796 | 322,532 |
| Total Apps Revenue | 344,102 | 458,691 | 704,749 | 965,272 |
| Total Revenue | $ 750,165 | $ 776,231 | $ 1,465,570 | $ 1,401,652 |

23.    On November 8, 2023, the Company published a shareholder letter announcing the Company's financial results for the third quarter ended September 30, 2023. Specifically, the shareholder letter stated the following, in relevant part:

We are thrilled to announce another quarter of solid execution leading to very strong financial results. We exceeded the high-end of our quarterly guidance thanks to our incredible team and unwavering commitment to growing the mobile app ecosystem. ***Our success this quarter was primarily driven by the continued performance of AXON 2.0, the AI-based advertising engine behind our AppDiscovery platform.*** Total revenue for the third quarter was $864 million (+21% yr/ yr), net income was $109 million at a net margin of 13%, and Adjusted EBITDA was $419 million (+63% yr/yr) at an Adjusted EBITDA margin of 49%. During the quarter, we generated $199 million of net cash from operating activities and $194 million of Free Cash Flow. At the end of the third quarter, we had $332 million of cash and cash equivalents.

Our Software Platform business continues to sustain its strong growth trajectory throughout 2023.

We grew Software Platform revenue 24% from last quarter to a record $504 million (+65% yr/yr), and expanded Adjusted EBITDA by 33% from last quarter to $364 million (+91% yr/yr), equal to a 72% Adjusted EBITDA margin. Our Apps business also delivered quarterly growth with revenue increasing 5% from last quarter to $360

million (-11% yr/yr) and Adjusted EBITDA of $55 million (-18% yr/yr), a 15% Adjusted EBITDA margin.

\*                    \*                    \*

### 3Q23
### Financial Overview
ALL COMPARISONS ARE TO 3Q22 UNLESS OTHERWISE NOTED.

**Revenue** was $864 million, an increase of 21%. Software Platform revenue increased to 58% of total revenue compared to 43%.

**Net Income** was $109 million, a net margin of 13% compared to net income of $24 million and a net margin of 3%.

**Adjusted EBITDA[1]** increased 63% to $419 million and Adjusted EBITDA margin increased to 49% from 36%.

**Software Platform** revenue grew 65% to $504 million. Segment Adjusted EBITDA increased 91% to $364 million, a 72% margin.

**Apps** revenue declined 11% to $360 million. Segment Adjusted EBITDA declined 18% to $55 million, a 15% margin.

**Cash Flow:** We generated $199 million million of net cash from operating activities and $194 million of Free Cash Flow[1].

\*                    \*                    \*

**Software Platform Update**

Our persistent focus on execution and innovation strengthened three consecutive quarters of revenue and Adjusted EBITDA growth this year for our Software Platform segment including a 33% sequential increase in Adjusted EBITDA this quarter alone. Over the past two years (3Q21 to 3Q23) Software Platform revenue has more than doubled, achieving an annual run-rate this quarter of over $2 billion.

Moreover, our Software Platform Adjusted EBITDA outpaced our strong revenue growth, illustrating the high flow-through from revenue to Adjusted EBITDA made possible with our Software Platform. Software Platform Adjusted EBITDA in the third quarter comprises nearly 90% of our total Adjusted EBITDA.

In the third quarter, we achieved our highest quarterly Software Platform revenue at $504 million, growing 65% year-over-year and 24% from the second quarter. This growth was driven by AppDiscovery where our successful launch of AXON 2.0 in the second quarter continues to propel our performance.

***During the quarter we benefited from the full quarter impact of our initial AXON 2.0 launch, continued improvements of our technology and an increase in advertiser spend as our clients saw the improved performance of our new AI-enhanced advertising engine. Software Platform Adjusted EBITDA grew 91% year-over-year to $364 million at an Adjusted EBITDA margin of 72%.*** While we remain energized about the opportunities available to improve our Software Platform technology and expand our reach, we are more excited about what this means to our advertising partners, who can benefit from growth through increased spend at better returns.

\*                    \*                    \*

**Apps Update**

In the third quarter, our Apps segment revenue grew 5% from the second quarter to $360 million.

This growth was primarily associated with increased investment in user acquisition ***marketing spend on AppDiscovery as our own studios also saw improvements in***

***efficiency and performance from AXON 2.0.*** Third quarter Apps Adjusted EBITDA was $55 million with Adjusted EBITDA margin slightly declining sequentially to 15% due to an increase in user acquisition spend.

24.     On November 8, 2023, the Company submitted its quarterly report for the period ended September 30, 2023 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The report described the Company's purported revenue sources and corresponding disaggregated revenue as follows, in relevant part:

**Revenue**

***Revenue from Contracts with Customers***

The Company generates Software Platform and Apps revenue. Software Platform revenue is generated primarily from fees collected from advertisers and advertising networks who use the Software Platform. Apps revenue consists of in-app purchase ("IAP") revenue generated from in-app purchases made by users within the Company's apps ("Apps"), and in-app advertising ("IAA") revenue generated from advertisers that purchase ad inventory from Apps.

<u>*Software Platform Revenue*</u>

The vast majority of the Software Platform Revenue is generated through AppDiscovery and MAX, which provide the technology to match advertisers and owners of digital advertising inventory ("Publishers") via auctions at large scale and microsecond-level speeds. The terms for all mobile advertising arrangements are governed by the Company's terms and conditions and generally stipulate payment terms of 30 days subsequent to the end of the month. Substantially all of the Company's contracts with customers are fully cancellable at any time or upon short notice.

Software Platform Revenue is generated by placing ads on mobile applications owned by Publishers. The Company's performance obligation is to provide customers with access to the Software Platform, which facilitates the advertiser's purchase of ad inventory from Publishers. The Company does not control the ad inventory prior to its transfer to the advertiser, because the Company does not have the substantive ability to direct the use of nor obtain substantially all of the remaining benefits from the ad inventory. The Company is not primarily responsible for fulfillment and does not have any inventory risk. The Company is an agent as it relates to the sale of third-party advertising inventory and presents revenue on a net basis. The transaction price is the product of either the number of completions of agreed upon actions or advertisements displayed and the contractually agreed upon price per advertising unit with the advertiser less consideration paid or payable to Publishers. The Company recognizes Software Platform Revenue when the agreed upon action is completed or when the ad is displayed to users. The number of advertisements delivered and completions of agreed upon actions is determined at the end of each month, which resolves any uncertainty in the transaction price during the reporting period.

Software Platform Revenue also includes revenue generated by the Company's mobile application tracking and attribution solutions that is recognized ratably over the subscription period, generally up to twelve months.

\*                            \*                            \*

*In-App Advertising Revenue*

IAA Revenue is generated by selling ad inventory on the Company's Apps to third-party advertisers. Advertisers purchase ad inventory either through the Software Platform or through third-party advertising networks ("Ad Networks"). Revenue from the sale of ad inventory through Ad Networks is recognized net of the amounts retained by Ad Networks as the Company is unable to determine the gross amount paid by the advertisers to Ad Networks. The Company recognizes revenue when the ad is displayed to users.

The Company presents taxes collected from customers and remitted to governmental authorities on a net basis.

Disaggregation of Revenue

The following table presents revenue disaggregated by segment and type (in thousands):

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2023 | 2022 | 2023 | 2022 |
| Software Platform Revenue | $ 504,452 | $ 306,592 | $ 1,265,273 | $ 742,972 |
| In-App Purchase Revenue | 247,309 | 272,437 | 732,262 | 915,177 |
| In-App Advertising Revenue | 112,495 | 134,070 | 332,291 | 456,602 |
| Total Apps Revenue | 359,804 | 406,507 | 1,064,553 | 1,371,779 |
| Total Revenue | $ 864,256 | $ 713,099 | $ 2,329,826 | $ 2,114,751 |

25.    On February 14, 2024, the Company published a shareholder letter announcing the Company's financial results for the fourth quarter and full year ended December 31, 2023. Specifically, the shareholder letter stated the following, in relevant part:

In 2023 we released our advanced AXON 2.0 technology, optimized our gaming studios, and invested in new initiatives to drive future market expansion and long-term growth. ***In 4Q23 there were several key factors driving the growth of our customers and partners including a strong holiday season, year-over-year growth in the mobile app advertising market, our MAX bidding enhancements and the market shift to real-time bidding***. The combination of these factors is helping the market improve advertising efficiency, which we believe will lead to continued compounding growth for our partners.

In the fourth quarter, we generated revenue of $953 million (+36% yr/yr), net income of $172 million at a net margin of 18%, and Adjusted EBITDA of $476 million (+83% yr/yr) at an Adjusted EBITDA margin of 50%. Net cash from operating activities was $344 million, with free cash flow of $340 million. At the end of 4Q23, we had approximately 340 million shares outstanding.

Total revenue for 2023 was $3.3 billion (+17% yr/yr), with net income of $357 million at a net margin of 11%, and Adjusted EBITDA of $1.5 billion (+41% yr/yr) at an Adjusted EBITDA margin of 46%. In 2023 net cash from operating activities was $1.1 billion (+157% yr/yr) with free cash flow of $1.0 billion (+167% yr/yr). At the end of 2023 we had $502 million of cash and cash equivalents. Our team's focus on execution and innovation in 2023 exceeded our expectations, driving double-digit revenue growth in our Software Platform business every quarter this year. Software

Platform revenue grew to a record $1.8 billion (+76% yr/yr) in 2023, generating Adjusted EBITDA of $1.3 billion (+58% yr/yr) at an Adjusted EBITDA margin of 69%.

*                              *                              *

**2023**
**Financial Overview**
ALL COMPARISONS ARE TO 2022 UNLESS OTHERWISE NOTED.

**Revenue** was $3.3 billion, an increase of 17%.

**Software Platform revenue** grew 76% to $1.8 billion. Segment Adjusted EBITDA increased 58% to $1.3 billion, a 69% margin.

**Apps revenue** declined 18% to $1.4 billion. Segment Adjusted EBITDA declined 11% to $227 million, a 16% margin.

**Net Income** was $357 million, a net margin of 11% compared to a net loss of $193 million and a net margin of -7%.

**Adjusted EBITDA** increased 41% to $1.5 billion, an Adjusted EBITDA margin of 46%.

**Cash Flow:** We generated $1.1 billion of net cash from operating activities and $1.0 billion of Free Cash Flow.

*                              *                              *

**4Q23**
**Financial Overview**
ALL COMPARISONS ARE TO 4Q22 UNLESS OTHERWISE NOTED.

**Revenue** was $953 million, an increase of 36%. Software Platform revenue increased to 60% of total revenue compared to 44%.

**Software Platform** revenue grew 88% to $576 million. Segment Adjusted EBITDA increased 126% to $420 million, a 73% margin.

**Apps revenue** decreased 5% to $377 million. Segment Adjusted EBITDA decreased 24% to $56 million, a 15% margin.

**Net Income** was $172 million, a net margin of 18% compared to a net loss of $80 million and a net margin of -11%.

**Adjusted EBITDA** increased 83% to $476 million, an Adjusted EBITDA margin of 50%.

**Cash Flow:** We generated $344 million of net cash from operating activities and $340 million of Free Cash Flow.

*                              *                              *

**Software Platform Update**

*Our Software Platform segment revenue and Adjusted EBITDA grew consecutively every quarter in 2023, driven by our team's commitment to improving the performance of our technology. Over the past five years our annual Software Platform revenue has grown over 9x while maintaining an approximate 70% Adjusted EBITDA margin during that period. In 2023, our Software Platform revenue was $1.8 billion (+76% yr/yr) while Adjusted EBITDA increased to $1.3 billion (+58% yr/yr), an Adjusted EBITDA margin of 69%.*

*In the fourth quarter, we achieved another record quarter with Software Platform revenue of $576 million, growing 88% year-over-year and 14% from the third quarter. The growth was driven by the continued performance of AppDiscovery, as the AXON engine continues to learn and scale.*

During the quarter, we saw advertisers spend more as a result of improved performance from our AI-enhanced advertising engine. Software Platform Adjusted EBITDA grew 126% year-over-year to $420 million at an Adjusted EBITDA margin of 73%. We remain excited and committed to growing the advertising ecosystem as we work towards expanding our Software Platform reach in 2024.

26.     On February 26, 2024,  the Company submitted its annual report for the fourth quarter and full year ended December 31, 2023 on a Form 10-K filed with the SEC, affirming the previously reported financial results. The report described the Company's purported revenue sources and corresponding disaggregated revenue as follows, in relevant part:

> **Revenue from Contracts with Customers**—The Company generates Software Platform and Apps revenue. Software Platform revenue is generated primarily from fees collected from advertisers including advertising networks who use the Software Platform. Apps revenue consists of in-app purchase ("IAP") revenue generated from in-app purchases made by users within the Company's apps ("Apps"), and in-app advertising ("IAA") revenue generated from third-party advertisers that purchase ad inventory from Apps.

> *Software Platform Revenue*

> The vast majority of the Software Platform Revenue is generated through AppDiscovery and MAX, which provide the technology to match advertisers and owners of digital advertising inventory ("Publishers") via auctions at large scale and microsecond-level speeds. The terms for all mobile advertising arrangements are governed by the Company's terms and conditions and generally stipulate payment terms of 30 days subsequent to the end of the month. Substantially all of the Company's contracts with customers are fully cancellable at any time or upon a short notice.

> The Company's performance obligation is to provide customers with access to the Software Platform, which facilitates the advertiser's purchase of ad inventory from Publishers. The Company does not control the ad inventory prior to its transfer to the advertiser, because the Company does not have the substantive ability to direct the use of nor obtain substantially all of the remaining benefits from the ad inventory. The Company is not primarily responsible for fulfillment. The Company is an agent as it relates to the sale of third-party advertising inventory and presents revenue on a net basis. The transaction price is the product of either the number of completions of agreed upon actions or advertisements displayed and the contractually agreed upon price per advertising unit with the advertiser less consideration paid or payable to Publishers. The Company recognizes Software  Platform Revenue when the agreed upon action is completed or when the ad is displayed to users. The number of advertisements delivered and completions of agreed upon actions is determined at the end of each month, which resolves any uncertainty in the transaction price during the reporting period.

> Software Platform Revenue also includes revenue generated from **Adjust's measurement and analytics marketing platform** that is recognized ratably over the subscription period of generally up to twelve months. Revenue from other services under Software Platform was not material.

*              *              *

> *In-App Advertising Revenue*

> IAA Revenue is generated by selling ad inventory on the Company's Apps to third-party advertisers. Advertisers purchase ad inventory either through the Software Platform or through third-party advertising networks ("Ad Networks"). Revenue

from the sale of ad inventory through Ad Networks is recognized net of the amounts retained by Ad Networks as the Company is unable to determine the gross amount paid by the advertisers to Ad Networks. The Company recognizes revenue when the ad is displayed to users.

The Company presents taxes collected from customers and remitted to governmental authorities on a net basis.

**Disaggregation of Revenue**

The following table presents revenue disaggregated by segment and type (in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2023** | **2022** | **2021** |
| Software Platform Revenue | $ 1,841,762 | $ 1,049,167 | $ 673,952 |
| In-App Purchases Revenue | 989,007 | 1,179,133 | 1,458,595 |
| In-App Advertising Revenue | 452,318 | 588,758 | 660,557 |
| Total Apps Revenue | 1,441,325 | 1,767,891 | 2,119,152 |
| Total Revenue | $ 3,283,087 | $ 2,817,058 | $ 2,793,104 |

27.      On May 8, 2024, the Company published a shareholder letter announcing the Company's financial results for the first quarter ended March 31, 2024. Specifically, the shareholder letter stated the following, in relevant part:

The first quarter marked a strong start to 2024 with outstanding business performance driven by the continued improvement of our AXON technology. We were encouraged to see improvement in the app advertising market with another quarter of year-over-year market growth and a continued shift to real-time bidding. ***By continuing to innovate and improve our AXON technology, we remain committed to driving growth not just for our company, but for the entire ecosystem we support.***

In the first quarter, we generated revenue of $1.06 billion (+48% yr/yr), net income of $236 million at a net margin of 22%, and Adjusted EBITDA of $549 million (+101% yr/yr) at an Adjusted EBITDA margin of 52%. Net cash from operating activities was $393 million, with free cash flow of $388 million. At the end of 1Q24, we had $436 million in cash and cash equivalents and approximately 329 million shares of our Class A common stock outstanding.

Our Software Platform revenue grew for the fifth consecutive quarter to a record $678 million in Q1, representing 18% growth from last quarter (+91% yr/yr), with Adjusted EBITDA expanding 17% from last quarter to $492 million (+125% yr/yr) at an Adjusted EBITDA margin of 73%.

1

\*                        \*                        \*

2

**1Q24**
**Financial Overview**
ALL COMPARISONS ARE TO 1Q23  UNLESS OTHERWISE NOTED.

3

**Revenue** was $1.06 billion, an increase of 48%.

**Net Income** was $236 million, a net margin of 22% compared to a net loss of $4.5 million and a net margin of -1%.

4

5

**Software Platform** revenue grew 91% to $678 million. Segment Adjusted EBITDA increased 125% to $492 million, a 73% margin.

**Adjusted EBITDA** increased 101% to $549 million, an Adjusted EBITDA margin of 52%.

6

**Apps** revenue grew 5% to $380 million. Segment Adjusted EBITDA increased 3% to $57 million, a 15% margin.

**Cash Flow:** We generated $393 million of net cash from operating activities and $388 million of Free Cash Flow.

7

8

\*                        \*                        \*

9

**Software Platform Update**

10

*Our Software Platform segment grew significantly in the first quarter with Software Platform revenue of $678 million, up 91% year-over-year driven by further improvement of our AXON technology, which continues to benefit from ongoing self-learning, additional data, and engineering enhancements.* Our technology improvements contributed to greater return on ad spend (ROAS) for our advertisers, leading to increased investment. Continued discipline and a relatively fixed cost-base led to exceptional flow-through from revenue to Software Platform Adjusted EBITDA during the quarter, with year-over-year growth of 125% to $492 million at an Adjusted EBITDA margin of 73%.

11

12

13

14

15

28.     On May 8, 2024, the Company submitted its quarterly report for the period ended

16

March 31, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial

17

results. The report described the Company's purported revenue sources and corresponding

18

disaggregated revenue as follows, in relevant part:

19

**Revenue**

20

***Revenue from Contracts with Customers***

21

The Company generates Software Platform and Apps revenue. Software Platform revenue is generated primarily from fees collected from advertisers and advertising networks who use the Software Platform. Apps revenue consists of in-app purchase ("IAP") revenue generated from in-app purchases made by users within the Company's apps ("Apps"), and in-app advertising ("IAA") revenue generated from advertisers that purchase ad inventory from Apps.

22

23

24

*Software Platform Revenue*

25

The vast majority of the Software Platform Revenue is generated through AppDiscovery and MAX, which provide the technology to match advertisers and owners of digital advertising inventory ("Publishers") via auctions at large scale and microsecond-level speeds. The terms for all mobile advertising arrangements are governed by the Company's terms and conditions and generally stipulate payment terms of 30 days subsequent to the end of the month. Substantially all of the

26

27

28

Company's contracts with customers are fully cancellable at any time or upon short notice.

The Company's performance obligation is to provide customers with access to the Software Platform, which facilitates the advertiser's purchase of ad inventory from Publishers. The Company does not control the ad inventory prior to its transfer to the advertiser, because the Company does not have the substantive ability to direct the use of nor obtain substantially all of the remaining benefits from the ad inventory. The Company is not primarily responsible for fulfillment and does not have any inventory risk. The Company is an agent as it relates to the sale of third-party advertising inventory and presents revenue on a net basis. The transaction price is the product of either the number of completions of agreed upon actions or advertisements displayed and the contractually agreed upon price per advertising unit with the advertiser less consideration paid or payable to Publishers. The Company recognizes Software Platform Revenue when the agreed upon action is completed or when the ad is displayed to users. The number of advertisements delivered and completions of agreed upon actions is determined at the end of each month, which resolves any uncertainty in the transaction price during the reporting period.

Software Platform Revenue also includes revenue generated from Adjust's measurement and analytics marketing platform that is recognized ratably over the subscription period, generally up to twelve months. Revenue from other services within the Software Platform was not material.

                    *                    *                    *

*In-App Advertising Revenue*

IAA Revenue is generated by selling ad inventory on the Company's Apps to third-party advertisers. Advertisers purchase ad inventory either through the Software Platform or through third-party advertising networks ("Ad Networks"). Revenue from the sale of ad inventory through Ad Networks is recognized net of the amounts retained by Ad Networks as the Company is unable to determine the gross amount paid by the advertisers to Ad Networks. The Company recognizes revenue when the ad is displayed to users.

The Company presents taxes collected from customers and remitted to governmental authorities on a net basis.

**Disaggregation of Revenue**

The following table presents revenue disaggregated by segment and type (in thousands):

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2024 | 2023 |
| Software Platform Revenue | $    678,370 | $    354,758 |
| In-App Purchase Revenue | 259,196 | 251,328 |
| In-App Advertising Revenue | 120,549 | 109,319 |
| Total Apps Revenue | 379,745 | 360,647 |
| Total Revenue | $ 1,058,115 | $    715,405 |

29.    On August 7, 2024, the Company published a shareholder letter announcing the Company's financial results for the second quarter ended June 30, 2024. Specifically, the shareholder letter stated the following, in relevant part:

*In the second quarter of 2024, we celebrated the first anniversary of our enhanced AXON technology. Reflecting on the past year, we're thrilled by the significant growth AXON drove for our advertising partners. AXON enhancements through ongoing self-learning and our dedicated development efforts have fueled robust business performance this quarter.*

In the second quarter, we generated revenue of $1.08 billion (+44% yr/yr), net income of $310 million (+286% yr/yr) at a net margin of 29%, and Adjusted EBITDA of $601 million (+80% yr/yr) at an Adjusted EBITDA margin of 56%. Net cash from operating activities was $455 million (+98% yr/ yr), with Free Cash Flow of $446 million (+102% yr/yr). At the end of 2Q24, we had $460 million in cash and cash equivalents and approximately 334 million shares of our Class A and Class B common stock outstanding.

Our Software Platform revenue grew consecutively in Q2 to $711 million (+75% yr/yr), with Software Platform Adjusted EBITDA expanding from last quarter to $520 million (+91% yr/yr) at an Adjusted EBITDA margin of 73%.

\*                    \*                    \*



2Q24
**Financial Overview**
ALL COMPARISONS ARE TO 2Q23 UNLESS OTHERWISE NOTED.

**Revenue** was $1.08 billion, an increase of 44%.

**Net Income** was $310 million, a net margin of 29% compared to a net income of $80 million and a net margin of 11%.

**Software Platform** revenue grew 75% to $711 million. Segment Adjusted EBITDA increased 91% to $520 million, a 73% Adjusted EBITDA margin.

**Adjusted EBITDA** increased 80% to $601 million, an Adjusted EBITDA margin of 56%.

**Apps** revenue grew 7% to $369 million. Segment Adjusted EBITDA increased 33% to $81 million, a 22% margin.

**Cash Flow:** We generated $455 million of net cash from operating activities and $446 million of Free Cash Flow.

\*                    \*                    \*

**Software Platform Update**

Our Software Platform segment continued to grow consecutively in the second quarter, with Software Platform revenue of $711 million, up 75% year-over-year, driven by AXON improvements through ongoing self-learning and directed model enhancements. Our technology contributed to enhanced growth opportunities for our advertising partners at greater scale.

Software Platform Adjusted EBITDA grew 91% year-over-year to $520 million at an Adjusted EBITDA margin of 73% with ongoing cost management efforts enabling significant flow-through of revenue growth to Adjusted EBITDA.

30.    On August 7, 2024, the Company submitted its quarterly report for the period ended June 30, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The report described the Company's purported revenue sources and corresponding disaggregated revenue as follows, in relevant part:

**Revenue**

***Revenue from Contracts with Customers***

The Company generates Software Platform and Apps revenue. Software Platform revenue is generated primarily from fees collected from advertisers and advertising networks who use the Software Platform. Apps revenue consists of in-app purchase ("IAP") revenue generated from in-app purchases made by users within the Company's apps ("Apps"), and in-app advertising ("IAA") revenue generated from advertisers that purchase ad inventory from Apps.

*Software Platform Revenue*

The vast majority of the Software Platform Revenue is generated through AppDiscovery and MAX, which provide the technology to match advertisers and owners of digital advertising inventory ("Publishers") via auctions at large scale and microsecond-level speeds. The terms for all mobile advertising arrangements are governed by the Company's terms and conditions and generally stipulate payment terms of 30 days subsequent to the end of the month. Substantially all of the Company's contracts with customers are fully cancellable at any time or upon short notice.

The Company's performance obligation is to provide customers with access to the Software Platform, which facilitates the advertiser's purchase of ad inventory from Publishers. The Company does not control the ad inventory prior to its transfer to the advertiser, because the Company does not have the substantive ability to direct the use of nor obtain substantially all of the remaining benefits from the ad inventory. The Company is not primarily responsible for fulfillment and does not have any inventory risk. The Company is an agent as it relates to the sale of third-party advertising inventory and presents revenue on a net basis. The transaction price is the product of either the number of completions of agreed upon actions or advertisements displayed and the contractually agreed upon price per advertising unit with the advertiser less consideration paid or payable to Publishers. The Company recognizes Software Platform Revenue when the agreed upon action is completed or when the ad is displayed to users. The number of advertisements delivered and completions of agreed upon actions is determined at the end of each month, which resolves any uncertainty in the transaction price during the reporting period.

Software Platform Revenue also includes revenue generated from Adjust's measurement and analytics marketing platform that is recognized ratably over the subscription period, generally up to twelve months. Revenue from other services within the Software Platform was not material.

\*                    \*                    \*

*In-App Advertising Revenue*

IAA Revenue is generated by selling ad inventory on the Company's Apps to third-party advertisers. Advertisers purchase ad inventory either through the Software Platform or through third-party advertising networks ("Ad Networks"). Revenue from the sale of ad inventory through Ad Networks is recognized net of the amounts retained by Ad Networks as the Company is unable to determine the gross amount paid by the advertisers to Ad Networks. The Company recognizes revenue when the ad is displayed to users.

The Company presents taxes collected from customers and remitted to governmental authorities on a net basis.

*Disaggregation of Revenue*

The following table presents revenue disaggregated by segment and type (in thousands):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2024 | 2023 | 2024 | 2023 |
| Software Platform Revenue | $ 711,015 | $ 406,063 | $ 1,389,385 | $ 760,821 |
| In-App Purchase Revenue | 250,570 | 233,625 | 509,766 | 484,953 |
| In-App Advertising Revenue | 118,534 | 110,477 | 239,083 | 219,796 |
| Total Apps Revenue | 369,104 | 344,102 | 748,849 | 704,749 |
| Total Revenue | $ 1,080,119 | $ 750,165 | $ 2,138,234 | $ 1,465,570 |

31.     On November 6, 2024, the Company published a shareholder letter announcing the Company's financial results for the third quarter ended September 30, 2024. Specifically, the shareholder letter stated the following, in relevant part:

> *We had another fantastic quarter in Q3. Our AXON models continue to improve through self- learning and, more importantly this quarter, from technology enhancements by our engineering team. As we continue to improve our models our advertising partners are able to successfully spend at a greater scale.* We're proud to be a catalyst to reinvigorating growth in our industry.
>
> In the third quarter, we generated revenue of $1.20 billion (+39% year-over-year), net income of $434 million (+300% year-over-year) at a net margin of 36%, and Adjusted EBITDA of $722 million (+72% year-over-year) at an Adjusted EBITDA margin of 60%. We generated net cash from operating activities of $551 million (+177% year-over-year) and Free Cash Flow of $545 million (+182% year-over-year). At the end of 3Q24, we had $568 million in cash and cash equivalents and 335 million shares of our Class A and Class B common stock outstanding.
>
> Our Software Platform revenue grew in the third quarter to $835 million (+66% year-over-year) and Software Platform Adjusted EBITDA expanded to $653 million (+79% year-over-year) at an Adjusted EBITDA margin of 78%.
>
> During the third quarter, we retired and withheld a total of 5.0 million shares of our Class A common stock for a total cost of $437 million1. Given our confidence in AppLovin's future, our board of directors has increased our share repurchase authorization by an incremental $2.0 billion, increasing our total aggregate remaining authorization to $2.3 billion, with future repurchases to be funded from Free Cash Flow.

                    *                    *                    *

> 3Q24
> **Financial Overview**
> ALL COMPARISONS ARE TO 3Q23 UNLESS OTHERWISE NOTED.
>
> **Revenue** was $1.20 billion, an increase of 39%.
>
> **Net Income** was $434 million, a net margin of 36% compared to a net income of $109 million and a net margin of 13%.
>
> **Software Platform** revenue grew 66% to $835 million. Segment Adjusted EBITDA increased 79% to $653 million, a 78% Adjusted EBITDA margin.
>
> **Adjusted EBITDA** increased 72% to $722 million, an Adjusted EBITDA margin of 60%.
>
> **Apps** revenue grew 1% to $363 million. Segment Adjusted EBITDA increased 24% to $68 million, a 19% margin.
>
> **Cash Flow:** We generated $551 million of net cash from operating activities and $545 million of Free Cash Flow.

                    *                    *                    *

**Software Platform Update**

Our Software Platform segment continued to grow in the third quarter, with Software Platform revenue of $835 million, up 66% year-over-year, driven by continued development of our AXON engine through ongoing self-learning and directed model enhancements. These technology enhancements allowed our advertising partners to further increase the scale of their spend on our platform while consistently achieving their return on ad spend ("ROAS") goals.

Software Platform Adjusted EBITDA grew 79% year-over-year to $653 million at an Adjusted EBITDA margin of 78% reflecting continued management of operating leverage as we scale. As we have noted in the past, our margins for this business will fluctuate on a quarterly basis, primarily driven by our investment in infrastructure as we continue to scale and secure data center capacity to support future growth.

Our core advertising business now represents substantially all of our Software Platform revenue and future focus for the company. Starting with our next shareholder letter and Annual Report on SEC Form 10-K, we will rename our "Software" Platform and associated revenue to "Advertising" to better align with the nature of this business.

32.     On November 6, 2024, the Company submitted its quarterly report for the period ended September 30, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The report described the Company's purported revenue sources and corresponding disaggregated revenue as follows, in relevant part:

**Revenue**

***Revenue from Contracts with Customers***

The Company generates Software Platform and Apps revenue. Software Platform revenue is generated primarily from fees collected from advertisers and advertising networks who use the Software Platform. Apps revenue consists of in-app purchase ("IAP") revenue generated from in-app purchases made by users within the Company's apps ("Apps"), and in-app advertising ("IAA") revenue generated from advertisers that purchase ad inventory from Apps.

***Software Platform Revenue***

The vast majority of the Software Platform Revenue is generated through AppDiscovery and MAX, which provide the technology to match advertisers and owners of digital advertising inventory ("Publishers") via auctions at large scale and microsecond-level speeds. The terms for all mobile advertising arrangements are governed by the Company's terms and conditions and generally stipulate payment terms of 30 days subsequent to the end of the month. Substantially all of the Company's contracts with customers are fully cancellable at any time or upon short notice.

The Company's performance obligation is to provide customers with access to the Software Platform, which facilitates the advertiser's purchase of ad inventory from Publishers. The Company does not control the ad inventory prior to its transfer to the advertiser, because the Company does not have the substantive ability to direct the

use of nor obtain substantially all of the remaining benefits from the ad inventory. The Company is not primarily responsible for fulfillment and does not have any inventory risk. The Company is an agent as it relates to the sale of third-party advertising inventory and presents revenue on a net basis. The transaction price is the product of either the number of completions of agreed upon actions or advertisements displayed and the contractually agreed upon price per advertising unit with the advertiser less consideration paid or payable to Publishers. The Company recognizes Software Platform Revenue when the agreed upon action is completed or when the ad is displayed to users. The number of advertisements delivered and completions of agreed upon actions is determined at the end of each month, which resolves any uncertainty in the transaction price during the reporting period.

Software Platform Revenue also includes revenue generated from Adjust's measurement and analytics marketing platform that is recognized ratably over the subscription period, generally up to twelve months. Revenue from other services within the Software Platform was not material.

*                    *                    *

### In-App Advertising

Revenue IAA Revenue is generated by selling ad inventory on the Company's Apps to third-party advertisers. Advertisers purchase ad inventory either through the Software Platform or through third-party advertising networks ("Ad Networks"). Revenue from the sale of ad inventory through Ad Networks is recognized net of the amounts retained by Ad Networks as the Company is unable to determine the gross amount paid by the advertisers to Ad Networks. The Company recognizes revenue when the ad is displayed to users.

The Company presents taxes collected from customers and remitted to governmental authorities on a net basis.

### Disaggregation of Revenue

The following table presents revenue disaggregated by segment and type (in thousands):

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2024 | 2023 | 2024 | 2023 |
| Software Platform Revenue | $     835,186 | $     504,452 | $     2,224,571 | $     1,265,273 |
| In-App Purchase Revenue | 246,344 | 247,309 | 756,110 | 732,262 |
| In-App Advertising Revenue | 116,705 | 112,495 | 355,788 | 332,291 |
| Total Apps Revenue | 363,049 | 359,804 | 1,111,898 | 1,064,553 |
| Total Revenue | $     1,198,235 | $     864,256 | $     3,336,469 | $     2,329,826 |

33.     On February 12, 2025, the Company issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2024. Specifically, the press release stated the following, in relevant part:

**Fourth Quarter and Full Year 2024 Financial Highlights:**

| (In thousands, except percentages) | Quarter Ended December 31, | | | Year Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2024 | 2023 | % Change | 2024 | 2023 | % Change |
| Advertising Revenue[1] | $999,487 | $576,489 | 73% | $3,224,058 | $1,841,762 | 75% |
| Apps Revenue | 373,292 | 376,772 | (1)% | 1,485,190 | 1,441,325 | 3% |
| Total Revenue | 1,372,779 | 953,261 | 44% | 4,709,248 | 3,283,087 | 43% |
| Advertising Adjusted EBITDA | 776,699 | 420,008 | 85% | 2,442,597 | 1,275,705 | 91% |
| Apps Adjusted EBITDA | 71,325 | 56,147 | 27% | 277,008 | 226,953 | 22% |
| Adjusted EBITDA | $848,024 | $476,155 | 78% | $2,719,605 | $1,502,658 | 81% |
| Net Income | $599,204 | $172,233 | 248% | $1,579,776 | $356,711 | 343% |

**Additional Financial Highlights:**

● Net cash from operating activities was $701 million and $2.1 billion, and Free Cash Flow was $695 million and $2.1 billion for the fourth quarter and full year 2024, respectively.

● During the fourth quarter and full year 2024, we retired and withheld 1.6 million and 25.7 million of our Class A common stock, for a total cost of $0.5 billion and $2.1 billion, respectively2. At the end of 4Q 2024, we had 340 million shares of our Class A and Class B common stock outstanding.

34.     The above statements identified in ¶¶ 19-33 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that AppLovin's app segment relied on the systematic exploitation of fraudulent advertising practices including 'clickjacking' and 'click spoofing'; (2) that AppLovin's advertising and e-commerce program relied on intercepting and appropriating advertising attribution credit; (3) that AppLovin employed a backdoor installation scheme to force unwanted apps on customers; (4) that as a result of the foregoing, AppLovin's revenue was falsely inflated; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**<u>Disclosures at the End of the Class Period</u>**

35.     On February 26, 2025, before the market opened, Culper Research published a report entitled "AppLovin Corporation (NADSAQ:APP): Force-Feeding Users with Silent Backdoor Installs and Copying Meta's Homework" (the "Culper Report"). The Culper Report alleged, among other things, that "AppLovin's nascent e-commerce initiative is a smoke and mirrors game that the Company has rigged" by "requir[ing] advertisers first demonstrate proof of $600,000 per month on Meta, so that AppLovin – through its MAX mediation platform – can 'see' ads shown to Meta users

in order to insert itself into the process and take credit for the sale." The Culper Report further alleged that AppLovin's App segment is dependent on the "systematic exploitation of app permissions that enable advertisements themselves to force-feed silent, backdoor app installations directly onto users' phones" to "illicitly inflate the Company's mobile gaming result." The Culper Report concluded that because the Company's "gaming promotion is unsustainable, and the Company has thus hung its hat on e-commerce" where it operates a similarly "rigged" operation.

36.     The Culper Report, as quoted above, specifically stated, in relevant part, the following regarding AppLovin's "rigged" app and advertising practices:

> Having peaked at a market capitalization of $173 billion, **we believe AppLovin could go down as the single largest US stock promotion unraveling since at least the GFC**. We are short for two reasons.

> - First, we believe AppLovin's recent success in mobile gaming stems from ***the systematic exploitation of app permissions that enable advertisements themselves to force-feed silent, backdoor app installations directly onto users' phones, with just a single click*** – an event that is often inadvertent thanks to the Company's notorious UX gimmicks. This is AdTech's version of "the truck rolling down the hill." As AppLovin is paid largely on a per-install basis, each illicit install translates directly to profit.

> - Second, ***we believe AppLovin's nascent e-commerce initiative is a smoke and mirrors game that the Company has rigged in its favor from the start***. AppLovin must maintain a tight rein on advertisers it allows onto the platform, lest the narrative slip. To that end, the Company requires advertisers first demonstrate proof of ***$600,000 per month on Meta, so that AppLovin – through its MAX mediation platform – can "see" ads shown to Meta users in order to insert itself into the process and take credit for the sale.*** AppLovin then cajoles advertisers into spreading the news of their success, drumming up excitement. The Company has parlayed this excitement into a waitlist, where sources say the Company is now again stacking the deck with advertisers with low SKU counts, those without robust data science teams (who can more easily call bullshit), or those who are willing to use Adjust, AppLovin's own attribution platform that allows the Company to "grade their own homework."

> *                *                *

> **The Mechanics of AppLovin's Backdoor Installation Scheme: Unwanted Apps Force-Fed to Users Directly from Ads. Pure Profit to AppLovin**

> From late 2022 through at least late 2024, AppLovin simultaneously smuggled a single permission into thousands of their own advertising customers apps via MAX SDK updates. The permission allows the apps to "bind" to AppHub, effectively borrowing or inheriting AppHub's one-click direct install permissions as their own. This permission is presently embedded within many of the most popular free-to-play games in the world, including Subway Surfers, 8 Ball Pool, Wordscapes, and Angry Birds 2

1                          *                    *                    *

2  **AppLovin's e-Commerce Push is a Smoke and Mirrors Game, Rigged from the Start**

3

4  ***We believe AppLovin is entirely aware that its gaming promotion is unsustainable, and the Company has thus hung its hat on e-commerce.*** CEO Adam Foroughi claims that e-commerce is the "*best product*" he's ever seen released by AppLovin,

5  touting "*a lot of proof of life*" and "*really positive results*" from pilot tests that began late last year. Investors have cheered these results on, but we believe AppLovin has

6  been playing a rigged game from the start. We think there's meaningful risk that Meta takes action.

7

8  **AppLovin Requires Customers First Spend Big on Meta. Why? We Believe It's To Steal Attribution**

9  Public comments from advertisers mention AppLovin requires significant minimum spend on Meta to gain eligibility to the program, which we confirmed independently

10  from multiple industry sources.

11  "*...they're currently only allowing advertisers into the program who spend $600k/mo or more on Meta.*"

12

13  "*...for ecom, you currently need to be spending $600k/mo on meta to be considered...*"

14  "*Smaller or less established brands might not be able to adapt to a new channel quite as easily, or be able to afford the minimum $20,000 per day ad spend AppLovin*

15  *requires at this time.*"

16  The Company doesn't appear to publicly disclose this requirement to investors, let alone provide an explanation of why it exists. We anticipate that AppLovin will

17  likely argue that the requirement is there to ensure high-quality program participants, we think it serves a more underhanded purpose. It's unclear to us why AppLovin

18  would require its users to rely on any other platform at all. Meta certainly doesn't require advertisers to spend on AppLovin first, so the Company's reliance on Meta

19  is telling.

20  Several former AppLovin employees and competitors suggested to us that the true purpose likely relates back to AppLovin's ability to "see" Meta's existing

21  advertising, thanks to the Company's ownership of the MAX mediation layer. As such, AppLovin can quite literally copy Meta's homework.

22

23  "*The budget is enormous, which means it's going broad spend across Meta. Which then means, they're [AppLovin is] able to collect those intent signals, probably through Adjust apps that are being tracked, and then take the credit. I don't trust it*

24  *at all. There's no way.*" – Former Adjust Employee

25  "*They see everything... They could be playing attribution games. People that Meta targeted on their site, [AppLovin] might get the attribution...*" – AppLovin

26  Competitor

27          37.    Also on February 26, 2025, at approximately 10 AM EST, Fuzzy Panda Research

28  published a report entitled "AppLovin (APP) – Formers Allege Ad Fraud; Is DTC Hype Actually

'Stealing' Meta's Data" (the "Fuzzy Panda Report"). The Fuzzy Panda Report detailed the manner in which AppLovin's e-commerce pilot program operates its rigged operation by "reverse engineer[ing] Meta's targeting methods" in order to "steal" referral credits for targeting advertisers. The Fuzzy Panda Report further detailed the manner in which the Company's "impossibly high CTRs (click-thru rates) of 30-40%, 10x the industry norms" are the product of what industry experts can only describe as "Ad Fraud." The Fuzzy Panda Report also detailed the manner in which that Company inflates key metrics, and monetizes "fake activity" including using "ads which are programmed to 'click themselves' and open the App Store." Specifically, the Fuzzy Panda Report stated the following, in relevant part:

But experts say the early e-commerce success came from **"Copying Meta's Homework"** by **"reverse engineering"** **Meta's data.**

○ Experts said "Facebook is getting the great ROAS… and **AppLovin is just stealing the credit.**"

We were told AppLovin e-commerce playbook reverse engineer's Meta's data in the following way:

○ APP convinces e-com customers to use an AppLovin SDK for mediation.

○ APP requires $600k of monthly Ad spend to join the beta, which doesn't make sense.

○ This allows AppLovin to "peek" at a large enough sample of Meta's successful ads via their mediation platform.

○ APP allegedly then knows which customers are most likely to convert.

○ APP's MAX ad auction bidding platform then gives them a real-time view into Meta's $ bids and values for each consumer.

○ APP also requires E-com companies to use the exact same Meta ads enabling AppLovin to serve up the same winning ads that Meta would have.

○ AppLovin allegedly combines all these data points with 3rd party data brokers and an AppLovin tracking IDs to **reverse engineer Meta's valuable data**.

○ This apparently allows AppLovin to know which consumers are the likeliest to **convert and then front-run Meta.**

We uncovered a **confidential study** which found an **impossibly high correlation >12.7 std deviations between AppLovin e-commerce targeting & Meta's**.

○ E-com founders told us of similar experiences "**When Meta dips in performance, AppLovin is also dipping in performance.**"

Meta Senior Executives said if/when AppLovin is caught **"Meta will shut it down."**

AppLovin has impossibly high CTRs (click-thru rates) of 30-40%, 10x the industry norms. Formers and Experts told us this was obvious evidence of what they best described as **"Ad Fraud**."

We played AppLovin games and experienced the shady ads first hand and discovered:

> ○ **"Manipulative End Card Practices"** in ads where close buttons "X" and skip ">>" do the exact opposite and instead open the App Store.

> ○ Ad Experts told us "[**AppLovin] is making money on fake activity**."

> ○ Ads which are programmed to "click themselves" and open the App Store. We saw this in the code too.

> ○ Multiple other dark ad practices, like unreadable ads and UX tricks meant to coerce an unintentional install.

> ○ Experts say the shady ad tactics are obvious due to impossibly high CTRs (click thru rates).

*          *          *

**Experts Say AppLovin Is Copying Meta's Targeting Data in DTC E-Commerce Push**

**Experts Believe AppLovin is "Stealing" Meta's Data**

**Confidential Study Claims to Corroborate Theft of META's Data**

**AppLovin Insists E-Com clients Advertise on Meta – And Use the Same Ads on Both Platforms**

"Facebook is getting the great return on ad spend and **AppLovin is just stealing the credit**"

*~ Ad Fraud Expert C*

How is AppLovin suddenly able to get great metrics and target e-commerce customers with results that closely match Meta's?

It seems too good to be true, and we think it is. So do experts. Advertising experts told us that **AppLovin was essentially copying its homework from Meta**, the industry leader in mobile e-com advertising. We spoke to multiple former and current senior Meta employees and they told us there is no way that the relationship is symbiotic, and that Meta likely would not have any need for AppLovin's data.

Why would AppLovin insist its e-commerce customers spend >$600k a month on Meta advertising and use their top Meta ads with AppLovin?

**Experts Explain How AppLovin Could "Steal" Meta's Data**

Multiple AdTech experts said they think the reason AppLovin's e-com ads produce ROAS similar to Meta's is likely rooted in AppLovin having found a creative solution for how to harness and piggyback on Meta's user PII and rich targeting data.

"**They're taking a bunch of different data points that Meta sends in different contexts.** And then if you combine them together, **it creates a persistent identifier.**"

*~Ad Executive D*

Experts first explained that Meta does not need AppLovin. Second, they told us that these incremental ad dollars to AppLovin are essentially directly coming from Meta's bottom-line. Which is the exact opposite to what Adam Foroughi told investors in the Q4-2024 earnings call.

Below is our best effort at summarizing multiple ad tech experts' viewpoints on the very complicated way that AppLovin reverse engineers Meta's targeting methods:

They explained their theory of how they believe that AppLovin is able to see who Meta is targeting with specific ads. AppLovin sees the real-time prices Meta is bidding on the AppLovin "MAX" platform. That data is one of the keys for AppLovin to "copy" or essentially "reverse engineer" Meta's targeting. The experts believed this is why it is essential that AppLovin advertisers also spend $600k a month on Meta – AppLovin needs the same customers so it can replicate Meta's targeting strategy for each brand.

The required Meta ad spend could be so there is a significantly significant sample size of Meta's data flowing through AppLovin's mediation platform. Thus, AppLovin can see which Meta Ads have been winning via mediation and also see exactly who the highest value targets are via current Meta bids on the AppLovin's ad auction network. Having the same ads makes it even easier for AppLovin.

The experts told us that AppLovin likely then combines the Meta bid information, the AppLovin device fingerprint, and data being bought from third party data brokers (that includes a vast amount of personal information) to essentially "steal" Meta's data on consumers. AppLovin then can use that info to enhance their own fingerprint of a user and then bid similar prices for users when targeting them with AppLovin served ads.

*                    *                    *

**Formers Allege Ad-Fraud – APP Caught Using Fake Clicks & Other Dirty Tricks To 'Game' Installs**

**Shady Ad Practices**

**Clickjacking & Click Spoofing? = Monetization of Mistaps? Deliberate False Engagement?**

**Code Reveals AppLovin Counting FAKE Clicks & Downloads**

"**Everybody in the industry knows that AppLovin** is full of sh*t and that **it's fraudulent**."

*~Former AppLovin Anti-Fraud Executive B*

We interviewed a multitude of industry and ad fraud experts who consistently told us that AppLovin is deeply engaged in **"Ad Fraud."** We experienced AppLovin's shady ad practices first-hand. We played the games, we analyzed the data APP collected from us, and we discovered a multitude of dark business practices ad fraud experts told us is **"100% fraud."**

AppLovin primarily charges advertisers on ROAS (Return on Ad Spend) basis or on a Cost Per Install (CPI) or a CPA (Cost per Action) basis. But every accidental mis-click that causes an app installation can lead to a real user, and that is why AppLovin appears to be employing every manipulative ad technique in the book.

These bad ad practices also put AppLovin in a position to claim credit via Adjust, the mediation network it owns, which cannibalizes what would have otherwise been organic free installs for independent gaming companies.

We engaged renowned ad fraud researcher Ben Edelman — previously HBS faculty member, later a Chief Economist at Microsoft to help us analyze some of AppLovin's ad practices.

"I encountered a significant number of elements to cause **inadvertent ad clicks**. First, Applovin routinely showed **ads with fake user interface elements** including instructions like ads reading "drag to move" or "swipe to run", seemingly playable right there within the ad, but actually the play features didn't work.  If a user followed the text instructions within the ad to, supposedly, interact with the ad, **the ad instead opened Google Play to install the game**.  Second, Applovin ads **intentionally blocked closing and exiting an ad,** including presenting these buttons only with a delay and alternating between different corners of the ad.

*~Ben Edelman*

**Dark Ad Practices We Experienced Included:**

Testing games revealed the AppLovin **SDK sending messages to its servers that appear to be false interactions**

Clickjacking/Click Spoofing?

> o   User hit "X" to close = ad interaction recorded + opened App Store.

> o   User hits ">>" to skip = ad interaction recorded + opened App Store.

Fake Clicks = more Downloads?

> o   User takes NO action = ad interaction recorded + opened App Store.

> o   Unplayable in-game ads that coerce consumers to click download.

False Impressions?

> o   Ads that are too small to see; yet APP appears to record an impression.

> o   Game design that causes user to swipe through an ad

Ads that bypassed Child Protection settings.

38.     On this news, the Company's share price fell $46.06, or 12.2%, to close at $331.00 per share on February 26, 2025, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired AppLovin securities between May 10, 2023 and February 25, 2025, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

40.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, AppLovin's shares actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of AppLovin shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by AppLovin or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

42.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

43.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

1        (a)    whether the federal securities laws were violated by Defendants' acts as

2   alleged herein;

3        (b)    whether statements made by Defendants to the investing public during the

4   Class Period omitted and/or misrepresented material facts about the business, operations, and

5   prospects of AppLovin; and

6        (c)    to what extent the members of the Class have sustained damages and the

7   proper measure of damages.

8        44.    A class action is superior to all other available methods for the fair and efficient

9   adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

10  damages suffered by individual Class members may be relatively small, the expense and burden of

11  individual litigation makes it impossible for members of the Class to individually redress the wrongs

12  done to them.  There will be no difficulty in the management of this action as a class action.

13                          **UNDISCLOSED ADVERSE FACTS**

14       45.    The market for AppLovin's securities was open, well-developed and efficient at all

15  relevant times.  As a result of these materially false and/or misleading statements, and/or failures to

16  disclose, AppLovin's securities traded at artificially inflated prices during the Class Period.  Plaintiff

17  and other members of the Class purchased or otherwise acquired AppLovin's securities relying upon

18  the integrity of the market price of the Company's securities and market information relating to

19  AppLovin, and have been damaged thereby.

20       46.    During the Class Period, Defendants materially misled the investing public, thereby

21  inflating the price of AppLovin's securities, by publicly issuing false and/or misleading statements

22  and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth

23  herein, not false and/or misleading.  The statements and omissions were materially false and/or

24  misleading because they failed to disclose material adverse information and/or misrepresented the

25  truth about AppLovin's business, operations, and prospects as alleged herein.

26       47.    At all relevant times, the material misrepresentations and omissions particularized in

27  this Complaint directly or proximately caused or were a substantial contributing cause of the

28  damages sustained by Plaintiff and other members of the Class.  As described herein, during the

1  Class Period, Defendants made or caused to be made a series of materially false and/or misleading

2  statements about AppLovin's financial well-being and prospects. These material misstatements

3  and/or omissions had the cause and effect of creating in the market an unrealistically positive

4  assessment of the Company and its financial well-being and prospects, thus causing the Company's

5  securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false

6  and/or misleading statements during the Class Period resulted in Plaintiff and other members of the

7  Class purchasing the Company's securities at artificially inflated prices, thus causing the damages

8  complained of herein when the truth was revealed.

9  **LOSS CAUSATION**

10  48.  Defendants' wrongful conduct, as alleged herein, directly and proximately caused

11  the economic loss suffered by Plaintiff and the Class.

12  49.  During the Class Period, Plaintiff and the Class purchased AppLovin's securities at

13  artificially inflated prices and were damaged thereby. The price of the Company's securities

14  significantly declined when the misrepresentations made to the market, and/or the information

15  alleged herein to have been concealed from the market, and/or the effects thereof, were revealed,

16  causing investors' losses.

17  **SCIENTER ALLEGATIONS**

18  50.  As alleged herein, Defendants acted with scienter since Defendants knew that the

19  public documents and statements issued or disseminated in the name of the Company were

20  materially false and/or misleading; knew that such statements or documents would be issued or

21  disseminated to the investing public; and knowingly and substantially participated or acquiesced in

22  the issuance or dissemination of such statements or documents as primary violations of the federal

23  securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their

24  receipt of information reflecting the true facts regarding AppLovin, their control over, and/or receipt

25  and/or modification of AppLovin's allegedly materially misleading misstatements and/or their

26  associations with the Company which made them privy to confidential proprietary information

27  concerning AppLovin, participated in the fraudulent scheme alleged herein.

28

**APPLICABILITY OF PRESUMPTION OF RELIANCE**

**(FRAUD-ON-THE-MARKET DOCTRINE)**

51.    The market for AppLovin's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, AppLovin's securities traded at artificially inflated prices during the Class Period.  On February 14, 2025, the Company's share price closed at a Class Period high of $510.13 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of AppLovin's securities and market information relating to AppLovin, and have been damaged thereby.

52.    During the Class Period, the artificial inflation of AppLovin's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about AppLovin's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of AppLovin and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

53.    At all relevant times, the market for AppLovin's securities was an efficient market for the following reasons, among others:

(a)    AppLovin shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, AppLovin filed periodic public reports with the SEC and/or the NASDAQ;

(c)    AppLovin regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on

1  the national circuits of major newswire services and through other wide-ranging public disclosures,

2  such as communications with the financial press and other similar reporting services; and/or

3      (d)    AppLovin was followed by securities analysts employed by brokerage firms

4  who wrote reports about the Company, and these reports were distributed to the sales force and

5  certain customers of their respective brokerage firms.  Each of these reports was publicly available

6  and entered the public marketplace.

7      54.    As a result of the foregoing, the market for AppLovin's securities promptly digested

8  current information regarding AppLovin from all publicly available sources and reflected such

9  information in AppLovin's share price. Under these circumstances, all purchasers of AppLovin's

10  securities during the Class Period suffered similar injury through their purchase of AppLovin's

11  securities at artificially inflated prices and a presumption of reliance applies.

12      55.    A Class-wide presumption of reliance is also appropriate in this action under the

13  Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

14  because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or

15  omissions.   Because this action involves Defendants' failure to disclose material adverse

16  information regarding the Company's business operations and financial prospects—information that

17  Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.

18  All that is necessary is that the facts withheld be material in the sense that a reasonable investor

19  might have considered them important in making investment decisions.  Given the importance of

20  the Class Period material misstatements and omissions set forth above, that requirement is satisfied

21  here.

22                          **NO SAFE HARBOR**

23      56.    The statutory safe harbor provided for forward-looking statements under certain

24  circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The

25  statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

26  In addition, to the extent certain of the statements alleged to be false may be characterized as forward

27  looking, they were not identified as "forward-looking statements" when made and there were no

28  meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of AppLovin who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against All Defendants

57.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

58.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase AppLovin's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

59.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for AppLovin's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

60.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about AppLovin's financial well-being and prospects, as specified herein.

61.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of AppLovin's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about AppLovin and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

62.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

63.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing AppLovin's financial well-being and prospects from the investing public

and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

64.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of AppLovin's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired AppLovin's securities during the Class Period at artificially high prices and were damaged thereby.

65.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that AppLovin was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their AppLovin securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

66.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**

**Violation of Section 20(a) of The Exchange Act**

**Against the Individual Defendants**

68.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

69.     Individual Defendants acted as controlling persons of AppLovin within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

70.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

71.     As set forth above, AppLovin and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  March 24, 2025

**GLANCY PRONGAY & MURRAY LLP**

By:  */s/ Pavithra Rajesh*
Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  info@glancylaw.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
2121 Avenue of the Stars, Suite 800
Century City, CA 90067
Telephone: (310) 914-5007

*Attorneys for Plaintiff Ben Brownback*

## SWORN CERTIFICATION OF PLAINTIFF

## APPLOVIN CORPORATION SECURITIES LITIGATION

I, Ben Brownback, certify that:

1. I have reviewed the Complaint, adopt its allegations, and authorize the filing of a Lead Plaintiff motion on my behalf.

2. I did not purchase the AppLovin Corporation securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in AppLovin Corporation securities during the Class Period set forth in the Complaint are as follows:

   (See attached transactions)

5. I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

3/14/2025
_____                    _____
Date                                                                Ben Brownback

**Ben Brownback's Transactions in AppLovin Corporation (APP)**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 12/16/2024 | Bought | 100 | $345.6600 |
| 2/21/2025 | Bought | 100 | $453.7200 |