1  Shawn A. Williams (Cal. Bar ID 213113)
   ROBBINS GELLER RUDMAN
2     & DOWD LLP
   Post Montgomery Center
3  One Montgomery Street, Suite 1800
   San Francisco, CA  94104
4  Tel.: (415) 288-4545
   Fax: (415) 288-4534
5  Email: shawnw@rgrdlaw.com

6  [Additional counsel appear below]

7  *Counsel for Lead Plaintiffs and Lead Counsel for the Class*

8              **UNITED STATES DISTRICT COURT**
           **NORTHERN DISTRICT OF CALIFORNIA**
9                 **OAKLAND DIVISION**

10 BEN BROWNBACK, Individually and on          Case No. 4:25-cv-02772-HSG
   Behalf of All Others Similarly Situated,
11                                             <u>CLASS ACTION</u>
                           Plaintiff,
12                                             AMENDED COMPLAINT FOR
          vs.                                  VIOLATIONS OF THE FEDERAL
13                                             SECURITIES LAWS
   APPLOVIN CORPORATION, ADAM
14 FOROUGHI, HERALD CHEN, MATTHEW
   STUMPF, and VASILY (BASIL) SHIKIN,
15
                           Defendants.         <u>**DEMAND FOR JURY TRIAL**</u>
16

17

18

19

20

21

22

23

24

25

26

27

28

4924-3992-8423.v1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   JURISDICTION AND VENUE ............................................................................4

III.  PARTIES ..............................................................................................................5

IV.   BACKGROUND ...................................................................................................7

    A.    AppLovin's Business ................................................................................7

        1.    Advertising Segment................................................................8

        2.    Apps Segment ...........................................................................11

    B.    AppLovin Rolls out AXON 2.0 in 2023 and Announces Plans to Expand into E-Commerce in 2024 ...........................................................11

    C.    AppLovin's Valuation Catapults in November 2024 from Its Purported E-Commerce Success ................................................................15

    D.    In February and March 2025, Reports Reveal the Truth About AppLovin's Deceptive Ad Practices and E-Commerce Pivot ....................18

        1.    February 20, 2025—Bear Cave Report ....................................18

        2.    February 26, 2025—Culper and Fuzzy Panda Reports ............20

        3.    March 27, 2025—Muddy Waters Report ...................................24

    E.    AppLovin's Post-Class Period Disclosures Obfuscate Ongoing Stagnation in AppLovin's E-Commerce Business.................................27

V.    DEFENDANTS' SCHEME AND WRONGFUL COURSE OF BUSINESS..................29

    A.    Defendants Boosted Mobile Ad-Gaming Installations and Ad Impressions Through Undisclosed, Deceptive Practices .........................29

    B.    Defendants' E-Commerce Advertising Business Was Built on Claiming Attribution for Sales that Were Driven by Meta......................32

VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS .............................................................................................................34

    A.    November 6, 2024—3Q24 Earnings Report and Form 10-Q ..............35

    B.    December 11, 2024—Nasdaq Investor Conference..............................44

    C.    February 12, 2025—4Q24 and FY24 Earnings Report .......................46

    D.    February 26, 2025—CEO Blog Post ....................................................49

| | | | Page |
|---|---|---|---|
| VII. | | ADDITIONAL SCIENTER ALLEGATIONS | 51 |
| | A. | Massive Insider Stock Sales Support the Strong Inference of Scienter | 51 |
| | | 1. The Individual Defendants Insider Selling Is Highly Suspicious | 52 |
| | | 2. KKR's Selling Is Highly Suspicious | 55 |
| | | 3. Suspiciously-Timed Sales by Other Company Insiders | 56 |
| | B. | The Fraud Involved AppLovin's Core Products and the Individual Defendants Are High-Level Executives Who Were Directly Involved in or Informed of the Company's Operations | 57 |
| | C. | AppLovin's Fraudulent Conduct Required Foroughi's and Chen's Participation and Approval | 60 |
| | D. | AppLovin Immediately Initiated a Stock Buy-Back to Rebut Investigative Reports and Prop Up Stock Price | 61 |
| | E. | AppLovin's Senior Executives' History with Deceptive Ad Practices | 63 |
| | F. | Defendants Foroughi and Stumpf Signed SOX Certifications Attesting that They Personally Supervised AppLovin's Controls and Procedures | 64 |
| VIII. | | LOSS CAUSATION AND ECONOMIC LOSS | 65 |
| | A. | February 20, 2025—Bear Cave Report | 66 |
| | B. | February 26, 2025—Culper and Fuzzy Panda Reports | 67 |
| | C. | March 27, 2025—Muddy Waters Report | 69 |
| IX. | | APPLICABILITY OF THE PRESUMPTION OF RELIANCE: THE FRAUD-ON-THE-MARKET DOCTRINE | 70 |
| X. | | CLASS ACTION ALLEGATIONS | 71 |
| XI. | | CAUSES OF ACTION | 72 |
| XII. | | PRAYER FOR RELIEF | 76 |
| XIII. | | JURY DEMAND | 77 |

1    Lead Plaintiffs Northern California Pipe Trades Trust Funds and Monroe County Employees'

2    Retirement System (together, "Lead Plaintiffs"), by and through their undersigned counsel, allege

3    the following upon personal knowledge as to themselves and their own acts, and upon information

4    and belief as to all other matters.[1]

5    **I.    INTRODUCTION**

6        1.    This securities class action is brought on behalf of those who purchased or otherwise

7    acquired AppLovin Class A common stock between November 7, 2024 and March 27, 2025,

8    inclusive (the "Class Period"), seeking to pursue remedies under §§10(b), 20(a), and 20A of the

9    Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

10        2.    AppLovin is an advertising technology ("ad tech") company headquartered in Palo

11    Alto, California, that specializes in brokering the sale of digital ad space on free-to-play mobile

12    games and, until recently, also operated its own portfolio of mobile games with a significant number

13    of daily players.  Put simply, the Company's core advertising business offers a marketplace where

14    companies can advertise on their apps and/or place ads for their apps.  The ads are then sorted by

15    AppLovin's proprietary and supposedly artificial-intelligence ("AI") based recommendation engine

16    called AXON, which purportedly uses predictive algorithms to enable advertisers to match their apps

17    to users who are more likely to download them.  As of early 2024, nearly all of AppLovin's

18    advertising revenue was mobile game related, and was derived both from businesses using its ad

19    software and consumers making in-app purchases on its own mobile games.

20        3.    By May 2024, the Company began to explore the possibility of launching an e-

21    commerce ad product that would build upon its purported success with AXON within the mobile

22    gaming arena.  Specifically, AppLovin announced its intention to transfer its experience in the

---

[1]    Lead Plaintiffs' information and belief is based on, among other things, the independent investigation of Lead Counsel, which includes, but is not limited to, a review and analysis of: (a) AppLovin Corporation's ("AppLovin" or the "Company") public filings with the U.S. Securities and Exchange Commission ("SEC"); (b) transcripts of AppLovin senior management's conference calls with investors and analysts; (c) releases and media reports issued about and disseminated by the Company; (d) analyst reports issued about AppLovin; (e) other public information and data regarding the Company; (f) information obtained from former AppLovin employees and ad tech experts; and (g) documents cited herein.  Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1   mobile gaming world, and specifically with AI, to the direct to consumer ("DTC"), or e-commerce

2   space.  Throughout the pivot to e-commerce, AppLovin management touted its success, analogizing

3   the e-commerce transition to the Company's prior success following deployment of its AXON 2.0

4   AI product.  Analysts took note, commenting on investor confidence in the Company's ability to

5   achieve its growth targets and expand into the e-commerce space, and the potential for this

6   expansion to completely change AppLovin's "narrative."  This narrative was built on AppLovin

7   touting its algorithmic models as its secret sauce to its impressive results that were significantly

8   higher than industry average in important metrics such as Return on Ad Spend ("ROAS").

9          4.     What Defendants (defined below) failed to disclose, however, was that AppLovin's

10  growth in mobile gaming was driven by an array of deceptive practices that Defendants knew would

11  be difficult, if not impossible, to scale for e-commerce for any prolonged time period.  Among the

12  shady practices utilized by AppLovin to boost its performance metrics were: (a) creating

13  unsustainable revenue streams through incentives and discounts; (b) coercing unintentional

14  installations of apps; (c) designing ads to maximize clicks and impressions; (d) tracking and

15  retargeting consumers in violation of platform rules and privacy safeguards; and (e) manipulating

16  attribution data in order to claim credit for sales driven by much larger marketplace participants such

17  as Meta Platforms, Inc. (formerly known as Facebook, Inc.) ("Meta").  These practices were at the

18  heart of the Company's operations and allowed AppLovin to materially overstate both the demand

19  for its advertising services and the true performance of its mobile ad-gaming platform.

20         5.     Building on what Defendants touted as AppLovin's breakthrough success in mobile

21  ad-gaming and AI-driven advertising, AppLovin launched its pilot program further expanding into e-

22  commerce in the latter half of 2024 by offering generous incentives to a limited group of advertisers

23  that were already spending substantial amounts advertising with Meta.  Throughout the Class Period,

24  Defendants touted the initial success of the e-commerce pilot, when, in reality, Defendants had

25  overstated the Company's AI capabilities and organic scalability of its e-commerce business, and

26  concealed that its revenue growth was low-quality, unsustainable, and premised on an array of

27  deceptive practices.

28

6.      Nevertheless, Defendants' scheme and public misstatements had their intended effect. On November 7, 2024 alone (*i.e.*, the first day of the Class Period), the price of AppLovin's Class A common stock jumped $77.98 per share, or 46%, as more than 18 million shares changed hands after AppLovin announced its third quarter 2024 ("3Q24") results, including year-over-year revenue growth of 39%, net income growth of 300%, and adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") growth of 72%. AppLovin's stock price skyrocketed by more than 750% in 2024, significantly outperforming the NASDAQ composite index, which increased around 30% in 2024. Over the following months, as Defendants continued their deceptive practices and issued further false and misleading statements to the market, AppLovin's stock price continued to increase and trade at inflated levels up to and exceeding $510 per share. Insiders took full advantage, selling ***more than $2.6 billion*** of AppLovin stock during the five-month Class Period while shares traded at artificially inflated levels. The Individual Defendants (defined below) accounted for nearly $1 billion in sales, while private equity sponsor KKR (defined below) sold more than $1.6 billion on a single day while completely exiting its position.

7.      Defendants were well aware of the true nature of AppLovin's operations and that their Class Period statements were misleading when made. The Individual Defendants (*i.e.*, the highest-ranking corporate officers at AppLovin) were all directly involved in the founding and management of the closely-held Company. Indeed, the fraud itself involved the Company's core business operations, and the Individual Defendants routinely displayed their personal, granular knowledge of AppLovin's advertising practices and e-commerce initiative in their detailed answers to analyst questions on quarterly earnings calls and during investor conferences. Defendants also later admitted that the Company deliberately "constrained" the advertiser onboarding for its e-commerce platform during the Class Period, and their personal experience at prior companies evidences their knowledge and pattern of utilizing deceptive practices to create a false growth narrative.

8.      Investors began to learn the truth in February 2025, as short sellers and other market commentators issued a number of investigative reports revealing AppLovin's deceptive practices and the unsustainable and unscalable nature of the Company's pivot to e-commerce. These reports were

well researched and detailed, buttressed by industry experts and refined analyses of AppLovin's business, and demonstrated the true drivers of the Company's purported growth. By the time the truth was fully revealed in March 2025, the price of AppLovin's Class A common stock had fallen from a Class Period high of $510 per share to less than $275 per share—a staggering decline of 46%, wiping out billions in market cap. Lead Plaintiffs and other investors who purchased or acquired AppLovin's Class A common stock during the Class Period collectively suffered significant damages.




## II.    JURISDICTION AND VENUE

9.    The claims alleged herein arise under §§10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§78j(b), 78t(a), and 78t-1), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

11.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). AppLovin's headquarters were located within this District during the Class Period, the statements issued by Defendants alleged herein to be actionable were prepared, reviewed in, and disseminated from this District, and Defendants conducted substantial economic activity in this

1   District.  As such, substantial acts in furtherance of the alleged misconduct have occurred in this

2   District.

3      12.    In connection with the acts alleged in this complaint, Defendants, directly or

4   indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

5   the mails, interstate telephone communications, and the facilities of the national securities markets.

6   **III.    PARTIES**

7      13.    Lead Plaintiff Northern California Pipe Trades Trust Funds ("NorCal Pipe") is a

8   multi-employer defined benefit pension plan that provides health welfare and pension benefits for

9   workers in the pipe trades industries.  As of October 2024, approximately 4,250 people were

10  participants in or beneficiaries of the plan and NorCal Pipe had over $500 million in assets under

11  management.

12     14.    Lead Plaintiff Monroe County Employees' Retirement System ("Monroe County") is

13  a defined benefit pension plan that provides retirement, disability, and death benefits to more than

14  1,600 members and beneficiaries, with more than $257 million in assets under management.

15     15.    Lead Plaintiffs each purchased AppLovin Class A common stock at artificially

16  inflated prices during the Class Period and suffered damages as a result of the violations of the

17  Exchange Act alleged herein, as set forth in their previously filed certifications (*see* ECF No. 31-2).

18     16.    Defendant AppLovin is a publicly traded ad tech company incorporated under the

19  laws of Delaware and headquartered in Palo Alto, California.  AppLovin was founded in 2011 and

20  went public in April 2021, and its Class A common stock trades on the NASDAQ under the trading

21  symbol "APP."  Its Class B and Class C common stock are neither listed nor traded.  AppLovin is

22  considered a "controlled company" within the meaning of NASDAQ corporate governance

23  requirements.

24     17.    Defendant Adam Foroughi ("Foroughi") is one of AppLovin's co-founders.  Foroughi

25  is and was, at all relevant times, AppLovin's Chief Executive Officer ("CEO") and Chairperson of

26  its Board of Directors (the "Board").  Prior to founding AppLovin, Foroughi co-founded two

27  different ad tech companies, Lifestreet Media Inc. and Social Hour Inc.  Prior to that, he worked as a

28  web traffic analyst for Claria Corporation (formerly Gator Corporation).  During the Class Period,

1  Foroughi sold 1,043,530 shares of AppLovin stock at artificially inflated prices for proceeds of

2  $350,430,570.

3      18.    Defendant Herald Chen ("Chen") was the Chief Financial Officer ("CFO") of

4  AppLovin from November 2019 until December 2023.  In January 2024, Chen transitioned into a

5  new role as advisor to CEO Foroughi.  Prior to working at AppLovin, Chen served as the head of

6  Technology, Media, and Telecom at the private equity firm Kohlberg Kravis Roberts & Co. L.P.

7  (together with its affiliates, "KKR") from 2007 to 2019.  Chen also joined the Board in August 2018,

8  when he led KKR's $400 million equity investment in AppLovin that year.  KKR fully disposed of

9  its AppLovin stock in November 2024 for over $1.6 billion in proceeds.  Chen remains a member of

10  the Company's Board.  During the Class Period, Chen also personally sold 790,000 shares of

11  AppLovin stock at artificially inflated prices for proceeds of $262,938,721.

12      19.    Defendant Matthew Stumpf ("Stumpf") has been the CFO of AppLovin from

13  January 1, 2024 to the present.  Prior to that position, he served as AppLovin's Vice President of

14  Finance, originally joining the Company in 2020.  During the Class Period, Stumpf sold 51,525

15  shares of AppLovin stock at artificially inflated prices for proceeds of $16,914,120.

16      20.    Defendant Vasily (Basil) Shikin ("Shikin") is and was, at all relevant times,

17  AppLovin's Chief Technology Officer ("CTO").  Prior to becoming the Company's CTO, Shikin

18  served as AppLovin's Vice President of Engineering from January 2012 to January 2020.  During

19  the Class Period, Shikin sold 1,145,227 shares of AppLovin stock at artificially inflated prices for

20  proceeds of $362,454,075.

21      21.    Defendants Foroughi, Chen, Stumpf, and Shikin are collectively referred to herein as

22  the "Individual Defendants."  The Individual Defendants and AppLovin are collectively referred to

23  herein as "Defendants."

24      22.    The Individual Defendants, because of their positions with the Company, possessed

25  the power and authority to control the contents of AppLovin's quarterly reports, shareholder letters,

26  releases, and presentations to securities analysts, money and portfolio managers, and investors (*i.e.*,

27  the market).  The Individual Defendants were provided with copies of AppLovin's reports and press

28  releases alleged herein to be misleading prior to or shortly after their issuance and approved or

1   ratified the statements therein and/or had the ability and opportunity to prevent their issuance or

2   cause them to be corrected.  Because of their positions with the Company, their direct participation

3   in the management of the Company, their direct involvement in the day-to-day operations of the

4   Company, and their access to material, nonpublic information available to them, the Individual

5   Defendants knew or recklessly disregarded that the adverse facts specified herein had not been

6   disclosed to and were being concealed from the public, and knew or recklessly disregarded that the

7   positive representations being made were then materially false.

8   **IV.    BACKGROUND**

9         **A.    AppLovin's Business**

10        23.    AppLovin is an ad tech company whose business model focuses on serving ads in

11  free-to-play mobile games.  During the Class Period, AppLovin generated revenue from two

12  segments: (a) its Advertising segment (f/k/a Software Platform), through which the Company

13  provided a platform for advertisers to reach audiences within mobile games; and (b) its Apps

14  segment consisting of a portfolio of over 200 free-to-play mobile games that the Company operated

15  through a network of ten studios.[2]  In 2024, the Company received approximately $3.2 billion of its

16  revenue from its Advertising segment (68% of total revenue) and approximately $1.5 billion from its

17  Apps segment (32% of total revenue).

18        24.    The Company reported sequential growth in Advertising (formerly Software

19  Platform) revenue and EBITDA in the quarters leading up to the Class Period:



---

[2]    The Advertising segment was known as the Software Platform segment up until the Company's
announcement of its fourth quarter 2024 ("4Q24") results in February 2025.

25.     Reported revenue and EBITDA for the Apps segment, on the other hand, remained relatively flat leading up to the Class Period:

 

### 1.     Advertising Segment

26.     AppLovin claims to provide AI-powered advertising products to automate its clients' marketing and monetization campaigns, whereby the Company uses real-time auctions to facilitate both sides of advertising transactions—coordinating the sale of advertising inventory (*i.e.*, ad space) from publishers (the owners of digital ad space) to advertisers.  AppLovin's digital ad inventory is comprised of primarily free-to-download mobile games, and its advertising platform purportedly provided advertisers with access to approximately ***1.6 billion*** daily active users as of December 31, 2024.[3]

27.     The vast majority of the Company's advertising revenue is generated through the Company's AppDiscovery and MAX products, which are used in tandem to match advertisers and publishers of digital ad space via auctions at large scale and microsecond-level speed through the use of the Company's AI recommendation engine, AXON 2.0.

28.     According to the Company's SEC filings, the transaction price that AppLovin receives for each placed ad "is the product of either the number of completions of agreed upon actions or advertisements displayed and the contractually agreed upon price per advertising unit with

---

[3]     AppLovin defines its "active users as the average number of unique device identities that open a mobile app (whether that mobile app our own or a third party's) which has our software development kit (SDK) on each day in a period."

1    the advertiser" less consideration owed to the ad publisher. AppLovin recognizes "Advertising

2    Revenue when the agreed upon action is completed or when the ad is displayed to users."

3    Advertising revenue is generated from advertisers "typically on a performance-based, cost-per-install

4    basis," then shared with publishers "typically on a cost per impression model."[4]

5        29.    ***AppDiscovery*** is AppLovin's advertising platform. It provides the Company's

6    advertiser clients—historically consisting primarily of mobile app creators—with software products

7    to create and monitor advertising campaigns for user acquisition and monetization. AppDiscovery

8    purportedly uses "AXON's predictive algorithms" to target users who are more likely to download

9    and engage with an advertiser's products. Additionally, AppDiscovery provides its own analytics

10    data to advertisers regarding their returns on investment. AppLovin proclaims that AppDiscovery is

11    the "cornerstone" of the advertising business, "comprising a vast majority" of the Company's

12    advertising revenue.

13        30.    ***MAX*** is AppLovin's mediation platform. An ad mediation platform is a technology

14    that automates the process of finding the most profitable ad for each user and enables app developers

15    to manage and optimize their ad inventory in one centralized place. It sells publishers' ad inventory

16    to advertisers using automated, real-time auctions that occur in microseconds, and the highest

17    bidding advertiser wins the ad impression. The Company claims "MAX yields more targeted users

18    for advertisers and enables publishers to achieve better competitive prices for each impression" and

19    is the "preferred in-app bidding solution for many publishers worldwide."

20        31.    ***AXON*** is AppLovin's AI-based recommendation engine that purportedly uses

21    predictive algorithms to enable advertisers to match their apps to users who are more likely to

22    download them. As part of its growth strategy, AppLovin indicated its plans to improve AXON to

23    grow the Advertising segment, and claimed "[t]he continued development of [its] AI-powered

24    AXON advertising engine is critical to our future growth and competitive advantage." AppLovin

25

---

26    [4]     Under a "cost-per-install" ("CPI") model, the advertiser pays a fixed rate to an ad network for
each time its app is installed on a device. Under a "cost per impression" model, the advertiser pays a
27    fixed cost per ad impression (*i.e.*, view). The most commonly used cost per impression model is
"cost per mille" ("CPM"), where advertisers pay a fixed rate for every one thousand times their ad is
28    displayed to users.

launched AXON 2.0 in 2023, and the Company has frequently touted that the program is continually improving through self-learning.  Indeed, according to the Company:

> On an ongoing basis, AXON AI's models experience compounding improvements through self-learning, continuing data ingestion, and engineering oversight and enhancements.  As more advertisers use our performance-based advertising solutions, the models improve through additional data and better insights (per the collection described above), which then further enhances the efficiency and effectiveness of our performance-based advertising solutions.

32.    ***Array*** is an app management software that sends on-device app recommendations to users, allowing mobile operators (*i.e.*, original equipment manufacturers like Samsung and T-Mobile) to monetize by using direct downloads on Array's AppHub to install AppLovin-advertised apps on Array-enabled devices, circumventing app stores such as Apple's App Store or the Google Play Store.[5]  AppLovin's website describes that process as follows: (a) a user receives an ad; (b) the user is then referred to the advertiser's landing page; and (c) the app is installed through AppHub.  According to the Company, "Array helps developers drive growth through Direct Download."

33.    ***Audience+*** is the Company's e-commerce marketing platform.  Audience+ (or "AudiencePlus") is powered by AXON and purportedly targets and tracks consumers through AI-powered ads in mobile apps using AXON Pixel.  AXON Pixel is a JavaScript code that allows advertisers to track visitor activity, including actions like page views, adding an item to an online shopping cart, or completing a purchase.  Audience+ is available by invitation only.

34.    ***Adjust*** is AppLovin's wholly-owned mobile measurement partner that provides attribution, analytics, and measurement services designed to track and attribute specific user actions (*e.g.*, installs or purchases) to the correct ad network that supposedly drove the action and thus, decides what ad gets credited and compensated for the install or purchase.  Adjust uses an

---

[5]    AppLovin's Array Privacy Policy states that the Array Services are "comprised of the preinstalled Array application, the Array software development kit (the 'SDK') if applicable, and Direct Download, which facilitates the on-device installation of mobile apps that you choose to download through the Array Services."

1    "attribution waterfall" to work backward from the install or purchase to find the last reliable ad

2    engagement (either clicks or impressions) within a defined attribution window to credit the action.[6]

3                    **2.    Apps Segment**

4    35.    During the Class Period, the Company's Apps revenue consisted of both in-app

5    purchase revenue generated from users' in-app purchases within the Company's mobile applications

6    and in-app advertising revenue generated from advertisers that purchased ad inventory from the

7    Company's applications.  The Company's in-app purchase revenue included fees collected from

8    mobile users to purchase virtual goods within mobile games and apps.  In contrast, in-app

9    advertising revenue, which was generated by selling ad inventory on the Company's apps to third-

10   party advertisers, would be recognized "when the ad is displayed to users."

11   36.    The Company's Apps segment operated more than 200 free-to-play, "hypercasual"

12   mobile games through ten game studio subsidiaries: Athena Studio, Belka Games, Clipwire Games,

13   Leyi, Lion Studios, Machine Zone, Magic Tavern, PeopleFun, Zenlife Games, and Zeroo Gravity.

14   37.    In February 2025, AppLovin announced with its 4Q24 results that it would be selling

15   its Apps segment to focus solely on its core Advertising business.  On May 7, 2025, the Company

16   entered into a purchase agreement with London-based Tripledot Studios ("Tripledot") and its

17   subsidiaries to sell the equity interests of AppLovin's wholly-owned subsidiaries that operated the

18   Apps business.  The sale of AppLovin's Apps business was completed on June 30, 2025 for $400

19   million in cash and an approximate 20% equity stake ($400 million in equity) in Tripledot.

20           **B.    AppLovin Rolls out AXON 2.0 in 2023 and Announces Plans to**
              **Expand into E-Commerce in 2024**
21
22   38.    AppLovin launched a revamped version of its AXON engine—AXON 2.0—in the

23   second quarter of 2023, which purportedly implemented AI and machine learning enhancements to

24   improve the engine's ad targeting capabilities.  Foroughi likened the upgrade from AXON 1 to

25   AXON 2 as "no different than OpenAI moving from ChatGPT 3 to 4."  When asked during a

26   February 14, 2024 earnings call about the main differences between AXON 2 and AXON 1,

27
     ───────────────────────
28   [6]    Adjust was acquired by AppLovin in 2021, and its integration allows AppLovin to receive
     attribution and in-app event data through automated callbacks.

however, Foroughi could provide no specific details about the improvements in its "black box algorithm":[7]

> **[William Blair Analyst:]** We get the question all the time in simple terms, if you could explain what's the main difference from AXON 2 versus AXON 1. Maybe just for simplicity sake, for investors sort of frame what's the biggest change or observation you see on your end?

> **[Foroughi:]** Yes, it's just better. I mean just the technology is built to scale better, it's more efficient, more effective. These are predictive technologies at the end of the day. And I'm drawing the analogy to Chat GPT. And the only reason I do that is because we can all type in a box and get a result. And we all know that Chat GPT 3 to 3.5 to 4, 4 was better than 3.5, it was better than 3, right? But we could have seen that.

> Well, what we can't see in a black box algorithm is a type in and a result. But what we can see is that what we're trying to predict is show an advertisement to a consumer for some advertiser and drive value to the advertiser. And there's a whole bunch of predictions along the way, and AXON 2 makes them better than the prior version. And that creates a lot of efficiency gain, both for our business and that of our partners.

39.     As of early 2024, nearly all of AppLovin's advertising revenue was mobile game related, with AXON 2.0 being credited for driving impressive year-over-year revenue growth. At the time, the vast majority of AppLovin's ad business was premised on showing ads for mobile games inside of other mobile games in an attempt to drive downloads of the advertised games. But the Company claimed its AXON 2.0 product purportedly had broader potential and that, in addition to improved user targeting, AXON 2.0 had been designed for use outside mobile games, including for e-commerce vendors. In other words, AXON 2.0 could be used to match users with direct-to-consumer ads for commercial goods.

40.     By May 2024, the Company began to publicly discuss the launch of a web-based e-commerce ad product as part of a broader strategy of moving into industries and ad verticals outside of mobile gaming, and AppLovin began using its AXON 2.0 engine to power its marketing platform for e-commerce brands across its purported base of more than one billion daily active app users.

---

[7]   A "black box" AI system is one where users can see the inputs and outputs to an AI model, but cannot see the inner workings or algorithms to determine how the model comes to its conclusions. IBM, *What is black box AI?*, https://www.ibm.com/think/topics/black-box-ai (last accessed Sep. 12, 2025). The lack of transparency makes it difficult to users to validate the outputs of such systems, and "the opacity of a black box model can hide cybersecurity vulnerabilities, biases, privacy violations and other problems." *Id.*

41.     AppLovin's e-commerce opportunity was massive.  For instance, analysts at Macquarie Equity Research later sized AppLovin's e-commerce ad opportunity at ~$120 billion, noting that "[t]he ecommerce [direct-to-consumer] performance advertising market is 2-3x the size of AppLovin's mobile games user acquisition market of $40-50bn."  As Foroughi later claimed, "there are over 10 million businesses worldwide [that] advertise online that could eventually use our platform profitably."

42.     As news of the Company's e-commerce pilot rolled out, market analysts grew intrigued with the potential for AXON 2.0's success in e-commerce, with a number of sell-side analysts citing AppLovin's e-commerce vertical as a catalyst for the Company's future growth.  By September 2024, following a series of meetings Defendants held with analysts and investors, numerous market analysts reported on AppLovin's confidence that e-commerce revenue would materially contribute to the Company's 2025 Advertising revenues.

43.     For instance, following a mid-quarter meeting with Foroughi and Stumpf to discuss e-commerce potential, analysts at BofA Securities made an upward adjustment to their 2025 revenue model to "include[] a 10% eCommerce contribution (up from 4%)" for 2025, stating:

> Management gave us enough specifics on the generalizability of its AI Engine, its target customer profile, competitiveness of its value proposition, and its likely go to market partners to reflect their confidence in our models.

44.     Analysts at BTIG likewise raised their estimates and price target based, in part, on the Company's e-commerce expansion following its mid-3Q24 meetings:

> Similar to the gaming space, commerce markets are looking for performant alternatives to Meta . . ., but will only meaningfully ramp spend on a new platform if performance is superior to the alternative.  ***CEO Adam Foroughi also noted that he wouldn't have made public declarations around the commerce business and their confidence in scaling the extension if he didn't believe that they had solved everything other than the go-to-market aspect.***  Management also reminded participants that the last time they told investors to take notice of ongoing improvements was in late '23/early '24 when the share price was ~$10 and they began highlighting the potential impact of the Axon 2.0 rollout.

45.     Management's affirmations began to be reflected in the stock price.  In a September 27, 2024 report, Morgan Stanley analysts noted that AppLovin's stock price had "risen by 38% since the start of the month, despite a lack of new financial results or public announcements from the company," which they believed to be driven "by increased investor confidence in APP's

ability to achieve its growth targets and potentially expand into new verticals, as a result of a series of meetings that management has held with investors."  Accordingly, analysts were going to be closely monitoring the Company's progress as it scaled its e-commerce pilot across more customers, as "[e]arly success could have meaningful implications for future growth."  Indeed, those same Morgan Stanley analysts stated the Company's ability to scale its e-commerce product had the potential to change AppLovin's entire growth "narrative":

> ***That said, we believe success in ecommerce has the potential to be narrative-changing for APP***, as it would not only be a driver of growth/earnings diversification, but also evidence that the company could eventually build an ad business that extends far beyond the core "games running ads inside other games" offering that defines it today.

46.     As *Bloomberg* later noted in a July 23, 2025 article titled "AppLovin Short Sellers Discover Mobile Ad Tech's Ugly Underbelly," however, the Company's narrative-changing growth driver in the e-commerce space would ultimately require AppLovin to beat out established e-commerce advertisers like Meta and Google:

> [W]hile AppLovin is very good at getting people who play free mobile games to download other free mobile games, ***its peer-beating valuation hinges on its ability to graduate to getting people to buy products in the so-called direct-to-consumer space***.
>
>     This puts AppLovin in direct competition with the big boys, particularly Meta Platforms Inc. and Alphabet Inc.'s Google.

47.     Thus, Defendants were keenly aware that the Company's valuation was tied to the success of its highly-touted e-commerce pilot, and undertook steps to make its initial launch look as successful as possible.  To this end, AppLovin restricted inclusion to its e-commerce pilot and offered generous incentives in the latter half of 2024 to an initial limited and self-selected customer group of high-spending advertisers—extending ad credits of up to $10,000 to select DTC brands that spent at least $600,000 a month on Meta's advertising platform.  By doing so at a time when e-commerce spend would receive a guaranteed seasonality boost in the third and fourth quarters from holiday spending, Defendants ensured they could show initial explosive growth in the program.  Despite Defendants' growth claims, however, the Company's e-commerce product has yet to be rolled out to a broad advertising audience and remains available by invite only.

**C.    AppLovin's Valuation Catapults in November 2024 from Its Purported E-Commerce Success**

48.    By November 2024, the Company's e-commerce pilot was well underway.  During the November 6, 2024 earnings call with analysts and investors to discuss the Company's 3Q24 results, Foroughi touted the Company's e-commerce product as "the best product I've ever seen released by us, fastest growing."  According to Foroughi, the Company's e-commerce platform was expected to materially contribute to AppLovin's revenue in 2025:

> And for e-commerce to really drive material impact, and let's define that by 10% plus, is going to take some time to ramp up to.  But we've never seen anything that looks like this in terms of strength in market.  And so if it does scale the way we think it will, it's going to make an impact in '25.

49.    According to Foroughi, the Company's e-commerce platform was "maybe the most innovative advertising technology that the world has yet seen," and would allow AppLovin "to service tens of thousands to hundreds of thousands to millions of advertisers on our platform."

50.    Foroughi also claimed, *inter alia*, that the Company's nascent e-commerce data "has exceeded our expectations, with the advertisers in the pilot seeing substantial returns, often surpassing those from other media channels and, in many cases, experiencing nearly 100% incrementality from our traffic."  *See* §VI.A., *infra*.

51.    The market immediately took note.  AppLovin's stock price jumped $77.98 per share the trading day following the Company's November 6, 2024 announcements, with numerous market analysts highlighting Defendants' claims on the e-commerce pilot driving the increased valuation:

(a)    BTIG analysts "point[ed] to [Audience+] potentially being more impactful [to the Company] than the Axon 2.0 launch was in its first year";

(b)    Jeffries analysts noted that "[p]erhaps the most positive data point from the [November 6, 2024] call was the fact that APP's new e-comm pilot is the 'best product they've ever released'";

(c)    HSBC raised its 2024 and 2025 earnings per share ("EPS") forecasts for the Company, citing "earlier gains from the e-com expansion" and "management's bullish tone around the upcoming e-com product launch"; and

1           (d)        J.P. Morgan increased its December 2025 price target by 25% "from $160 to

2   $200 to reflect our upward estimate revisions and a higher multiple due to more confidence in e-

3   commerce expansion," noting "APP is increasingly confident e-commerce will scale significantly in

4   2025 & beyond."

5           52.     Following conversations with Stumpf, Piper Sandler reported on November 26, 2024

6   that "***[t]he biggest [investor] debates center around future model improvements & the scalability of***

7   ***E-Commerce***," with Stumpf relaying that "[o]n E-Commerce, early results suggest the spend is

8   incremental and advertiser feedback has been very positive." According to Piper Sandler, it "had a

9   number of investor conversations," and "[m]ost investors seem to agree E-Commerce could have a

10  meaningful impact to numbers in 2025."

11          53.     The following week, Morgan Stanley hosted Foroughi and Stumpf for a series of

12  investor meetings. In its December 4, 2024 report, Morgan Stanley claimed "***[t]he clearest single***

13  ***area of focus for investors remains ecommerce*** and the company expressed high confidence in the

14  ecommerce ads pilot, which they characterized as effective and '***past the point of uncertainty'***

15  ***around its viability***."

16          54.     On February 12, 2025, the Company hosted its 4Q24 earnings call for analysts and

17  investors. During that call, Foroughi claimed, *inter alia*, that "Q4 was a major milestone, arguably

18  our most foundational period since the AXON upgrade in 2023." According to Foroughi, AppLovin

19  "captured meaningful holiday shopping advertising dollars and witnessed the impact of an

20  advertising category beyond solely gaming contributing to [the Company's] growth."

21          55.     During that call, Foroughi touted the success of its e-commerce pilot:

22          Early pilots have shown positive outcomes for a range of advertisers,
    suggesting that any business in any vertical can harness the power of our platform.
23  This opens up a massive opportunity as there are over 10 million businesses
    worldwide you advertise online that could eventually use our platform profitably.
24
            By delivering incremental value, we position ourselves as an engine for
25  growth. It's a win-win for brands, consumers and shareholders. These early results
    solidify our vision of building one of the most influential marketing platforms in the
26  world. Where we once focus on gaming, ***we're now positioning ourselves to serve***
    ***the entire global advertising economy***. Importantly, the users engaging with our
27  network aren't just shifting existing purchases. They're discovering new products
    while playing the games they love, generating truly incremental demand.
28

56.     Foroughi also "highlight[ed] [the Company's] favorite metric going forward, adjusted EBITDA per employee."[8]  According to the CEO, "[i]n Q4, [the Company] had approximately $3 million in run rate adjusted EBITDA per employee in our advertising business," or double the EBITDA per employee from the prior quarter ($1.5 million as of 3Q24), which signaled greater operational efficiency and higher productivity in e-commerce.  Stumpf echoed Foroughi's confidence in the e-commerce business, again claiming "the ability for us to contribute a material portion of revenue from the e-commerce opportunity in 2025."  *See* §VI.C., *infra*.

57.     Still, despite purportedly beating expectations, AppLovin declined to break out revenue by vertical, leaving investors in the dark as to how much revenue e-commerce was actually generating for the Company.  As J.P. Morgan noted, "while APP is not providing a break-out, management reiterated its expectation for e-commerce to be a material (10%+) contributor this year.  Based on our estimates, this implies e-commerce revenue of at least $450M in 2025."  UBS reported "4Q Advertising revenue of $999M/73.4% YoY beat UBSe/St[reet estimate] $894M 55% YoY by 26%, the largest beat vs St ests since the launch of Axon 2.0, primarily driven by healthy sequential gaming growth and early success in ecommerce from the integration of 'hundreds' of mid-sized DTC brands."

58.     AppLovin's stock price continued its meteoric rise in response to Defendants' February 12, 2025 statements, increasing $91.35 per share the following trading day to close at $471.67.  By the close of market on February 14, 2025 it was trading at ***more than $510 per share***.[9]  Analysts also reacted favorably to the Company's earnings announcement.  According to a February 21, 2025 Benchmark Equity Research report, for example, the Company's 4Q24 earnings signaled enduring growth in e-commerce:

> ***APP is successfully monetizing its 1B+ daily active users, historically focused on mobile gaming ads, by tapping into e-commerce and direct-to-consumer brands***.

---

[8]     EBITDA per employee is a financial metric calculated by dividing the Company's EBITDA by the total number of employees.  It provides a measure of workforce efficiency, and higher EBITDA per employee generally indicates greater operational efficiency and higher productivity.  Assuming EBITDA is consistent, EBITDA by employee will increase when the denominator (number of employees) decreases.

[9]     Prior to September 2024, the price of AppLovin's Class A common stock had never exceeded $100 per share.

The company is positioning itself as a broad-based digital advertising leader, with strong early traction in new verticals beyond gaming. CEO Adam Foroughi emphasized that APP is not just shifting existing ad spend, but creating new demand, making its platform a growth engine for brands. Important, APP is achieving high operating leverage, with $3M in adjusted EBITDA per employee, reinforcing its structural advantage.

**D.     In February and March 2025, Reports Reveal the Truth About AppLovin's Deceptive Ad Practices and E-Commerce Pivot**

59.     Beginning in late February 2025, several market participants and short sellers issued investigative reports detailing the true facts behind AppLovin's e-commerce capabilities, and uncovered numerous deceptive ad practices that had fueled its historic growth. These reports revealed Defendants' practice of: (a) overstating the capabilities of the Company's AI technology and its AXON 2.0 engine for ad targeting and as a driver of revenue growth; and (b) overplaying the results of the Company's initial launch of its e-commerce business, while omitting its deceptive practices that helped fuel its historical growth in mobile gaming advertising and enabled it to claim attribution for e-commerce sales that were driven by Meta.

**1.     February 20, 2025—Bear Cave Report**

60.     The morning of February 20, 2025, Edwin Dorsey, the founder and author of The Bear Cave, published an investigative report titled "Problems at AppLovin (APP)" (the "Bear Cave Report").[10] The Bear Cave Report claimed that AppLovin's rapid growth was "fueled by low-quality revenue growth from ads that are deceptive, predatory, and at times unreadable or unclickable." The Bear Cave's investigation of AppLovin's practices included gathering the observations of three named industry experts, collecting anonymous reports of poor ad practices from former AppLovin customers, reviewing Company disclosures, and spending "dozens of hours playing mobile games in the AppLovin ecosystem."

61.     The Bear Cave Report asserted that "[a]d fraud allegations have multiplied in recent months, especially because AppLovin requires certain customers to also spend significantly on Meta ads," and publicized several "critical issues" that warranted additional scrutiny, including

---

[10]   The Bear Cave is not a short seller. Its founder and author, Edwin Dorsey, "does not take positions against companies profiled in The Bear Cave," and instead provides analysis and commentary to the investing public.

1    accusations highlighting the Company's "[d]ependency on Meta [s]pend," the Company's "[l]ack of

2    [t]ransparency," and conflicts of interest stemming from AppLovin acting as the app mediation

3    partner for Meta, "while also requiring heavy Meta spend from advertisers on the demand side."

4        62.    The Bear Cave Report also highlighted increased skepticism with AppLovin's

5    nascent e-commerce operations, reporting sentiment from an e-commerce marketer, whose company

6    "[w]as spending around $25K/day" through AppLovin.  According to that post referenced by the

7    Bear Cave, the marketer had "since grown suspicious [AppLovin] is too good to be true, and have

8    pulled down spend until I can measure instrumentality or at the very least have transparency into

9    how much budget is going toward retreating [*sic*]."

10        63.    The Bear Cave Report also cited allegations published by The Captain's Log, whose

11    author claimed that "AppLovin's e-commerce growth story is not sustainable nor scaleable."

12    According to The Captain's Log, "[w]hile initial e-commerce results may appear clean or positive,

13    it's not possible to scale this over the user base."  A later-published post on The Captain's Log also

14    referenced by the February 20, 2025 Bear Cave Report claimed opaqueness in AppLovin's e-

15    commerce business, alleging "[t]here are no details about e-commerce because AppLovin has very

16    few real e-commerce use cases."

17        64.    Also on February 20, 2025, *The Capitol Forum* reported on similar concerns in

18    AppLovin's shift to e-commerce.  In its February 20, 2025 article, *The Capitol Forum* revealed that

19    as the Company "pivots to advertising for e-commerce brands across mobile games, some marketing

20    experts question whether in-game advertisements can effectively boost sales in an ad space that has

21    traditionally focused on promoting other games and at times uses dark patterns to drive user clicks

22    and downloads."[11]

23        65.    The February 20, 2025 revelations caused an immediate drop in AppLovin's stock

24    price.  *See* §VIII.A., *infra*.  In the wake of the Bear Cave Report and *The Capitol Forum* article, and

25    in an effort to quell losses from the sudden decline in AppLovin stock, Foroughi immediately filed a

26

27    ――――――――――――――――
      [11]    Ad tech experts recognize that mobile game users are unlikely to intentionally click an ad and go
28    to an e-commerce website to complete a purchase, because real human users consider the ads a
      distraction while playing the game.

1    Notice of Proposed Sale of Securities with the SEC on February 21, 2025 and subsequently sold

2    90,000 shares representing over $36 million in proceeds in just the two trading days following the

3    February 20, 2025 revelations.

4                    **2.    February 26, 2025—Culper and Fuzzy Panda Reports**

5          66.    Over the following days and weeks, AppLovin's e-commerce and App businesses

6    drew additional market scrutiny.  On February 26, 2025, prior to markets opening, investment

7    research firm Culper Research issued a report titled, "AppLovin Corporation (NASDAQ: APP):

8    Force-Feeding Users with Silent Backdoor Installs and Copying Meta's Homework. Straight to the

9    Principal's Office, Please" (the "Culper Report"), expanding upon the Bear Cave Report's e-

10   commerce claims and adding additional allegations concerning the Company's operations.

11         67.    According to Christian Lamarco, the founder of Culper Research, the Culper Report

12   was the culmination of several months of investigation and research, which included "a decompiling

13   and forensic review of AppLovin and partner app code, app download data, consultations with a

14   renowned ad fraud researcher, interviews with former employees, customers across both mobile

15   gaming and e-commerce, competitors, and industry experts, as well as extensive reviews of

16   AppLovin filings and disclosures, public announcements, social media comments, AppLovin

17   employee profiles, and more."

18         68.    The Culper Report alleged that, although the Company credited its mobile gaming

19   turnaround to AppLovin's AXON 2.0 AI tool, AppLovin employed its "breakthrough 'AI'

20   technology . . . AXON 2.0 largely as a promotional tool," calling it "a smokescreen to hide the true

21   drivers of [the Company's] mobile gaming and e-commerce initiatives, neither of which have much

22   to do with AI."

23         69.    The true drivers of the Company's explosive success was not AXON 2.0, but instead,

24   according to the Culper Report, were: (a) an alleged "Backdoor Installation Scheme," which

25   purportedly "enable[d] advertisements themselves to force-feed silent, backdoor app installations

26   directly onto users' phones," often inadvertently without the user's knowledge, with "each illicit

27   install translat[ing] directly to profit"; and (b) the Company's "nascent e-commerce initiative [that]

28

1   is a smoke and mirrors game that the Company has rigged in its favor" to "[s]teal [ad] [a]ttribution"

2   thanks to the Company's "MAX mediation layer," which allows it to "copy Meta's homework."

3        70.    According to Culper Research, its investigation included reviewing and analyzing app

4   source code to identify how apps "bind" to AppLovin's AppHub to initiate installations.  The Culper

5   Report claimed that "[f]rom late 2022 through at least late 2024, AppLovin simultaneously

6   smuggled a single permission into thousands of their own advertising customers [*sic*] apps via

7   [AppLovin] MAX SDK updates."  This practice "allows the apps to 'bind' to AppHub, effectively

8   borrowing or inheriting AppHub's one-click direct install permissions as their own," including "the

9   permission to initiate direct downloads outside" of mobile app stores.  AppLovin purportedly then

10  "hijack[s] these permissions to force-feed direct installations to users," which creates an illusion of

11  advertising efficiency.  "With more installations, it appears to game studios as if their advertising

12  dollars are becoming more efficient."

13       71.    Culper Research referred to these "UX gimmicks" (user experience gimmicks) as

14  "unquestionably malicious," and claimed "the Company's backdooring of direct installations into

15  partners' apps is tantamount to malware," while employees referred to direct downloads as "'the

16  company's top revenue driver.'"  The Culper Report revealed that "AppLovin's current Senior

17  Director of Strategic Partnerships . . . confirmed the ability to 'install mobile applications directly

18  without the need for an app store,'" and that AppLovin's "technical lead for Array calls out 'direct

19  downloads for instant access to games from ads' as a key functionality" for the Company.

20       72.    Culper Research confirmed its source code findings with "renowned ad fraud

21  researcher," Dr. Ben Edelman, who confirmed Culper Research's conclusion and noted, "'[i]t is

22  difficult to conceive of a proper purpose, within the expected/legitimate functioning of AppHub,

23  why a game would need to bind to Apphub.'"

24       73.    The Culper Report also alleged that "AppLovin is entirely aware that its gaming

25  promotion is unsustainable, and the Company has thus hung its hat on e-commerce."[12]

26

27

28  [12]  AppLovin offloaded its app portfolio in June 2025.

74. According to the Culper Report:

> AppLovin's nascent e-commerce initiative is a smoke and mirrors game that the Company has rigged in its favor from the start. AppLovin must maintain a tight rein on advertisers it allows onto the platform, lest the narrative slip. To that end, the Company requires advertisers first demonstrate proof of $600,000 per month on Meta, so that AppLovin – through its MAX mediation platform – can "see" ads shown to Meta users in order to insert itself into the process and take credit for the sale.[13]

75. Culper Research alleged that "[s]everal former AppLovin employees and competitors suggested to [Culper Research] that the **true purpose** likely relates back to AppLovin's ability to 'see' Meta's existing advertising, thanks to the Company's ownership of the MAX mediation layer." Thanks to MAX, "AppLovin can quite literally copy Meta's homework," allowing the Company to step in and claim attribution for sales that were actually driven by Meta.

76. The Culper Report also claimed that AppLovin "cajoles" its advertising clients into "drumming up excitement" for the Company's e-commerce product to create the appearance of additional demand:

> AppLovin then cajoles advertisers into spreading the news of their success, drumming up excitement. The Company has parlayed this excitement into a waitlist, where sources say the Company is now again stacking the deck with advertisers with low SKU counts, those without robust data science teams (who can more easily call bullshit), or those who are willing to use Adjust, AppLovin's own attribution platform that allows the Company to "grade their own homework."

77. Culper Research also claimed that AppLovin's e-commerce "outperformance [has] resulted from the Company having effectively 'rigged the game' in [its] favor to wildly overstate true results to advertisers."

78. Also on February 26, 2025, investment research firm Fuzzy Panda Research ("Fuzzy Panda") issued its own investigative report titled, "AppLovin (APP) – Formers Allege Ad Fraud; Is DTC Hype Actually 'Stealing' Meta's Data; Illegal Tracking of Children & Serving Sex Ads to Kids" (the "Fuzzy Panda Report"), which was based on, *inter alia*, interviews with "Ad Fraud

---

[13] By selecting those advertisers that had already been spending $600,000 or more on Meta, AppLovin virtually guaranteed that there would be sales for which the Company could claim credit using its own attribution reporting. Because AppLovin is a mediation partner of Meta, it has visibility into the ads shown by Meta and, through its software development kit ("SDK"), it can load the e-commerce landing pages to cause the AppLovin pixels to fire and mark the devices as exposed to an AppLovin ad, so that subsequent purchases can be claimed by AppLovin in the attribution reporting. The SDK was also used to trigger automatic installations. *See, e.g.*, ¶100.

Experts," former AppLovin executives, former and current senior Meta employees, and "renowned ad fraud researcher Ben Edelman." The Fuzzy Panda Report complemented and expanded upon the report released by Culper Research by: (a) accusing AppLovin of stealing Meta's consumer data and then "us[ing] that info to enhance [its] own fingerprint of a user and then bid similar prices for users when targeting them with AppLovin served ads"; and (b) alleging that "AppLovin is deeply engaged in 'Ad Fraud,'" and that the Company was "caught using fake clicks [and] other dirty tricks to 'game' installs."

79. According to Fuzzy Panda, AppLovin's "bull thesis focuses on expanding [the total addressable market] from mobile games into e-commerce," but the Company's "early e-commerce success came from 'Copying Meta's Homework' by 'reverse engineering' Meta's data."

80. Fuzzy Panda scrutinized the Company's purported e-commerce success, attributing early achievements to free advertising credits and "stealing" Meta's data. As described in the Fuzzy Panda Report, AppLovin capitalized on Meta's data to artificially enhance the appearance of e-commerce growth in the following ways:

- APP convinces e-commerce customers to use an AppLovin SDK for mediation.

- APP requires $600k of monthly Ad spend to join the beta, which doesn't make sense.

- This allows AppLovin to "peek" at a large enough sample of Meta's successful ads via their mediation platform.

  APP allegedly then knows which customers are most likely to convert.

- APP's MAX ad auction bidding platform then gives them a real-time view into Meta's $ bids and values for each consumer.

- APP also requires e-commerce companies to use the exact same Meta ads enabling AppLovin to serve up the same winning ads that Meta would have.

- AppLovin allegedly combines all these data points with 3rd party data brokers and an AppLovin tracking IDs to reverse engineer Meta's valuable data.

- This apparently allows AppLovin to know which consumers are the likeliest to convert and then front-run Meta.

81.     Fuzzy Panda criticized the Company's ability to target specific customers in the absence of Meta's data.  The Fuzzy Panda Report claimed that AppLovin creates a persistent identifier by harnessing personally identifiable information tracked by Meta.  According to Fuzzy Panda:

> AppLovin likely then combines the Meta bid information, the AppLovin device fingerprint, and data being bought from third party data brokers (that includes a vast amount of personal information) to essentially "steal" Meta's data on consumers. AppLovin then can use that info to enhance their own fingerprint of a user and then bid similar prices for users when targeting them with AppLovin served ads.

82.     The information disclosed in the Culper and Fuzzy Panda Reports caused significant declines in AppLovin's stock price.  *See* §VIII.B., *infra*.  In an effort to reassure the market following the February 26, 2025 reports, that day AppLovin issued a public blog post titled "Note from our CEO."  In the post, CEO Foroughi denied the reports' allegations as "false and misleading claims" made by "nefarious short-sellers."  Foroughi asserted that AppLovin's success was driven by "sophisticated AI models," and addressed specific topics including platform compliance, consumer experience, data practices, financial transparency, and the performance of its e-commerce pilot.  *See* §VI.D., *infra*.

83.     Within days, the Company also announced a plan to immediately repurchase the Company's stock as Defendants continued their efforts to subsequently prop up the stock price amid the double-digit decline.  *See* §VII.D., *infra*.

84.     On February 28, 2025, Chen seized the opportunity to offload an additional $65 million in AppLovin stock, selling 200,000 shares of his personal stock.

### 3.    March 27, 2025—Muddy Waters Report

85.     On March 27, 2025, yet another investigative report brought to light additional information concerning the Company.  That day, research firm Muddy Waters Research ("Muddy Waters") issued a report titled, "Approving [*sic*]: Deep Data Analysis Shows APP is Just Another Scammy AdTech Company" (the "Muddy Waters Report").  Muddy Waters engaged in a thorough study that challenged AppLovin's central growth narrative—*i.e.*, that the Company's e-commerce product drives high-return, incremental advertising performance.  The Muddy Waters Report

1   revealed that a majority of AppLovin's e-commerce conversions are due to retargeting, not net new

2   customers.[14]

3       86.   Based on its own "analysis of conversion log-level files provided by a leading

4   independent demand-side platform that covers over 37 million unique users from across five

5   different advertisers," Muddy Waters concluded that over 50% of AppLovin's e-commerce

6   conversions were a product of "retargeting," while only 25%-35% of the Company's e-commerce

7   conversions were incremental.  The Muddy Waters Report likewise alleged that its "analysis of 776

8   advertisers active in early Q1 2025 indicates that the [advertiser] churn rate is ~23%," which

9   represents the percentage of original website no longer utilizing AppLovin's Pixel for e-commerce.[15]

10      87.   The Muddy Waters Report echoed Fuzzy Panda, claiming AppLovin was

11  "impermissibly extracting proprietary IDs from Meta, Snap, Tiktok, Reddit, Google, and others,"

12  again raising concerns that "APP [is] at risk of being deplatformed."

13      88.   Muddy Waters again called in to question the Company's e-commerce tactics:

14          To identify high value users, it appears that APP is impermissibly extracting
            proprietary IDs from Meta, Snap, Tiktok, Reddit, Google, and others.  APP then
15          combines that misappropriated data to create artificial and persistent user IDs (aka
            user graphs).  This is an iteration of old-school fingerprinting schemes to target ads
16          without user consent.  The user graph is augmented by Shopify events (e.g. items
            added to shoppers' carts, checkout initiation), which provides APP with a black edge
17          in the ad auctions.  The last critical step in this scheme involves the aggressive use of
            these Persistent Identity Graphs ("PIGs") to repeatedly target and retarget high value
18          users, serving them with ads won at these auctions.  ***In this way, APP claims the
            revenue from highly valuable last-click attributions***.  This subterfuge occurs outside
19          of the platforms' servers, making it difficult to detect.

20  (Footnote omitted.)

21

22  ──────────────
    [14]   Ad tech experts recognize that retargeting overstates the ROAS because those users already
23  know and have visited the advertiser's e-commerce site, so those predisposed users are already those
    most likely to convert to a purchase.  By showing ads to those users, AppLovin caused their devices
24  to be marked as exposed so they can claim credit for subsequent e-commerce purchases.

25  [15]   Muddy Waters' conclusion was a product of its analysis of e-commerce trial customers utilizing
    AppLovin's AXON Pixel, which the Company describes as "a small snippet of JavaScript code that
    allows [a customer] to track visitor activity on [its] site."  According to the Company, "[d]ata
26  collected by means of this Pixel allows AppLovin to measure and to improve the success of [an] ad
    campaign[]."  According to the Muddy Waters Report, its "[a]nalysts utilized both automated
27  scanning technologies and manual checks to ascertain which websites retained the presence of the
    Axon and/or APP-specific tracking pixels" in concluding the Company experienced a ~23% churn
28  rate.

89.     Muddy Waters refers to the digital collection of personal identifying information as Persistent Identity Graphs ("PIGs"), which is a type of data "fingerprinting" or digital profiling "often considered controversial and invasive" because it is collected without the users' knowledge or consent, which may potentially violate Apple's and Google's terms of service:

> APPs Persistent Identity Graphs (PIGs) are digital collections of personal identifying information (PII). APP collects and stores this personal user data on its servers. APPs development and storage of PIG data are a type of "fingerprinting," a form of digital profiling of individual users without their knowledge or consent to track them across the web.
>
> Fingerprinting aggregates various device and browser signals to create a unique identifier for users without relying on cookies. In addition to the 3P platform IDs collected, other shared information will commonly include the ip address, operating system, browser version, time zone, browser identifier, or device information (screen size, fonts installed, language). Unlike cookies, which users can delete or block, fingerprinting operates server-side, making it a persistent tracking mechanism that raises major privacy concerns. Fingerprinting is often considered controversial and invasive because it does not require user consent. ***Regulatory bodies and major tech companies like Apple and Meta have taken measures to limit or regulate fingerprinting due to its potential ethical and legal implications***.
>
> Fingerprinting without consent generally violates key privacy rules and TOS with its major platform partners. Fingerprinting without consent is explicitly prohibited by Apple on its iOS devices. As a Meta Audience Network Partner APP is subject to additional restrictions. Meta expressly prohibits the collecting or storage of any data obtained from any Ad or use of the Audience Network Service.
>
> Code reveals APPs collection of Facebook, Google, Snap, Reddit, as well as other platforms IDs. These code IDs can be clearly traced to their platforms.
>
> Proof of the collection of these data are clear and reproducible.

(Footnotes omitted.)

90.     AppLovin shares plunged 20% following the Muddy Waters Report, representing the stock's "steepest drop on record." *See* §VIII.C., *infra*.

91.     The slew of investigative reports prompted AppLovin to take further efforts to try to stop the bleed in the Company's stock price. Just hours after the Muddy Waters Report, Foroughi issued another blog post titled "A Note from Our CEO: Discussing Web Advertising Opportunity and Unpacking Pixels" publicly denouncing the recent allegations, and relying on an AI-generated response from xAI's Grok 3 chatbot prompted to "show that there's nothing unique to the AppLovin

pixel implementation."[16]  Several days later, on March 31, 2025, Shikin wrote a similar blog post defending the Company's e-commerce data practices using the AI-generated assistance of Grok 3.

### E.    AppLovin's Post-Class Period Disclosures Obfuscate Ongoing Stagnation in AppLovin's E-Commerce Business

92.    In the months following the end of the Class Period, additional evidence confirmed that AppLovin's e-commerce platform was not as scalable as Defendants had led investors to believe.  Likewise, it became clear that the Company's early e-commerce revenue growth, which was achieved over a small sample size following a limited targeted launch, was neither sustainable nor representative of the eventual market share AppLovin would garner among the DTC advertising market.

93.    For example, in June 2025, Needham analysts, after conducting their own market research, noted that "the total number of websites in our sample using Axon grew by +1.2% vs last month to 327 and with no additional big brand adds . . . *another sequential slowdown in growth*." The analysts noted that the failure to attract additional "big brands" was important because "they have the greatest ability to scale advertising spend on the platform."

94.    Two months later, the same analysts, again citing their proprietary "Ecommerce Tracker," noted a further slowdown in e-commerce growth: "Brands using the Axon Pixel increased +0.5% in the last month.   Of the >2,200 websites we searched, we found a net gain of +2 websites . . . . "  Likewise, in August 2025, J.P. Morgan analysts noted "limited onboarding of new e-commerce customers" which contributed to "less upside than prior" quarters.  Later in August 2025, a Wells Fargo Securities report noted: "The # of new sites adding the Applovin pixel declined 30% in June - Aug vs Jan - May, *consistent w/market perception that web ads customer growth slowed*."

---

[16]    Indeed, Foroughi concluded his responsive blog post with the following disclaimer: "This report includes content generated with the assistance of artificial intelligence (AI).  While the information has been reviewed for accuracy, the AI-generated content may contain errors or omissions.  Users are encouraged to exercise their own judgment and verify critical information independently."

1       95.    Defendants sought to mask the slowdown in new e-commerce customer additions by: (a) refusing to break-out its e-commerce financial results and customer metrics; and (b) blaming the lower-than expected e-commerce results on product delays.

96.    After the release of the Company's second quarter 2025 earnings results in August 2025, industry observers noted that Defendants "***didn't provide any new numbers around the e-commerce push***, which likely disappointed investors."[17]  UBS analysts commented on the "***[l]ack of visibility*** into web-based ads contribution."  Meanwhile, Defendants attempted to buy time by shifting the narrative, emphasizing that a delay in new product rollouts were to blame for the slower-than-expected ramp in e-commerce customers and revenue.  Indeed, during the Company's earnings call on August 6, 2025, Defendants admitted they had intentionally constrained the e-commerce advertiser onboarding process "for a couple of quarters."  At that point, the Company's e-commerce pilot had been deployed for just four quarters.  In other words, the Company was deliberately constraining the product during the Class Period, despite repeatedly touting its success during the same period.

97.    Further evidencing the e-commerce slowdown, Defendants also surprised the market in August 2025 by announcing a significant paid marketing plan to attract new e-commerce customers.  Analysts and investors had previously been led to believe there was a long waiting list (*i.e.*, "a line out the door") of potential new e-commerce customers waiting to sign up for advertising contracts.  As J.P. Morgan analysts noted: "APP plans to leverage paid marketing to recruit new advertisers after the global launch.  ***The paid marketing strategy comes as a surprise*** to us given APP's historic organic/word of mouth approach . . . ."

---

[17]  Leo Miller, *AppLovin's Q2 Miss Spooks Market, But Wall Street Doubles Down*, MarketBeat (Aug. 7, 2025), https://www.nasdaq.com/articles/applovins-q2-miss-spooks-market-wall-street-doubles-down.

# V.    DEFENDANTS' SCHEME AND WRONGFUL COURSE OF BUSINESS[18]

98.    AppLovin presents itself as a leading ad tech company, claiming that its proprietary AI platform (AXON) drives superior user acquisition and advertising performance.  Throughout the Class Period, Defendants repeatedly assured investors that AXON 2.0 was responsible for the Company's growth in revenue and profitability, and that its emergent e-commerce business was scalable and poised to drive massive sustainable growth.  Unknown to investors, however, AppLovin's growth was driven by a number of manipulative and undisclosed business practices.  Specifically, Defendants implemented a fraudulent scheme and course of conduct that relied upon a series of improper and deceptive practices that artificially inflated the Company's reported performance metrics, including: (a) installing applications onto users' devices without their knowledge; (b) flooding users with manipulative advertisements designed to maximize clicks and inflate engagement; (c) running advertisements in the background without users ever seeing them; and (d) retargeting and remarketing e-commerce consumers by engaging in artificial ad exposure to manipulate attribution and claim credit for sales actually driven by Meta.

### A.    Defendants Boosted Mobile Ad-Gaming Installations and Ad Impressions Through Undisclosed, Deceptive Practices

99.    In 2022, AppLovin launched Array, which partnered with original equipment manufacturers and carriers to preload AppHub onto newly sold devices.  AppHub was granted system-level permissions that allowed it to initiate direct installations of third-party applications from outside of the Google Play Store.  Although these permissions were legitimately granted to AppHub, Google classifies them as "high risk" and "sensitive" and prohibits their use in standardized applications:

> Google Play restricts the use of high risk or sensitive permissions, including the REQUEST_INSTALL_PACKAGES permission, which allows an application to request installing packages. . . .  To use this permission, your app's core functionality must include:

---

[18]    Lead Plaintiffs allege both "scheme liability" under Rule 10b-5(a) and (c) and "misstatement liability" under Rule 10b-5(b).  The statements referenced below in §VI, are alleged to be materially false and misleading as bases for the Rule 10b-5(b) misstatement claim.  The scheme allegations under Rule 10b-5(a) and (c) are based both on those statements and the additional deceptive acts alleged herein.

1.      Sending or receiving app packages, AND

2.      Enabling user-initiated installation of app packages.

*      *      *

To use this permission, your app must fall within permitted uses below, and have a core purpose to enable installation of packages. Core functionality is defined as the main purpose of the app. Without this core ability to install additional applications on the device, the app is "broken" or becomes unusable. The core functionality, and any core features that comprise this core functionality, must all be prominently documented and promoted in the app's description.

*      *      *

Permitted uses include:

- Web browsing or search; OR

- Communication services that support attachments; OR

- File sharing, transfer or management; OR

- Enterprise device management;

- Backup & restore;

- Device Migration/Phone Transfer.[19]

100.     To exploit AppHub's system-level permissions and circumvent the Google Play Store restrictions, AppLovin inserted permissions into its MAX mediation SDK—a software plug-in that developers insert into their apps so companies like AppLovin can run ads or other features—which is embedded in many of the most popular free-to-play mobile games such as Subway Surfers, 8 Ball Pool, Wordscapes, and Angry Birds 2. Through these added permissions, games could "bind" to AppHub, inherit its direct installation powers, and bypass the Google Play Store restrictions. As a result, AppLovin's SDK served ads, including background ads when users were not actively engaged with the app, that were capable of triggering automatic installations without user knowledge. Further, AppLovin buried in certain pop-up download terms a provision that purported to authorize it to install future apps on users' devices and, relying on that hidden term, installed additional apps

---

[19]   Google Play Console Help, *Use of the REQUEST_INSTALL_PACKAGES permission*, https://support.google.com/googleplay/android-developer/answer/12085295 (last accessed Sep. 12, 2025).

without user knowledge.  This scheme inflated AppLovin's advertising revenue, which is generated

"typically on a performance based, cost-per-install basis."

101.    Binding to AppHub appeared to serve no meaningful purpose for AppLovin-affiliated

applications other than to drive unwanted installations and inflate revenue.  As industry expert Dr.

Edelman concluded:

> "It is difficult to conceive of a proper purpose, within the expected/legitimate
> functioning of AppHub, why a game would need to bind to Apphub.
>
> The source code contains repeated reference to direct download.  The context
> and architecture of this code indicate that it performs the type of download described
> above."

102.    Dr. Edelman also noted that, based on his review of AppLovin's code, the Company

has the ability to "'end all direct downloads on a moment's notice—as it is likely to do if it faces

public criticism of this practice.'"  Further, the code "'certainly allows AppLovin to target direct

downloads by IP address, such as never performing direct downloads to countries or regions deemed

high-risk'" and "'is fairly read as indicating knowledge that direct download is a sensitive function

and might need to be scaled back or limited in some important way, including on short notice.'"

103.    AppLovin also deployed manipulative and deceptive advertisements designed to trick

users, generate more clicks, and drive additional unwanted installations.  Consumers reported that

AppLovin's ads often lacked a visible "X" to close, automatically redirected them to the Google

Play Store, or initiated installations without any legitimate action by the user.  One user explained

that "[e]very second ad you close automatically opens the Play Store," while another reported that

"there are ads that have no x to close them or they even automatically take you to the play store."

Others described even more aggressive tactics, such as "[i]f you accidentally touch an ad, it

automatically installs an app on your phone," and "[s]ome ads automatically download software

without the user taking action or granting additional permissions.  This is MALWARE."

104.    As one AdTech industry executive who reviewed AppLovin's mobile ad-gaming

program bluntly stated:

> "I'm almost certain that what they're doing is a Ponzi scheme... It's junk
> inventory, junk apps… They've changed recently... It's kicked you out of the app
> and forced you to download the other app via the ad.  Then when you log back in, it

counts you again, so it shows you as a repeating user, but in reality it's a really poor experience. It's dirty metrics."

105.    By exploiting AppHub's system-level installation powers in tandem with deceptive advertisements, AppLovin generated false clicks and involuntary application installs. These practices served no legitimate purpose other than to drive unwanted app installations and inflate advertising impressions. Defendants' scheme was designed to create the illusion of heightened engagement and performance and boost the Company's revenue.

### B.    Defendants' E-Commerce Advertising Business Was Built on Claiming Attribution for Sales that Were Driven by Meta

106.    Building on what Defendants touted as breakthrough success in mobile ad-gaming and AI-driven advertising, AppLovin expanded into e-commerce, claiming its e-commerce pilot program "has exceeded our expectations, with the advertisers in the pilot seeing substantial returns . . . and, in many cases, experiencing nearly 100% incrementality from our traffic." In reality, AppLovin's e-commerce advertising program was grounded in a continuation of its deceptive practices, systematically targeting its daily active users to capture credit for transactions attributable to Meta.

107.    Critically, to participate in AppLovin's e-commerce pilot, advertisers were required to prove they were already spending at least $600,000 per month on Meta's advertising platform. This ensured AppLovin only accepted advertisers with large, active Meta campaigns already generating significant transaction volume. By retargeting and remarketing[20] users already reached by Meta, AppLovin guaranteed there would be heavy overlap between devices "exposed" to an ad by Meta and those "exposed" by AppLovin. Whenever an "exposed" device later converted on a purchase, AppLovin could claim credit for the sale generated by Meta.

108.    AppLovin's so-called innovation was simply to blast ads—or generate artificial ad exposure—to its purportedly massive base of "daily active users," often running those ads in the background with little or no user engagement or visual acknowledgment. The purpose was not to

---

[20]    Retargeting means serving an advertisement to a user that has visited the advertiser's website, app, or product page but has not yet purchased anything. Remarketing means serving an advertisement to a user who has already purchased something from the advertiser.

1   persuade e-commerce consumers or drive incremental sales, but to "tag" as many devices as possible

2   as having been "exposed" to an AppLovin ad so that AppLovin could claim credit for the e-

3   commerce conversion ultimately driven by Meta.

4       109.    Further, because AppLovin facilitates access to Meta's advertising demand via MAX,

5   AppLovin had access to Meta's advertising inventory.  By leveraging this access, AppLovin

6   exploited its SDK to open, in a hidden web browser, the e-commerce landing page of an advertiser

7   running campaigns on both Meta and AppLovin, thereby enabling AppLovin to simulate a "click

8   through," *i.e.*, the loading of a landing page that ordinarily occurs only when a user intentionally

9   clicks an ad to make a purchase.  This covert loading of an advertiser's landing page activates

10  tracking "pixels" (*e.g.*, the AXON Pixel) that signal to the system that a user has seen, or been

11  "exposed" to, an AppLovin ad.  As a result, any subsequent purchase by that user is attributed to

12  AppLovin's purported ad exposure, even though the user never engaged with AppLovin's ad.

13      110.    In practice, this meant that both Meta and AppLovin often claimed the same e-

14  commerce conversion or attribution credit.  AppLovin's systems automatically logged and took

15  credit for the purchase on the basis that the device had been exposed to an AppLovin ad at some

16  point (*e.g.*, within a 30, 60, or 90-day window), even if the consumer never interacted with—or even

17  laid eyes on—the advertisement purportedly "displayed" by AppLovin.  This double counting

18  allowed AppLovin to inflate its e-commerce performance results without creating any genuine

19  incremental value.  In fact, AppLovin's scheme can be implemented even with a 24-hour attribution

20  window by exposing users to AppLovin ads once every 24 hours, thereby ensuring their devices are

21  always marked "exposed" and claiming credit for any subsequent purchases.

22      111.    Industry insiders noticed suspicious patterns that corroborate the existence of

23  Defendants' scheme to claim credit for conversions attributable to Meta.  As *Business Insider*'s Lara

24  O'Reilly reported, there was "'an "extremely high correlation" between when AppLovin sees a spike

25  in conversions and when Meta sees an increase in ad spend,'" raising the question of whether

26  "'AppLovin was driving real incremental value or whether its campaigns were just reaching the

27  exact same audience as Meta in some way.'"

28

112.     And independent analyses confirmed this suspicion.  Advertiser conversion logs demonstrated that a majority of e-commerce conversions attributed to AppLovin were in fact purchases already driven by Meta.  By spamming its user base and "exposing" as many devices as possible, AppLovin manufactured the appearance of nearly 100% incrementality, when in truth its contribution was only a fraction of that amount.  In fact, after accounting for repeat customers, independent investigators found that the true incrementality of AppLovin's e-commerce results was only 25%-35%, a fraction of Defendants' public claims of "'nearly 100% incrementality.'" *See* ¶86.

113.     Further, technical analysis revealed that AppLovin also engaged in undisclosed fingerprinting, secretly collecting user identifiers from platforms including Meta, Google, TikTok, and Snap (in violation of the platforms' terms of service), and combining them with behavioral signals from Shopify stores such as items added to cart or checkout attempts.  By stitching this data into PIGs, AppLovin could track users across devices and platforms, recognize when a Meta-targeted consumer was on the verge of purchase, and then serve a last-second advertisement to hijack credit for the transaction.  This enabled AppLovin to identify and target "high-value" consumers in the final stages of the purchasing process.

114.     AppLovin's e-commerce platform was neither innovative nor uniquely effective, falling far short of Defendants' representations.  It simply inundated users' devices with artificial ad exposure and exploited undisclosed conditions to ensure overlap with Meta's advertising base.  By claiming credit for conversions that Meta had actually driven, AppLovin falsely portrayed itself as a significant driver of e-commerce growth, thereby misleading investors and inflating its stock price.

## VI.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS[21]

115.     Throughout the Class Period, Defendants made a series of materially false and misleading statements and omissions regarding AppLovin's e-commerce business by: (a) overstating the capabilities of the Company's AI technology and its AXON 2.0 engine for ad targeting and as a driver of revenue growth; and (b) overplaying the results of the Company's initial launch of its e-

---

[21]     For ease of reference, the portion of Defendants' statements that Lead Plaintiffs allege are false and misleading are set forth in bold italics throughout §VI.

commerce business, while omitting its deceptive practices that helped fuel its historical growth in

mobile gaming advertising and enabled it to claim attribution for e-commerce sales that were driven

by Meta.  Defendants also maintained the same assurances and hypothetical risk warnings regarding

terms of service and privacy violations both prior to and during the Class Period, while concealing

that the Company's deceptive and risky business practices were actively subjecting AppLovin to

reputational harm.

A.      **November 6, 2024—3Q24 Earnings Report and Form 10-Q**

116.    On November 6, 2024, AppLovin announced its financial results for the third quarter

ended September 30, 2024 in a press release and Form 8-K filed with the SEC, which included a

shareholder letter signed by Foroughi and Stumpf (the "3Q24 Shareholder Letter").  In the 3Q24

Shareholder Letter, Defendants stated the following:

> Our Software Platform segment continued to grow in the third quarter, with
> Software Platform revenue of $835 million, up 66% year-over-year, ***driven by
> continued development of our AXON engine through ongoing self-learning and
> directed model enhancements***.  These technology enhancements allowed our
> advertising partners to further increase the scale of their spend on our platform while
> consistently achieving their return on ad spend ("ROAS") goals.

117.    It was misleading for Foroughi and Stumpf to state that Software Platform growth

was driven by AXON's "ongoing self-learning and directed model enhancements" when, in reality,

AppLovin's growth was fueled by improper practices designed to artificially inflate the Company's

performance metrics.  Specifically, AppLovin's growth was inflated through, among other things:

(a) serving ads in the background without any user engagement; (b) forcing installations of affiliated

applications onto users' devices without their knowledge; and (c) flooding users with low-quality

"junk ads" designed to manufacture clicks and engagement rather than deliver genuine advertiser

value.  *See* ¶¶99-105, *supra*.

118.    On the earnings call held that same day, Foroughi's prepared remarks attributed

AppLovin's positive growth to enhancements in its AXON algorithm and AI software development,

and touted the future impact of the Company's nascent e-commerce business:

> We continue to execute well, expanding our core business and laying the
> groundwork for its sustained growth.  Last quarter, I shared our confidence in
> achieving 20% to 30% year-over-year growth for the foreseeable future.  We
> continue to expect 4% to 5% quarterly growth through self-learning and market

growth, *with occasional step changes resulting from enhancements to our AXON algorithm*.

> *This quarter, we saw one of those step changes, with meaningful growth driven by advancements to AXON.* While we can't predict the timing of these breakthroughs, we are in the early stages of AI software development, both within our company and in the broader industry. We expect ongoing research advancements to continue driving our technology forward.

> While we remain confident in 20% to 30% growth for mobile gaming advertisers alone, we're also exploring new areas, as shown by our recent e-commerce pilot. *Early data has exceeded our expectations, with the advertisers in the pilot seeing substantial returns, often surpassing those from other media channels and, in many cases, experiencing nearly 100% incrementality from our traffic*.

> *We're increasingly confident this vertical will scale significantly in 2025 and become a strong contributor for us over the next year and beyond.* To support this, we've streamlined resources and are reallocating talent from other initiatives to our e-commerce go-to-market team. In the next few quarters, we'll launch a self-service platform, opening global opportunities for advertisers of all sizes.

119.    On the same November 6, 2024 earnings call, Stumpf similarly attributed the Company's positive third-quarter revenue growth to improvements in the AXON technology:

> During the quarter, *improvements in our AXON technology, driven by ongoing self-learning, and enhancements by our engineering team contributed to further growth of our software platform*. This segment generated $835 million in revenue and $653 million in adjusted EBITDA, achieving a 78% margin and growing 66% in revenue and 79% in adjusted EBITDA from the same period last year. Quarter-over-quarter flow-through from revenue to adjusted EBITDA was 107%.

120.    During the question-and-answer portion of the same earnings call, Foroughi repeatedly assured market analysts about the tremendous potential for AppLovin to expand beyond gaming into e-commerce using AXON 2.0. For instance, in response to the very first question on the call, Foroughi described the Company's e-commerce pilot as the best product AppLovin had ever released, and that it would meaningfully impact the business in 2025 and beyond:

> [BTIG Analyst:] I would assume that while e-commerce is in pilot phase, there's really very little revenue contribution. Is that right? And then, if so, for the existing gaming and nongaming businesses, was one a bigger contributor this quarter? Meaning, was one more responsive, I guess, to the performance improvements that you delivered?

> *            *            *

> [Foroughi:] Yes. So e-commerce is still in pilot, as we touched on last quarter. I'll say, before jumping into impact this quarter, it's the – *it's a super compelling product*. Our team has done an amazing job building it. *In all my years,*

*it's the best product I've ever seen released by us, fastest growing*, but it's still in pilot.  So compared to the scale of our business inside gaming, it's too early for e-commerce to make a financial impact that's material.

*            *            *

Now our technology continues to improve.  We've got a long road map of enhancements that we can deliver to this platform because, like I said in the talk script, these AI technologies are just really, really early in existence, both internally and externally.  And all research advancements are going to let us really expand the business inside the gaming category. *E-commerce, on the other hand, is looking so strong that it's something that we think will be impactful to the business financially '25 and then for the long term*.

121.    The statements in ¶¶118-120 were false and misleading when made.  Defendants Foroughi and Stumpf repeatedly attributed AppLovin's growth to purported "enhancements" and "advancements to AXON," while falsely positioning the e-commerce pilot as a transformative new vertical delivering "substantial returns," "looking so strong," and certain to be impactful to the business financially.  In reality, AppLovin's growth was not driven solely by technological breakthroughs or genuine performance, but also by deceptive and undisclosed practices that artificially inflated its reported results. *See* ¶¶98-114, *supra*.  Rather than producing "step changes" through AXON "enhancements," AppLovin manufactured growth by forcing unwanted app installations and spamming devices with ads, including background ads that users never saw, designed to maximize clicks and impressions at the expense of true user engagement. *See* ¶¶99-105, *supra*.  Defendants' assurances that advertisers were achieving "substantial returns" from the e-commerce pilot was likewise misleading. *See* ¶¶106-114, *supra*.  In truth, AppLovin's reported e-commerce results were favorably distorted by: (a) offering generous incentives to a limited group of cherry-picked advertisers who were already spending substantial advertising dollars on Meta; (b) artificially exposing devices to AppLovin ads, thereby enabling AppLovin to claim attribution credit for purchases actually driven by Meta; and (c) timing the rollout of its e-commerce pilot to take advantage of seasonal holiday shopping to create the illusion of explosive growth. *See* ¶¶47, 106-114, *supra*.  This made it appear that advertisers were achieving strong ROAS, when in fact the performance was overstated and unsustainable. *See* ¶¶85, 98-114, *supra*.

122.     In response to the next analyst question that inquired of potential headwinds in the e-commerce area given the lack of brand awareness in that space, Foroughi insisted that AppLovin could organically grow in e-commerce without investing in sales and marketing:

> **[Citigroup Analyst:]** It's exciting to hear that you're excited about your e-commerce pilot. I just had one question. As investors sort of think about the ramp of that business, is there anything about it that could ramp more slowly even if you're more excited about the efficacy of the product? And I'm thinking specifically about your brand just not being known in e-commerce circles and maybe you have to spend marketing dollars or hire a sales team or something that's just different than the brand name you have within the gaming ecosystem that could make it ramp more slowly, even though it might be a better product or as good of a product. Thanks.
>
> . . . **[Foroughi:]** So look, e-commerce is a new category for us. So we do need brand awareness. That's a given. But our products are really good. And the key to when we started the business and doing so well in gaming is we took a really long-term approach. *We said we're going to build a product that's so good that advertisers have to have it. We're not going to invest heavily in sales, and we're going to organically grow over the years*. And we've done that.
>
> And you can look at the trajectory of the company since we've been public, but even if you backdate it to when we started, every year, *we've gotten bigger and gotten more penetration into the gaming category and done it organically*. So when we look at e-commerce, we're not in any sort of rush. *Now that said, if you check even Twitter today, there's tons of noise from e-commerce brands saying, in our pilot, they're seeing as much scale and a strong ROAS as they're seeing anywhere in the world today on their user acquisition buys*.
>
> So when you have that kind of performance, you're delivering an automated return on ad spend model approach to a very large, fragmented category, like e-commerce, that desperately needs another marketing channel after having so many promises in the past that haven't panned out. It's something that's probably going to get a lot of noise and be very attractive to the other side very quickly.

123.     In response to the next question regarding how AXON could be used to expand into other verticals, Foroughi stated AppLovin's approach was to "go to the entirety of e-commerce":

> **[Morgan Stanley Analyst:]** So the question is just on that e-commerce pilot. I guess, given that you're, based on the results of the pilot, successfully expanding into other verticals and using AXON and the data available to you to target other types of advertising outside of gaming, do you have any reason to believe or any doubt about the ability to expand the model to cover other verticals other than just e-commerce? Because it seems like, given the size of the audience and just the amount of data that you have to observe, it shouldn't necessarily just be limited to e-commerce. If you can move beyond gaming, do you believe you can move to other verticals?
>
> . . . **[Foroughi:]** 10 years from now, we think every advertiser that has a transactional model, whether it's collecting an e-mail address for a newsletter or a local pizza shop or an e-commerce brand or a gambling brand or a gaming brand or anything across any category, can buy on our platform and do it at scale. So there's no limitation to the power of the math and the technology that we've written.

***But the only limitation, the only reason why we referenced it as e-commerce today is the go-to-market***. We do want to be thoughtful about how we penetrate new categories. But even inside e-commerce, we're not approaching it as we're only going to go to fashion and then we're going to go to beauty. We're approaching it as ***we're going to go to the entirety of e-commerce, and then we're going to go to the entirety of the rest of the categories of advertising that matter***. And then hopefully, we're going to go to the whole world of transactional businesses over time.

124. In response to further questioning on the expected contribution from the e-commerce business, Foroughi denied that there were any seasonality effects from the Company's "fastest-growing product":

[UBS Analyst:] Great. Thanks for taking the question. Maybe another one here on e-commerce. Adam, I think you had said on 2025, we should be starting to see a material contribution. We've been getting a lot of questions from investors. Just kind of how to be thinking about material and just any tighter of a time frame you could maybe help us understand? I know 1Q is seasonally weak for e-commerce, but could it be as soon as 1Q that we start to see a contribution from that business?

[Foroughi:] Like we've said, we're confident in the 20% to 30% in gaming alone. This is sort of additive. ***I also just said it's the fastest-growing product I've ever seen. So it looks really good. Now if we were scaled in e-commerce, we'd have seasonality in the business. We don't today really have seasonality in the business***. When you're in pilot, you're talking about tens to hundreds total shops. And so we're really just early stages here, but the performance is really strong.

So it's hard for us to predict how quickly it can ramp. And I do like to remind people that when you have a scaled business, I think, run rate-wise, now $3.3 billion or so on this advertising business, that's really a lot of net revenue that we're reporting, gross it up to total ad dollars on the platform.

And for e-commerce to really drive material impact, and let's define that by 10% plus, is going to take some time to ramp up to. ***But we've never seen anything that looks like this in terms of strength in market. And so if it does scale the way we think it will, it's going to make an impact in '25***.

125. The statements in ¶¶122-124 were false and misleading when made. Foroughi assured investors that AppLovin's e-commerce pilot could "organically" scale without sales or marketing investment, that the Company could rapidly expand "to the entirety of e-commerce" and other verticals, and that the pilot—described as the "fastest-growing product" with "really strong" performance—was already producing "strong ROAS." In reality, Defendants were deliberately constraining the growth of AppLovin's e-commerce program, and its limited and purported "really strong" performance was favorably distorted by: (a) offering generous incentives to a limited group of cherry-picked advertisers who were already spending substantial advertising dollars on Meta;

(b) artificially exposing devices to AppLovin ads, thereby enabling AppLovin to claim attribution credit for purchases actually driven by Meta; and (c) timing the rollout of its e-commerce pilot to take advantage of seasonal holiday shopping to create the illusion of explosive growth. *See* ¶¶47, 106-114, *supra*. This made it appear that advertisers were achieving strong ROAS, when in fact the performance was overstated and unsustainable. *See* ¶¶85, 98-114, *supra*. Likewise, Foroughi's claim that the Company had scaled its gaming business "organically" was also false, as that growth was driven by deceptive practices, including forced app installations, junk ads designed to manufacture clicks and engagement, and background ads that users never even saw, all designed to inflate impressions and performance metrics. *See* ¶¶99-105, *supra*.

126.    In response to yet further questions about AppLovin's e-commerce opportunity, Foroughi again reiterated tremendous potential for AppLovin to expand beyond gaming ads, but refused to discuss the technological details of how AXON 2.0 would apply to these new customers:

> **[Cannonball Research Analyst:]** So can you help us understand this e-commerce opportunity?
>
> Is it just taking AXON 2.0 as it is and just making minor tweaks so that it just selects for targeted potential e-commerce customers? Or is it a big overhaul? And then how much of an advantage will you be able to take from the gaming and take it to e-commerce? And who – if you can, whom will you be competing against? Who is currently taking up those budgets?
>
> . . . **[Foroughi:]** So starting with like competition. I don't think, to date, anyone has delivered a solution inside mobile games for categories outside of gaming. And so we're going into greenfield. And what's exciting about these shops, and I said this on my talk track, when they're marketing on our platform today, this is a new audience.
>
> They're not otherwise able to reach this audience in that moment in time. So when we're able to show an ad for them and do it precisely and measure it all, there's an immense amount of incremental value for them from that advertisement. So it's a really strong solution for them.
>
> So it will continue to make our platform able to monetize that audience better, which is going to be a huge boom for our business and very healthy for the publisher as well, who will generate more dollars from their users but also get more diversity of content to their users. ***And in this case, if you're a game publisher, an e-commerce ad is not for someone who is building another game, it's for something that is completely different than your product. So it's a great win-win for all parties involved.***
>
> On the technology side, I never like to talk about complexities of technology. I certainly wouldn't say anything we do is simple. I don't think a lot of people in the world, I mean, maybe hundreds, max, engineers understand how to build these types

of platforms.  We've seen very few, only a handful of software implementations that are compelling at scale inside what we're calling these AI technologies, and we're one of those.

*And our engineers are building really complicated technologies that can do a lot more than just the first implementation did, which was drive performance marketing to gaming*.  So we think there's going to be a lot of expansion opportunity over time.  The technology platform is really powerful, and math is not limited to categories.  So there's going to be, I think, years of growth ahead of us.

127.    And when asked if the Company expected any "bottlenecks" in trying to expand the e-commerce business, Foroughi referred to the e-commerce pilot "as being the most compelling [product] we've seen yet" with a "line out the door of companies that want to jump on to this platform":

**[Oppenheimer & Co. Analyst:]** [O]n e-commerce, where are you spending or investing in commerce? And is there any bottlenecks you're trying to break through as you ramp up e-commerce and then get it to commercial stage?

**[Foroughi:]** *No.  Like I said, it's the most exciting product that we've ever launched.  We've never seen this kind of data on a new product*.  And if you recall, I mean, I don't voice optimism much since we've gone public on new products.  We've talked about a lot of products.  We are a very entrepreneurial company.  We will try a lot of things.  But the last time I talked about a really good product was when we launched AXON 2.0.  That turned out pretty good for us, our company, our partners and our investors.

*So if we're talking about this product as being the most compelling one we've seen yet, that you can assume we're not running into bottlenecks, other than like we just don't have the capacity yet in terms of human capital and every solution component automated to scale it out as quickly as the market demands.  So we've got to line out the door of companies that want to jump on to this platform*.

128.    According to Foroughi, AppLovin "built maybe the most innovative advertising technology that the world has yet seen," which would enable the Company "*to service tens of thousands to hundreds of thousands to millions of advertisers on [its] platform*."

129.    The statements in ¶¶126-128 were false or misleading when made.  Foroughi touted the e-commerce pilot as "the most exciting product [the Company] ever launched" that would "generate more dollars" for publishers, and further claimed it was driven by advanced AI technology with a "line out the door" of advertisers waiting to join and that the Company was "not running into bottlenecks" in the ramp up of its e-commerce product.  In truth, Defendants were deliberately constraining the growth of AppLovin's e-commerce program, and its limited and purported "really

strong" performance was favorably distorted by: (a) offering generous incentives to a limited group of cherry-picked advertisers who were already spending substantial advertising dollars on Meta; (b) artificially exposing devices to AppLovin ads, thereby enabling AppLovin to claim attribution credit for purchases actually driven by Meta; and (c) timing the rollout of its e-commerce pilot to take advantage of seasonal holiday shopping to create the illusion of explosive growth. *See* ¶¶47, 106-114, *supra*. That is, the pilot was a small-scale test inflated by riding the coattails of Meta's technology to claim attribution that was not driven by AppLovin. AppLovin's e-commerce program did not "generate more dollars" for publishers but instead imposed additional costs by duplicating attribution already credited to Meta. *See* ¶¶106-114. Likewise, the purported "really complicated technologies" that supposedly "dr[o]ve performance marketing to gaming" were in fact the product of practices, including forced app installs and deceptive ads designed to manufacture clicks, engagement, and impressions. *See* ¶¶99-105. These practices provided no credible basis for Foroughi's claims of sustainability or long-term growth concerning its e-commerce platform.

130.    Also on November 6, 2024, AppLovin filed its quarterly report on Form 10-Q with the SEC for 3Q24, signed and certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Foroughi and Stumpf. The "Risk Factors" section of the 3Q24 Form 10-Q stated that the Company faced risks of adverse effects from any actual or perceived privacy violations under a risk factor titled "Risks Related to Legal and Regulatory Matters":

> We are subject to laws and regulations concerning privacy, information security, data protection, consumer protection, advertising, tracking, targeting, and protection of minors, and these laws and regulations are continually evolving. ***Our actual or perceived failure to comply*** with these laws and regulations ***could*** adversely affect our business, financial condition, and results of operations.

131.    These warnings were written as hypothetical risks *i.e.*, that with regard to "privacy policies and terms of service located ***in application store fronts***, within our mobile games, and on our respective websites," privacy violations ***could*** cause users to lose trust in the Company which ***could*** adversely affect its business and operations:

> ***Any failure or perceived failure by us to comply with our terms of service or privacy policy, or with applicable laws, regulations, or legal, contractual, or other actual or asserted obligations to users or third parties***, concerning privacy, information security, data protection, consumer protection, or protection of minors; or our privacy-related legal obligations, or any compromise of security that results in

the unauthorized release or transfer of personal information or other user data, may result in governmental enforcement actions or other proceedings, claims, demands, and litigation by private parties, or public statements against us by consumer advocacy groups or others and ***could cause our users to lose trust in us, which could adversely affect our business, financial condition, or results of operations***. Additionally, if third parties we work with, such as users, developers, vendors, service providers, or other business partners violate applicable laws or our policies, such violations may also put our users' information at risk and could in turn adversely affect our reputation, business, financial condition, and results of operations.

132.    The above warnings were repeated in identical form in AppLovin's annual report filed with the SEC on Form 10-K for full year 2024 ("FY24"), signed and certified pursuant to SOX by Foroughi and Stumpf.

133.    Defendants' risk factor statements referenced in ¶¶130-132 were materially misleading because the Company disclosed as a hypothetical risk that any "actual" or "perceived failure" by the Company to comply with laws and regulations and various terms of service "***could***" cause reputational harm that "***could***" adversely affect AppLovin's business and operations while at the same time actively concealing inherently risky business strategies that directly and negatively affected the Company's reputation.  In reality, AppLovin was already engaged in inherently risky and improper business strategies—including forcing unwanted app installations, spamming users with unseen background and junk ads designed to manufacture clicks, engagement, and impressions, improper fingerprinting and collection of PIGs, and misappropriating attribution credit from Meta—that directly exposed the Company to precisely the privacy and consumer-protection violations described above.  *See* ¶¶98-114, *supra*.  These practices were not hypotheticals but ongoing misconduct that posed immediate reputational and regulatory risks.  By framing these risks as speculative possibilities, Defendants misled investors about the true condition of AppLovin's business and concealed the extent to which its reported growth was dependent on unlawful and unsustainable practices.

134.    In response to Defendants' November 6, 2024 statements, the price of AppLovin Class A common stock increased $77.98 per share (+46.3%) by the close of the market on November 7, 2024, compared to a 0.7% increase in the Standard & Poor's 500 Stock Index ("S&P 500").

**B.    December 11, 2024—Nasdaq Investor Conference**

135.    On December 11, 2024, Foroughi and Stumpf gave a presentation on behalf of AppLovin at the Nasdaq Investor Conference.  In response to a question regarding the excitement generating by the pivot to e-commerce advertising, Foroughi likened the Company's move to other sectors to TikTok's expansion beyond music videos, and again claimed the e-commerce pilot was "the fastest-growing product" the Company had ever released:

> **[Morgan Stanley Analyst:]** Let's shift to a topic I think a lot of people in the room were probably very excited about, which is e-commerce advertising.  So let's just start with, what are you doing in e-commerce?  How are the early tests going?  And why do you think AppLovin will win in this category?
>
> **[Foroughi:]** Yeah.  So obviously, there's a lot of excitement around this.  But let me start with why we ended up talking about expanding outside of gaming to begin with.  When we launched AXON 2.0, we saw the power of this technology, and this is what I call personalization technology.  It's a recommendation engine that's really powerful.
>
> Now if you have a recommendation technology and you give it just one category of content, it can't really do what it's designed to do.  An analogy would be it's easy to forget that TikTok once was Musical.ly.  When they bought that company for under $1 billion, it was niche.  They only showed music videos.  Then they opened up to all types of content and let the technology do the rest to scale the product.
>
> *Well, we've got a similar technology, it's very powerful, and we let it only show gaming advertisements to the consumer.  So once we saw the power of this technology, we said, look, this thing is going to be able to do anything.  So let's get it to be open to everything*.
>
> *And so we started building the tools and technologies to enable any website with the business model to be able to advertise on our platform and reach this really large audience of 1.4 billion daily actives through us and do it on a performance basis*.  And so we had a lot of confidence that we were able to – we were going to be able to do this.  We did that work.  We rolled it out.  *And now there's been a lot of noise on Twitter from customers that are early in a pilot that we're running that are seeing phenomenal results*.
>
> And so I'd urge investors to go to Twitter to – and look up AppLovin and just see the commentary to understand really how performant this product is for those advertisers.  We haven't talked much about the details outside of that.  But I did say on our earnings call last quarter, *this is the best and fastest-growing product we've ever released.  That includes the algorithm itself*.  So we're really excited about what the potential is here.

136.    Foroughi also claimed that the data they had seen in the e-commerce pilot confirmed that they could expand its advertising services to "any company that is online with a website that has a business model":

1   **[Morgan Stanley Analyst:]** Great. So when we think about your machine
2   learning engine, which is branded as AXON. So when we think about AXON and
    the ability to extend to e-commerce, does that imply that you could extend the
3   business to other non-gaming ad verticals? And if so, how broad is that opportunity?

4       **[Foroughi:]** Yeah. We think it's really broad. *We expect, now that we've*
    *seen the data that we've seen, that any company that is online with a website that*
    *has a business model, that drives to some KPI will be able to buy advertising*
5   *through our platform*. Now that KPI may vary. We've chosen specifically to go
    after mid-market direct-to-consumer shops right now.

6
7       Now their KPI is revenue and profit. They want to advertise and get users
    and know that they're making an incremental profit on that advertising. To us, that's
8   the hardest KPI because it's so far down the funnel. Now you can imagine a
    different type of advertiser who's sending e-mails to sell financial tips could come
9   online. Well, we can certainly sell e-mails. That's easier to go build the cost per
    lead model, and that exists in the system already.

10      Another advertiser, like a streamer, might want to sign up subscribers. Cost
    per registration is also supported in the system. *So because we have a KPI-based*
11  *advertising model, it's completely automated, and we've proven we can expand out*
    *to web and make it work across a wide variety of different types of business models*
12  *at all sorts of different prices in terms of cost-per-goods sold and revenue-per-*
    *goods sold, we know now that we can go out and expand this product to millions*
13  *and millions of customers in the future*.

14      137.    The statements detailed in ¶¶135-136 above were false or misleading when made.

15  Foroughi's assertion that AppLovin had built "the tools and technologies" to enable businesses to

16  profitably advertise through its platform "on a performance basis" concealed that the Company's

17  historic success in mobile ad-gaming was driven by deceptive practices such as forcibly triggering

18  app installations, spamming junk ads to maximize clicks, engagement, and impressions, and

19  generating "invisible" ad impressions to inflate performance metrics. *See* ¶¶99-105, *supra*.

20  Likewise, AppLovin's purported "expansion" into e-commerce was not driven by any technological

21  breakthrough, but was artificially manufactured by: (a) offering generous incentives to a limited

22  group of cherry-picked advertisers who were already spending substantial advertising dollars on

23  Meta; (b) artificially exposing devices to AppLovin ads, thereby enabling AppLovin to claim

24  attribution credit for purchases actually driven by Meta; and (c) timing the rollout of its e-commerce

25  pilot to take advantage of seasonal holiday shopping to create the illusion of explosive growth. *See*

26  ¶¶47, 106-114, *supra*. By assuring investors that AXON 2.0 could support "millions and millions"

27  of non-gaming advertising businesses on a performance basis, Foroughi misrepresented both the

28  source of the Company's past growth and the viability of its new e-commerce product.

## C.     February 12, 2025—4Q24 and FY24 Earnings Report

138.    On February 12, 2025, AppLovin announced its financial results for 4Q24 and FY24 in a press release and Form 8-K filed with the SEC, as well as in a shareholder letter signed by Foroughi (the "4Q24 Shareholder Letter"). In the 4Q24 Shareholder Letter, Foroughi stated:

> From the outset, we committed to building products that not only automated marketing but also delivered measurable incremental earnings. We wanted to design a platform to help our ***customers spend every dollar on acquiring users profitably and transparently***. This principle continues to guide the innovations we deliver to our partners.
>
> ***These principles were on full display in 2024, a year that not only brought significant growth—marked by a remarkable 75% increase in revenue in our advertising business—but also showcased the transformative potential of AI and automation***. We've spent several quarters optimizing our teams to embrace automation, knowing the world is moving in this direction. We believe those who view these technologies as allies, rather than threats, will unlock extraordinary potential and we aim to lead by example.

(Footnote omitted.)

139.    In the same shareholder letter, Foroughi continued to emphasize the Company's use of AI technologies as a key driver of growth:

> Over the last few years, our team has achieved extraordinary things. ***We've built an advertising model as powerful as any advertising AI model in the world, delivering measurable success for our partners***. Early adopters in gaming and direct-to-consumer commerce ***have already seen the impact of our technology***, and our mission is clear: to onboard every business that wants to drive measurable growth.
>
> We are driven by the belief that our technology can positively impact the global economy. By helping businesses of all kinds efficiently connect with their audiences, we unlock their potential to grow and thrive.

140.    Foroughi's statements in ¶¶138-139 were false and misleading when made. By claiming that AppLovin's platform enabled advertisers to "spend every dollar on acquiring users profitably and transparently," and touting a 75% revenue increase as proof of the "transformative potential of AI and automation," Foroughi concealed the true drivers of the Company's reported growth including deceptive advertising practices that forcibly triggered app installations, manipulated and inflated clicks, engagement, and ad impressions, and misappropriated e-commerce attribution from Meta. *See* ¶¶98-114, *supra*. It was false and misleading for Foroughi to attribute AppLovin's growth to "the impact of [the Company's] technology" when the growth was driven by

these undisclosed and improper practices. Likewise, it was false and misleading for Foroughi to state that AppLovin had "built an advertising model as powerful as any advertising AI model in the world, delivering measurable success," when in reality its mobile ad-gaming revenues were fueled by these deceptive ad practices and its e-commerce platform depended on claiming credit for e-commerce conversions that were generated by Meta. Thus, Foroughi misled the market regarding the sustainability and legitimacy of AppLovin's platform.

141. On the February 12, 2025 earnings call, Foroughi's prepared remarks highlighted the "meaningful" (but undisclosed) advertising dollars the Company was able to capture from its e-commerce pilot as proof of concept that AppLovin was positioning itself "to serve the entire global advertising economy," and announced that AppLovin would be selling its Apps business to focus solely on the Advertising business:

> Q4 was a major milestone, arguably our most foundational period since the AXON upgrade in 2023. For the first time, **we captured meaningful holiday shopping advertising dollars** and witnessed the impact of an advertising category beyond solely gaming contributing to our growth. I'm sure many of you are curious about how much revenue our e-commerce category contributed.
>
> While we're not breaking out revenue by vertical because that's not how we view our business, I'd like to provide some perspective. We operate a platform that reaches over 1 billion people in mobile games daily, with their engagement times comparable to social networks.
>
> Historically, most of our ads focused on advertising for other games, but now we're attracting a broader set of advertisers. **Q4 results show that our models can perform in other categories, in addition to continuing to improve performance for our gaming customers**. This breakthrough is only the beginning. We've now also validated that our platform success isn't only limited to direct-to-consumer brands.
>
> **Early pilots have shown positive outcomes for a range of advertisers, suggesting that any business in any vertical can harness the power of our platform. This opens up a massive opportunity as there are over 10 million businesses worldwide you advertise online that could eventually use our platform profitably**.
>
> By delivering incremental value, we position ourselves as an engine for growth. It's a win-win for brands, consumers and shareholders. **These early results solidify our vision of building one of the most influential marketing platforms in the world. Where we once focus on gaming, we're now positioning ourselves to serve the entire global advertising economy**. Importantly, the users engaging with our network aren't just shifting existing purchases. They're discovering new products while playing the games they love, generating truly incremental demand.
>
> By enabling these discoveries, we're expanding the global economy for consumers and advertisers alike. **Demand from advertisers wanting to join our platform is high**. Currently, our systems are still being fully developed and lack the

full self-service capabilities needed to handle growth at scale.  Our priority this year is to develop and roll out more automated tools to allow countless new businesses to tap into our platform.

In line with this expanding focus on advertising, we've been assessing how best to invest our resources to serve the needs of a global client base.  ***Seven years ago, we began acquiring gaming studios to help train our earliest machine learning models, an invaluable step in shaping the AI that underpins our AXON platform***.

However, we've never been a game developer at heart.  We have immense respect for the creativity it takes to build games, including from teams in our studios.  Today, we're announcing we've signed an exclusive term sheet to sell all of our apps business.

142.     During the question-and-answer portion of the same earnings call, Foroughi stated that the Company's e-commerce product was "***seeing success across any category that comes on to the platform***, which gives us a lot of confidence . . . as we go through the year."  Stumpf similarly maintained that the Company still felt "***very confident . . . [in] the ability for us to contribute a material portion of revenue from the e-commerce opportunity in 2025***."

143.     Analysts were excited about e-commerce's contribution to the Company's revenue, with Foroughi claiming the Company now had "proof of life in e-commerce," while claiming revenue broken out by category did not matter:

We're really, really early still in AI development and research, both inside our company and then obviously externally, too.  This is not a field that's mature.

It's early in its existence.  It's only going to get better.  And when our models get better, we've all seen the impact to revenue.  And the other piece is, we've always been a closed managed platform, specifically for mobile games.  ***We now have a lot of proof of life in e-commerce***.

You've seen it on Twitter, a lot of the noise from customers that are in.

But we have not let a lot of customers onto the platform yet as we've been on pilot.  ***As we go more and more open and start attracting thousands and tens of thousands, hundreds of thousands of customers to come on over the coming quarters and years, the business is going to continue to show compelling growth.  We look at it as one single business and better monetizing the 1 billion-plus daily actives that we see.  We don't think about it as revenue from each category matters***.

144.     While Defendants were opaque about the number of companies included in the e-commerce pilot, Foroughi claimed "***we've got just customers coming to us[,] [s]o there's a long, long line out the door***."

145. The statements in ¶¶141-144 were false and misleading when made. By claiming that AppLovin had "captured meaningful holiday shopping advertising dollars," achieved "proof of life in e-commerce," and could perform across "any business in any vertical," Foroughi misrepresented both the source of the Company's growth and the viability of its platform. In reality, AppLovin's purported success outside mobile gaming was not the product of a transformative AI breakthrough or genuine advertiser demand, but instead relied on: (a) offering generous incentives to a limited group of cherry-picked advertisers who were already spending substantial advertising dollars on Meta; (b) artificially exposing devices to AppLovin ads, thereby enabling AppLovin to claim attribution credit for purchases actually driven by Meta; and (c) timing the rollout of its e-commerce pilot to take advantage of seasonal holiday shopping to create the illusion of explosive growth. *See* ¶¶47, 106-114, *supra*. Likewise, the Company's prior success in mobile gaming was itself the result of deception, including forced app installations, junk ads designed to maximize clicks, engagement, and impressions, and "invisible" background ad impressions designed to inflate revenue. *See* ¶¶99-105, *supra*. Thus, by assuring investors that AppLovin was positioned "to serve the entire global advertising economy" and generate "a material portion of revenue from the e-commerce opportunity in 2025," Foroughi and Stumpf concealed that the Company's business remained dependent on deceptive practices and the unsustainable claiming of sales attributable to Meta.

146. In response to Defendants' February 12, 2025 statements, the price of AppLovin Class A common stock increased $91.35 per share (+24.0%) by the close of the market on February 13, 2025, compared to a 1.0% increase in the S&P 500.

**D.    February 26, 2025—CEO Blog Post**

147. On February 26, 2025, in response to the release of short-seller reports questioning the integrity of AppLovin's business practices, AppLovin issued a public blog post titled "Note from our CEO." In the post, CEO Foroughi denied the reports' allegations as "false and misleading claims" made by "nefarious short-sellers." Foroughi asserted that AppLovin's success was driven by "sophisticated AI models," and addressed specific topics including platform compliance, consumer experience, data practices, financial transparency, and the performance of its e-commerce pilot:

**Consumer Experience:**

*We earn revenue based on the value we drive—not on clicks or mere impressions. Our advertisements are designed to generate real engagement and revenue for our advertisers. Every download results from an explicit user choice*—whether via the App Store or our Direct Download experience. *Our economic model demands that ads lead to genuine, high-intent engagement, ensuring our campaigns deliver meaningful, measurable results.*

\*    \*    \*

**E-commerce Pilot:**

*Our e-commerce pilot is performing exceptionally well. The current requirement for a minimum monthly media spend is designed to justify the resources needed for manual onboarding.* We plan to expand our self-service tools and gradually lift these requirements over the year. To highlight our success, *in December, we reached a run rate of roughly $1 billion a year of gross advertiser spend in the e-commerce category alone from around 600 customers. The growth potential in the coming years is substantial. Moreover, the speed of this growth clearly demonstrates the legitimacy and effectiveness of our platform.*

148.    The statements detailed in ¶147 above were false or misleading when made. First, Foroughi's claim that AppLovin's revenue is based on the "value" it drives, "not on clicks or mere impressions," was false and misleading, and directly contradicted the Company's own disclosures that: (a) the Company recognizes "Advertising Revenue . . . when the ad is displayed to users"; and (b) concerning in-app advertising revenue, the Company recognizes revenue "when the ad is displayed to users." *See* ¶¶28, 35, *supra*. Likewise, Foroughi's assertions that AppLovin's "advertisements are designed to generate real engagement" and "[e]very download results from an explicit user choice" were false and misleading: AppLovin designed ads to maximize clicks and impressions to drive revenue, and to do so, it forced app installations onto users' devices without their knowledge; because these apps were installed onto users' devices without their knowledge, they were plainly not the result of "explicit user choice." *See* ¶¶99-105, *supra*. Second, Foroughi's statements that the "e-commerce pilot is performing exceptionally well," that the "minimum monthly media spend" requirement was meant to cover onboarding, and that "the speed of this [e-commerce] growth clearly demonstrates the legitimacy and effectiveness of our platform" were each false and misleading. AppLovin's e-commerce platform results were artificially distorted by: (a) offering generous incentives to a limited group of cherry-picked advertisers who were already spending substantial advertising dollars on Meta; (b) artificially exposing devices to AppLovin ads, thereby

1  enabling AppLovin to claim attribution credit for purchases actually driven by Meta; and (c) timing

2  the rollout of its e-commerce pilot to take advantage of seasonal holiday shopping to create the

3  illusion of explosive growth. *See* ¶¶47, 106-114, *supra*. The "growth" AppLovin touted in e-

4  commerce was nothing more than claiming credit and piggybacking on Meta's success.

5  **VII.    ADDITIONAL SCIENTER ALLEGATIONS**

6      **A.    Massive Insider Stock Sales Support the Strong Inference of Scienter**

7      149.    AppLovin insiders, including the Individual Defendants, had substantial financial

8  incentive to commit the fraud alleged herein, as they conducted a massive insider selling spree

9  during the Class Period while AppLovin Class A common stock traded at artificially inflated prices.

10  Their Class Period insider sales of more than 8.3 million Class A shares for ***more than $2.6 billion***

11  in proceeds supports a strong inference that insiders timed their respective trading with knowledge of

12  the alleged fraud and sought to capture the stock's artificially inflated trading price before the market

13  could learn and absorb the truth about Defendants' fraudulent conduct.

14      150.    The Individual Defendants themselves collectively sold more than three million

15  shares for nearly $1 billion in proceeds at times calculated to maximize personal benefit from

16  undisclosed inside information, while private equity insider firm KKR completely exited its position

17  by unloading nearly 5.3 million shares for more than $1.6 billion in proceeds on a single day—just

18  two weeks into the Class Period and immediately following a major spike in AppLovin's stock price.

19  As described *infra* (*see* ¶¶236-240), and as set forth in **Appendix 2**, Defendants' sales of AppLovin

20  shares were also made contemporaneously with Lead Plaintiffs' purchases of AppLovin shares

21  during the Class Period.

22      151.    As demonstrated below, the magnitude of these insider sales is extraordinary:

| Insider | Position | Shares | Amount |
|---|---|---|---|
| Foroughi | CEO & Chair | 1,043,530 | $350,430,570 |
| Shikin | CTO | 1,145,227 | $362,454,075 |
| Chen | CFO & Director | 790,000 | $262,938,721 |
| Stumpf | CFO | 51,525 | $16,914,120 |
| **Total: *Individual Defendants*** | | **3,030,282** | **$992,737,486** |
| *KKR* | | *5,274,246* | *$1,634,860,909* |
| **Total Insiders** | | **8,304,528** | **$2,627,598,396** |

1

### 1. The Individual Defendants Insider Selling Is Highly Suspicious

2        152.    The amount, nature, and timing of Foroughi's, Chen's, Stumpf's, and Shikin's insider

3    dispositions were dramatically out of line with their prior trading history and were conducted at

4    times to maximize their personal benefit while AppLovin Class A common stock traded at record

5    high prices.[22]  Indeed, during the equivalent pre-Class Period interval "Control Period" (*i.e.*, from

6    June 19, 2024 through November 6, 2025), the Individual Defendants sold significantly less in terms

7    of total proceeds received:

8

9

10

11



12

13

14

15

16

17

18

19

20

21

22

23

24    ───────────────────
[22]    As further detailed in **Appendix 1**, the shares sold by the Individual Defendants during the Class

25    Period were all listed with either an "S" or "F" transaction code on their Forms 4 filed with the SEC.
     According to the SEC, transaction "Code S" is used to identify open market sales, whereas "Code F"

26    transactions are those whose proceeds are purportedly used for the "[p]ayment of exercise price or
     tax liability by delivering or withholding securities incident to the receipt, exercise or vesting of a

27    security issued in accordance with Rule 16b-3."  Even if the proceeds of these Code F transactions
     legitimately went towards the payment of a stock option exercise price or tax liability, the Individual

28    Defendants still personally profited from transacting in AppLovin stock at artificially inflated prices
     by tendering fewer shares to cover such liabilities.

153.    The magnitude of the Individual Defendants' sales also represented significant proportions of their total Class A shareholdings, and the proceeds were astronomically higher than their annual salaries.[23]

| Defendant | Class A Shares Sold | Proceeds | Base Salary (Year) | Proceeds: Base Salary | % of Sales to Total Class A Ownership During Class Period (Measured as of March 31, 2025) |
|---|---|---|---|---|---|
| Foroughi | 1,043,530 | $350,430,570 | $400,000 (2024) | 876:1 | 26.9% |
| Chen | 790,000 | $262,938,721 | $400,000 (2023) | 657:1 | 49.3% |
| Stumpf | 51,525 | $16,914,120 | $400,000 (2024) | 42:1 | 22.5% |
| Shikin | 1,145,227 | $362,454,075 | $400,000 (2024) | 906:1 | 22.5% |
| **TOTALS** | 3,030,282 | $992,737,486 | | | |

154.    Further, each of the Individual Defendants sold Class A common stock within three months of the first corrective disclosures made on February 20, 2025, while the Company was concealing material, nonpublic information regarding its deceptive advertising practices and e-commerce pilot.  In fact, in the week between the Bear Cave Report (February 20, 2025) and the Fuzzy Panda and Culper Reports (February 26, 2025) and related ensuing stock price drop, Foroughi sold 90,000 shares of Class A common stock for gross proceeds of more than $37 million.  Immediately after the Fuzzy Panda and Culper Reports, Chen likewise sold 200,000 shares for approximately $65 million in proceeds as the Company's stock continued to decline.  As shown in

---

[23]    While Foroughi and Chen also held shares of Class B common stock, they were highly disincentivized from selling such shares in order to maintain their voting control of the Company.  AppLovin's Class B common stock has 20 times the voting power as the Class A common stock.  As set forth in AppLovin's SEC filings, "[t]he multi-class structure of [AppLovin's] common stock is intended to ensure that, for the foreseeable future, [its] CEO and Co-Founder Adam Foroughi continues to control or significantly influence the governance of the Company."  Through their exclusive ownership of Class B shares, Chen and Foroughi are "collectively able to determine or significantly influence any action requiring the approval of [AppLovin's] stockholders, including the election of [its] Board of Directors, the adoption of amendments to [its] certificate of incorporation and bylaws, and the approval of any merger, consolidation, sale of all or substantially all of our assets, or other major corporate transaction."  Class B shares are "neither listed nor traded" publicly.

1    the chart below, even when looking at just Code S open market sales, the Individual Defendants

2    purposefully timed their trades to maximize their gains from the stock's artificial inflation:



14    155.    An analyst at *Seeking Alpha* highlighted these concerns about "unprecedented insider

15    selling activity" following the Company's November 6, 2024 earnings release, flagging for investors

16    that insider sentiment may not align with what investors knew:

> Because November 2024 witnessed unprecedented insider selling activity totaling
> $3.6 billion across 12 transactions.  The scale of this selling activity, particularly
> from key executives, including the Chief Technology Officer [Shikin] and multiple
> directors, raises concerns about insider sentiments on the stock's current valuation
> levels.[24]

20    156.    That analyst referred to the Company's "Insider Selling Spree" as "one of the most

21    significant red flags" for the Company:

**Insider Selling Spree**

The recent insider trading activity at AppLovin presents one of the most significant
red flags in my analysis. In November 2024, insiders were on a selling spree. The
month recorded a staggering $3.6 billion in insider sales across 12 separate
transactions, marking the largest monthly insider selling volume in the company's
history. What makes this selling particularly noteworthy is not just its magnitude, but
the broad participation across multiple levels of leadership and the complete absence
of offsetting insider purchases.

---

[24]    The total insider sales referenced by *Seeking Alpha* includes sales from non-defendant Company insiders.

157.    The *Seeking Alpha* analyst also noted "[t]he fact that no insider purchases were recorded during the whole year of intense selling activity further reinforces the bearish signal"; in other words, that the stock's valuation was likely unsustainable.  According to that analyst:

> The total value of $3.6 billion in sales represents a significant portion of AppLovin's market capitalization and suggests a coordinated view among insiders about the stock's current valuation levels.
>
> . . . [T]he nature of this selling activity spanning multiple executive levels, board members and a major institutional holder sends a clear signal about insiders' collective assessment of the risk-reward profile at current valuations.

158.    That market report scrutinized Shikin's November 2024 sales in particular, reporting that as to his disposal of nearly one million shares, "[t]he timing and size of these sales from the company's technical leader given AppLovin's heavy emphasis on its AI-driven AXON technology raises questions about the sustainability of the company's competitive advantage."  Shikin's November 2024 sales alone amounted to over $315 million in proceeds.

159.    Notably, none of the Individual Defendants other than Shikin utilized Rule 10b-5 trading plans to execute their share disposals.  Sales of this magnitude by Foroughi, Chen, and Stumpf are highly suspicious absent a trading plan.  While Shikin did utilize trading plans, his usage of these plans is highly suspicious.  Shikin entered into two different plans in a six-month period, one established on December 9, 2024 during the Class Period, just six months after the previous plan had been established on June 7, 2024.  Moreover, Shikin's trades do not follow any discernible pattern and appear to be one-off in nature, rather than part of a regular, pre-scheduled trading plan.

## 2.    KKR's Selling Is Highly Suspicious

160.    Shortly after the start of the Class Period, private equity investor KKR completely liquidated its position in AppLovin in a highly suspicious, one-day transaction on November 21, 2024.  Specifically, on November 21, 2024, KKR sold 5.3 million AppLovin shares, its entire remaining holdings in AppLovin, for proceeds of over $1.6 billion.  According to an analyst at *Seeking Alpha*, the "large-scale exit by a sophisticated institutional investor [KKR] that likely has deep insight into the [C]ompany's operations and prospects is particularly concerning."[25]

---

[25]    KKR had special access to information and the ability to exert control over AppLovin as a party to an August 15, 2018 Investors' Rights Agreement, which granted KKR, *inter alia*, the right "to

161.    The magnitude and timing of this sale are particularly suspicious when compared to KKR's prior trading activity during the Control Period.  For example, on May 13, 2024, KKR sold only 1.75 million shares for proceeds of approximately $146 million.   Just months later and following a sharp increase in AppLovin's stock price, KKR increased the size of its sale by more than ten-fold in order to capitalize on the inflated price.




### 3.    Suspiciously-Timed Sales by Other Company Insiders

162.    In addition to the Individual Defendants and KKR, at least six other AppLovin insiders unloaded another 235,978 AppLovin shares for proceeds of nearly $73 million—including the Company's Chief Marketing Officer ("CMO"), Secretary, and four Directors.  These sales were similarly timed to take advantage of the inflated share price.  In total, at least ten different insiders dumped shares during the Class Period at artificially inflated prices.

| Name | Position | Date | Shares | Price | Amount |
|---|---|---|---|---|---|
| Jansen, Katie Kihorany | CMO | 11/12/24 | 59,876 | $286.14 | $17,132,855 |
| Jansen, Katie Kihorany | CMO | 11/13/24 | 59,876 | $286.12 | $17,131,990 |
| Billings, Craig Scott | Director | 11/21/24 | 18,000 | $318.94 | $5,740,954 |
| Vivas, Eduardo | Director | 11/26/24 | 30,330 | $330.67 | $10,029,070 |

visit and inspect the Company's properties; examine its books of account and records; and discuss the Company's affairs, finances, and accounts with its officers, during normal business hours of the Company."  KKR also had the unique right to attend all AppLovin Board meetings and give all meeting materials to KKR's directors.  KKR also had a nexus to the internal operations of AppLovin through its relationship with Chen—Chen was the former head of Technology, Media, and Telecom at KKR, and in that capacity, he led KKR's $400 million investment in AppLovin.

| Name | Position | Date | Shares | Price | Amount |
|---|---|---|---|---|---|
| Harvey Dawson, Alyssa | Director | 11/27/24 | 3,000 | $325.76 | $977,282 |
| Georgiadis, Margaret | Director | 11/29/24 | 30,500 | $339.69 | $10,360,433 |
| Valenzuela, Victoria | Secretary | 12/03/24 | 17,925 | $354.15 | $6,348,053 |
| Harvey Dawson, Alyssa | Director | 12/06/24 | 500 | $406.27 | $203,134 |
| Valenzuela, Victoria | Secretary | 12/19/24 | 15,971 | $313.07 | $5,000,041 |
| **Total—Other Insiders** | | | **235,978** | | **$72,923,812** |

**B.    The Fraud Involved AppLovin's Core Products and the Individual Defendants Are High-Level Executives Who Were Directly Involved in or Informed of the Company's Operations**

163.    Foroughi (CEO and Board Chairman), Stumpf (CFO), Shikin (CTO), and Chen (Director and former CFO) were AppLovin's top executives and thus, were responsible for, and remained well informed of, issues critical to the Company's success.  Throughout the Class Period, AppLovin's financial operations were overseen by the Individual Defendants.  Foroughi and Stumpf, specifically, repeatedly spoke on investor conference calls with analysts concerning the Company's financial results and pivot into e-commerce.  Those statements explicitly reference the duo's access to and technical knowledge of data concerning the Company's core products and the purported impacts those products had on the Company's revenue.  As CTO, Shikin led the engineering teams responsible for developing the Company's core products, while Foroughi was the public-facing architect of the Company's product strategies and strategic business transformations.  The Company's business and affairs were also managed by and under the direction of the Company's Board, for which Chen was a member and Foroughi was the Chairperson.

164.    The fraud alleged herein involves the operations and prospects of AppLovin's primary business segment, Advertising, and the Company's main advertising revenue drivers (including mobile game advertising and e-commerce).  Advertising revenue was the Company's largest contributor to the Company's bottom line during the Class Period.

165.    The vast majority of the Company's Advertising revenue is generated through two core products developed by AppLovin—AppDiscovery and MAX.  MAX, the Company's mediation platform, gathers pricing data from ad networks and publishers, providing the Company's proprietary AI tool AXON 2.0 with troves of data purportedly used for machine learning, which then

facilitates the matchmaking between advertisers and publishers in AppDiscovery, the Company's Advertising platform.

166. Prior to the Class Period, the Company's advertising segment experienced explosive growth, purportedly thanks to the Company's launch of AXON 2.0. AXON 2.0 was a purportedly meaningful driver of the Company's performance, and Foroughi specifically identified improvements to AXON 2.0 as the "core offering" of the Company's business, powered by "cutting-edge AI technologies."

167. In a pre-Class Period earnings call, Foroughi described that "incremental improvements in our technology is fundamentally core to our business on an ongoing basis," and that AXON 2.0 represented AppLovin's "biggest change for us in our business today . . . . It's a material upgrade of our core platform . . . ." Foroughi was personally knowledgeable about AXON 2.0's capabilities, noting that the "core expertise" behind it will "fuel our business for some time." According to Foroughi, as AXON 2.0 evolved, it would directly "generate lifts to revenue":

> [A]s we go to AXON 2, there's, on an ongoing basis, incremental improvements that we can make to the platform. ***That will fuel our business for some time***. And then there's the incremental uptick to AXON 3, and then AXON 4 and AXON 5. ***This core expertise is going to drive our business for a very, very long time. These technologies are only going to get more powerful***. And because of our market-leading position, we've got so much volume flowing through our systems that efficiency gains from these technologies, ***as they evolve, will generate lifts to revenue***.

168. Foroughi was also knowledgeable about the engineering behind AXON 2.0 and often answered analyst questions concerning AXON technology and its "self-learning" capabilities. According to Foroughi, the Company's AI model was "serving a ton of impressions every single day. And there's a feedback loop that gets this data back into the model and improves itself," which is why, according to Foroughi, AXON got better over time. AXON's data capabilities were purportedly unmatched. According to Foroughi, "[i]n our model, we're getting an insane amount of data into the system every single day. [The] [s]ystem is continuing to improve itself," through the Company's "cutting-edge technologies."

169. According to Stumpf, as AXON improved, so too did the Company's net revenue per installation. During the Company's May 8, 2024 earnings call with analysts and investors, Stumpf

1   attributed the "increase in both the net revenue per install as well as the volume of installations . . .

2   [to] the continued improvement of AXON." As Stumpf stated, he expected to see "both a growth in

3   the amount of money we're making per installation and volume of install as we see more advertisers

4   increase their spend" as AXON improved over time.

5        170.    According to Foroughi, AppLovin's advertising revenue grew "because our models

6   continue to improve," and the Company's goal was "[c]ontinued improvement from our models as

7   they learn [from] more data." Foroughi stated that AppLovin's models get "better every single

8   quarter because they see more data and they get more accurate. And that's – these models by

9   definition, this is how they work." Foroughi told analysts that these improvements are readily

10  visible to him, stating, "we see that in real-time, the models continue to get more accurate."

11       171.    As the Company rolled out AXON 2.0, Foroughi claimed it was the "key catalyst" for

12  the Company's Advertising business, and AXON 2.0 is credited by analysts with spurring the high-

13  double-digit growth in the Company's Advertising segment. *See, e.g.*, ¶¶31, 39.

14       172.    As part of the Company's strategic shift to compete more broadly in the global

15  advertising economy, the Company began using its AXON 2.0 engine to power its e-commerce

16  marketing platform, Audience+. Foroughi claimed that through Audience+ and e-commerce,

17  AppLovin was "building a platform with the potential to transform global marketing," and described

18  the new e-commerce program as "the best product I've ever seen released by us, fastest growing."

19  According to analysts at BTIG, that sentiment pointed to "[AudiencePlus] potentially being more

20  impactful than the Axon 2.0 launch was in its first year."

21       173.    Notably, and further evidencing Defendants' access to reports concerning the

22  Company's AXON and e-commerce products and unbeknownst to investors, Foroughi admitted,

23  after the Class Period, that the Company also deliberately constrained the rollout of the e-commerce

24  product during the Class Period because it was not yet "at the level that we wanted to get it to."

25       174.    More than two thirds of the Company's 2024 revenue was attributed to AppLovin's

26  Advertising operations. Thus, a strong inference arises that the Individual Defendants were aware

27  of, or recklessly disregarded, the true facts contradicting their false and misleading statements

28  concerning advertising revenue drivers and prospects.

175. According to Foroughi, he took on the role of Head of HR in 2024 (while still serving as AppLovin's CEO), and at the same time, the Company's engineering team, overseen by Shikin "absorbed" the Company's product development.

176. As the Company pivoted to e-commerce, Foroughi also identified a new "favorite metric" for gauging the Company's success—"adjusted EBITDA per employee"—which purportedly "underscores [the Company's] commitment to operational excellence." In his new role as Head of HR, Foroughi was able to manipulate that new "favorite metric" by "shedding" over 300 employees through permanent layoffs. With Foroughi at the helm of HR, he drove the Company from $1.5 million adjusted EBITDA per employee in 3Q24 to approximately $4 million in the first quarter 2025 ("1Q25"). Analysts attributed the increase in EBITDA per employee to the Company's decreasing headcount. Thus, in his role, Foroughi was able to manipulate the data presented to the market while simultaneously obfuscating just how successful the Company's e-commerce product was.

177. Due to their positions as senior Company insiders, the Individual Defendants stood to benefit from the Company's e-commerce smoke-and-mirrors game. As the Company touted success in e-commerce, AppLovin's share price experienced a meteoric rise, with at least five Company insiders, including defendants Chen and Foroughi, achieving billionaire status. The duo amassed their AppLovin wealth while Foroughi effected layoffs in an effort to increase the perception of operational growth in the "favorite" EBITDA per employee metric.

**C. AppLovin's Fraudulent Conduct Required Foroughi's and Chen's Participation and Approval**

178. Foroughi and Chen (collectively and with certain affiliates) maintained concentrated control over AppLovin through their collective ownership of all of the Company's issued and outstanding shares of Class B common stock—holding approximately two-thirds of AppLovin's aggregate voting power as of March 31, 2025. As of March 31, 2025, Chen held 5.1% of the Company's aggregate voting power, and Foroughi held 60.9% of the Company's aggregate voting power, which was alone sufficient to qualify AppLovin as a "controlled company" within the meaning of NASDAQ corporate governance requirements. Beyond this supermajority (and after

1    KKR sold its voting power through a massive $1.6 billion insider sale), no other shareholder

2    beneficially owned more than 2% of the total voting power.  This allocation of voting power allowed

3    Foroughi and Chen to maintain significant influence and control of the Board such that they could

4    direct how it voted.

5         179.    Foroughi and Chen are also parties to a voting agreement whereby all of the Class B

6    common stock held by them and their respective permitted entities will be voted as they determine.

7    The Company's SEC filings recognize that Foroughi and Chen "will collectively be able to

8    determine or significantly influence any action requiring the approval of our stockholders, including

9    the election of our Board of Directors, the adoption of amendments to our certificate of incorporation

10   and bylaws, and the approval of any merger, consolidation, sale of all or substantially all of our

11   assets, or other major corporate transaction."  According to a *Forbes* article dated November 23,

12   2024, "Chen will continue to have significant influence at AppLovin as a board member and

13   advisor" because of the voting power of Chen's Class B shares.

14        180.    Foroughi's and Chen's voting power gave them significant control over the

15   Company, such that the high-level, Company-wide decisions involving in the fraud alleged herein

16   could not have been made without their participation and approval.

17        **D.    AppLovin Immediately Initiated a Stock Buy-Back to Rebut**
          **Investigative Reports and Prop Up Stock Price**

18

19        181.    Almost immediately on the heels of the Culper and Fuzzy Panda Reports, AppLovin

20   authorized and issued a massive stock buyback in an effort to prop up the Company's declining

     stock price.

21

22        182.    On February 28, 2025, the Company announced an expansion of its share repurchase

23   program to allow for the immediate availability of an additional half a billion dollars for the

24   repurchase of its Class A common stock notwithstanding restrictions previously imposed by the

     Company's stock repurchase program.

25

26        183.    According to a Form 8-K filed with the SEC after the market closed on February 28,

27   2025, as of February 27, 2025, AppLovin "had approximately $1.772 billion remaining available

28   under its share repurchase program," subject to a quarterly repurchase limit equal to the Company's

1    free cash flow from the preceding fiscal quarter.  Accordingly, in 1Q25, the Company could

2    repurchase up to $695 million of AppLovin Class A common stock.

3         184.    On February 28, 2025, the Company's Board voted to authorize the immediate

4    modification of the Company's share repurchase program to make an additional $500 million

5    immediately available for stock repurchases, notwithstanding the free cash flow limitation.

6         185.    Analysts at Jeffries reported that they were "encouraged" by the Company's

7    repurchase decision, noting "[a]fter not buying back any shares in Q4 [2024], we were encouraged to

8    see APP announce they are making $500M available to repurchase.  This is notwithstanding the

9    amount that otherwise would have remained available during the quarter under the prior [free cash

10   flow] limitation."

11        186.    Media sources reported that "[s]hares of AppLovin . . . gained 6% as the company

12   announced a substantial $500 million immediate availability for share repurchases."  According to

13   that article, the Company's repurchase was "a strategic response to the stock's 22% drop" resulting

14   from the disclosure of negative investigative reports the week prior.

15        187.    According to the Company's Form 10-Q filed with the SEC on May 7, 2025, during

16   1Q25, the Company repurchased and subsequently retired 2.9 million shares of Class A common

17   stock for an aggregate amount of $1.0 billion.

18        188.    The Company's 1Q25 repurchase represented the single largest share repurchase in

19   the Company's history:

20

21

22

23

24

25

26

27

28



189.    In conjunction with its 1Q25 earnings results, the announcement of the 2.9 million share repurchase triggered an immediate 11.8% increase in the price of AppLovin's Class A common stock from a close price of $303.46 on May 7, 2025 to a close price of $339.51 on May 8, 2025, with analysts reiterating that AppLovin's 1Q25 repurchase was the Company's "highest qtrly repurchase ever."

### E.    AppLovin's Senior Executives' History with Deceptive Ad Practices

190.    AppLovin's reliance on deceptive practices is consistent with the track record of its CEO and senior executives.  Foroughi previously worked at Claria Corporation (formerly known as Gator Corporation), one of the first major spyware companies that was notorious for silently installing adware on users' computers, and whose name is now synonymous with "a type of adware or software that displayed or downloaded advertising automatically onto a person's computer."[26] Foroughi later co-founded Social Hour, an ad network company banned by Facebook from advertising on its platform in 2009 for "'deceptive content'" that posed a "'potential threat'" to their users' experience.  These prior ventures reveal a consistent pattern: Foroughi repeatedly worked at

---

[26]    Investopedia, *Gator: What It Means, How It Works, Adware*, https://www.investopedia.com/terms/g/gator.asp (last accessed Sep. 12, 2025).

1    and built companies premised upon deceptive advertising practices and exploitation of users for

2    profit.

3        191.    At AppLovin, Foroughi surrounded himself with former colleagues from these prior

4    ventures, and employed similar tactics to artificially inflate performance metrics while misleading

5    investors.  According to the Culper Report: (a) "AppLovin's co-founder and VP of Product Andrew

6    Karam worked at Lifestreet, Style Page, and Social Hour, all founded by Foroughi"; (b) "AppLovin

7    Director Eduardo Vivas co-founded Social Hour"; (c) "AppLovin's co-founder, former CTO, and

8    major shareholder John Krystynak was formerly the CTO of Social Hour"; (d) "AppLovin's GM of

9    New Initiatives Rafeal Vivas [Eduardo Vivas's brother] was Director of Business Development at

10    Social Hour"; and (e) "AppLovin Finance and Accounting executive Patrick McNenny previously

11    served as VP of Finance at Lifestreet."

12        192.    As described above, AppLovin's purported "success" was the result of deceptive

13    growth hacks, manipulation of attribution, and unauthorized tracking (*see* §V, *supra*)—schemes that

14    were enabled and perpetuated by Defendants' installation of trusted executives who ensured these

15    practices became embedded in the Company's operations.

16    **F.    Defendants Foroughi and Stumpf Signed SOX Certifications Attesting
         that They Personally Supervised AppLovin's Controls and
17         Procedures**

18        193.    The SOX certifications[27] signed by Foroughi and Stumpf further evidence scienter.

19    Foroughi and Stumpf signed SOX certifications filed with AppLovin's Form 10-K for FY24

20    representing that they were both "responsible for establishing and maintaining disclosure controls

21    and procedures . . . and internal control over financial reporting" and that the Company's financial

22    disclosures fairly and accurately presented its financial condition.  In AppLovin's Form 10-K for

23    FY24, the "Controls and Procedures" section states:

24            Our management, with the participation and supervision of our principal
            executive officer and our principal financial officer, has evaluated the effectiveness
25            of our disclosure controls and procedures . . . as of the end of the period covered by

26    ─────────────
      [27]    Exchange Act Rules 13a-14(a) and 15(d)-14(a), as adopted pursuant to §302 of SOX, require an
27    issuer's principal executive and financial officers to certify that: (a) the information contained in the
      issuer's annual reports is accurate and reliable; and (b) they have taken certain actions with respect
      to establishing and maintaining disclosure controls and procedures for the collection and reporting of
28    financial and other information.

this Annual Report on Form 10-K. Based on such evaluation, our principal executive officer and principal financial officer have concluded that, as of such date, our disclosure controls and procedures were effective at a reasonable assurance level as of December 31, 2024.

194.    Certifications pursuant to SOX are not directed solely at ensuring numerical accuracy and preventing dishonest accounting practices, and any interpretation restricting the statute's scope to these purposes would be artificially narrow and inconsistent with the remedial purpose of the statute.  The SEC interprets the fair presentation of companies' financial results to include any additional disclosure necessary to provide investors with a materially accurate and complete picture of an issuer's financial condition.  Here, the inference of Foroughi's and Stumpf's scienter is enhanced by the SOX-mandated certifications they signed, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about AppLovin was made known to them and that the Company's disclosure related controls were operating effectively.

## VIII.    LOSS CAUSATION AND ECONOMIC LOSS

195.    The market for shares of AppLovin Class A common stock was open, well-developed, and efficient during the Class Period.  Throughout the Class Period, AppLovin Class A common stock traded at artificially inflated prices as a direct result of Defendants' deceptive conduct, materially false and misleading statements, and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public.  Lead Plaintiffs and other members of the Class (defined below) purchased AppLovin Class A common stock relying upon the integrity of its market price and market information relating to AppLovin, and have been damaged thereby.

196.    When the relevant truth and its impact on AppLovin's financial results and prospects entered the market through a series of partial disclosures, the price of AppLovin Class A common stock significantly dropped, as the artificial inflation came out of the stock price over time.  As a result of their purchases of AppLovin Class A common stock during the Class Period, Lead Plaintiffs suffered economic loss (*i.e.*, damages) under the federal securities laws.

197.    The corrective impact of the initial disclosures alleged herein, however, was tempered by Defendants' ongoing conduct and misleading statements and omissions that continued to conceal the true nature of Defendants' fraud.  Each partial disclosure did not on its own fully remove the inflation from AppLovin's stock price because it only partially revealed the nature and extent of the fallout from Defendants' previously concealed misconduct.  Defendants' ongoing misrepresentations and omissions maintained the price of AppLovin Class A common stock at artificially inflated levels.

198.    The disclosures that corrected the market price of AppLovin Class A common stock are detailed below.  These stock price declines were due to firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific, non-fraud factors.

**A.    February 20, 2025—Bear Cave Report**

199.    On February 20, 2025, the Bear Cave Report and *The Capitol Forum* article partially revealed to the market the true facts regarding AppLovin's deceptive mobile advertising practices and the sustainability and prospective growth of the Company's e-commerce initiative.  *See* §IV.D.1., *supra*.

200.    Investors reacted negatively to this news.  As shown in the chart below, the price of AppLovin's Class A common stock fell $44.16 from a close of $494.17 on February 19, 2025, to close at $450.01 on February 20, 2025 (-8.9%) in response to these disclosures.  That same day, both the S&P 500 and the S&P 500 Information Technology Index ("S&P Info Tech") remained largely unchanged, each declining less than half of one percent that trading day.[28]

---

[28]    AppLovin's annual reports on Form 10-K compared the performance of its returns of its Class A common stock to the returns of the S&P 500 and the S&P Info Tech.

APP Price Performance

201.    Numerous media outlets attributed the 9% single-day stock price decline on February 20, 2025 to the Bear Cave Report, citing its revelations of AppLovin's "low quality" revenue growth and "skepticism regarding the sustainability of AppLovin's rapid growth."  Other media noted "AppLovin Stock Crashes After Edwin Dorsey's Bear Cave Alleges Potential 'Advertising Fraud' – Retail Mood Stays Deflated."

202.    According to a February 20, 2025 *Investing.com* article, "[t]he Bear Cave's investigation into AppLovin's ad operations *has introduced a new level of uncertainty for investors*, who may be reevaluating the risk profile associated with the [C]ompany's stock," and "[t]he [C]ompany's stock price movement is *indicative of the serious nature of the claims and the potential impact on investor sentiment*."

**B.    February 26, 2025—Culper and Fuzzy Panda Reports**

203.    On February 26, 2025, the Culper and Fuzzy Panda Reports revealed further new information to the market regarding AppLovin's e-commerce pilot and improper installation tactics to artificially boost revenue.  *See* §IV.D.2., *supra*.  As described above, those reports revealed that AppLovin was essentially "stealing" Meta's homework to claim attribution for the Company's nascent e-commerce business, while simultaneously inflating cost-per-installation revenue generated from hidden, backdoor app installations.  *See id.*

204.    As shown in the chart below, AppLovin's stock price plummeted in response to the February 26, 2025 disclosures in the Culper and Fuzzy Panda Reports.  The price of the Company's Class A common stock fell from a closing price of $377.06 per share on February 25, 2025 to a closing price of $331 per share on February 26, 2025, reflecting a $46.06 (-12.2%) decline from the day prior on usually high trading volume.



205.    As further illustrated by the below chart, the timing and magnitude of the decline in the price of AppLovin Class A common stock when compared to the price movements in the S&P 500 and the S&P Info Tech on February 20 and February 26, 2025 negates any inference that the losses suffered by Lead Plaintiffs and other Class members were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to AppLovin and the Individual Defendants' fraudulent conduct.





206.    Numerous media outlets directly tied the drop in AppLovin's stock price to the Culper and Fuzzy Panda Reports published on February 26, 2025, with *CNBC* reporting that same day that "[s]hares of AppLovin closed down 12% Wednesday as two short seller reports cast doubt on the integrity of the company's artificial intelligence-powered AXON advertising software."

**C.    March 27, 2025—Muddy Waters Report**

207.    On March 27, 2025, the Muddy Waters Report revealed further new information to the market regarding the Company's deceptive advertising practices and e-commerce business. *See* §IV.D.3., *supra*. The Muddy Waters Report revealed that, *inter alia*, a majority of AppLovin's e-commerce conversions are due to retargeting, not net new customers, and that AppLovin was "impermissibly extracting proprietary IDs from Meta, Snap, Tiktok, Reddit, Google, and others." *See id.*

208.    As shown in the chart below, the price of AppLovin's Class A common stock plunged $65.92 (-20.1%) on unusually high trading volume in response to the Muddy Waters Report—falling from a closing price of $327.62 on March 26, 2025 to a closing price of $261.70 on March 27, 2025. In contrast, the S&P 500 and the S&P Info Tech remained largely unchanged that trading day, with each declining less than one percentage point.

1
2
3
4
5
6
7
8
9
10
11



12    209.    Numerous media outlets directly attributed the March 27, 2025 price decline to the

13 Muddy Waters Report, with *CNBC* and *Bloomberg* reporting that same day that AppLovin's 20%

14 price decline was the "steepest drop on record" and that the "record one-day drop" came after

15 Muddy Waters "raised concerns about the company's digital ad technology."

16 **IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE: THE
        FRAUD-ON-THE-MARKET DOCTRINE**
17

18    210.    Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the

19 fraud-on-the-market doctrine in that:

20    •    Defendants made public misrepresentations or failed to disclose material facts during
            the Class Period;

21    •    the misrepresentations and omissions were material;

22    •    AppLovin Class A common stock traded in an efficient market;

23    •    the Company's common stock is liquid and was heavily traded during the Class
24           Period;

25    •    the Company's common stock traded on the NASDAQ and was covered by multiple
            analysts; and

26    •    Lead Plaintiffs purchased AppLovin Class A common stock between the time
27           Defendants misrepresented or failed to disclose material facts and the time the true
             facts were disclosed, without knowledge of the misrepresented or omitted facts.

28

1    211.   Based upon the foregoing, Lead Plaintiffs are entitled to a presumption of reliance

2    upon the integrity of the market.

3    212.   Lead Plaintiffs are also entitled to the presumption of reliance established by the

4    Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as

5    Defendants committed deceptive acts in furtherance of their scheme and omitted material

6    information in their Class Period statements in violation of a duty to disclose such information, as

7    detailed above.

8    ## X.   CLASS ACTION ALLEGATIONS

9    213.   Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

10   Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

11   acquired AppLovin Class A common stock during the Class Period (the "Class") and were damaged

12   thereby.  Excluded from the Class are Defendants, officers and directors of the Company, at all

13   relevant times, members of their immediate families and their legal representatives, heirs, successors

14   or assigns, and any entity in which Defendants have or had a controlling interest.

15   214.   The members of the Class are so numerous that joinder of all members is

16   impracticable.  Throughout the Class Period, AppLovin Class A common stock was actively traded

17   on the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiffs at this

18   time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are

19   hundreds or thousands of members in the proposed Class.  Record owners and other members of the

20   Class may be identified from records maintained by AppLovin or its transfer agent and may be

21   notified of the pendency of this action by mail, using the form of notice similar to that customarily

22   used in securities class actions.

23   215.   Lead Plaintiffs' claims are typical of the claims of the members of the Class as all

24   members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal

25   law that is complained of herein.

26   216.   Lead Plaintiffs will fairly and adequately protect the interests of the members of the

27   Class and have retained counsel competent and experienced in class and securities litigation.  Lead

28   Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

217.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, prospects, and/or management of AppLovin;

- whether statements made by Defendants to the investing public during the Class Period omitted material facts necessary to make the statements made neither false nor misleading;

- whether Defendants acted knowingly or with reckless disregard for the truth;

- whether the price of AppLovin Class A common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

218.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.    CAUSES OF ACTION

### COUNT I
### For Violation of §10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

219.    Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

220.    This Count is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder, and is brought against all Defendants.

221.    Pursuant to the above wrongful course of conduct, Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other documents described above, such as statements made to securities analysts and

1  the media that were designed to influence the market for AppLovin Class A common stock.  Such

2  reports, filings, releases, and statements were materially false and misleading in that they failed to

3  disclose material adverse information and misrepresented the truth about AppLovin's finances and

4  business prospects.

5        222.  By virtue of their ownership and/or positions at AppLovin, the Individual Defendants

6  had actual knowledge of the materially false and misleading statements and material omissions

7  alleged herein and intended thereby to deceive Lead Plaintiffs and the market, or, in the alternative,

8  the Individual Defendants acted with reckless disregard for the truth in that they failed or refused to

9  ascertain and disclose such facts as would reveal the false and misleading nature of the statements

10  made, although such facts were readily available to the Individual Defendants.  Those acts and

11  omissions were committed willfully or with reckless disregard for the truth.

12        223.  Information showing that the Individual Defendants acted knowingly or with reckless

13  disregard for the truth is peculiarly within their knowledge and control.  As executive officers of

14  AppLovin, the Individual Defendants had knowledge of the details of AppLovin's internal affairs.

15        224.  Defendants are directly and indirectly liable for the wrongs complained of herein.

16  Because of their positions of control and authority, the Individual Defendants were able to and did,

17  directly or indirectly, control the content of the statements of AppLovin.  As officers of a publicly

18  held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful

19  information with respect to AppLovin's businesses, operations, future financial condition, and future

20  prospects.  As a result of Defendants' misconduct, the market price of AppLovin Class A common

21  stock was artificially inflated throughout the Class Period.  Unaware of the adverse facts concerning

22  AppLovin's business and financial condition that were concealed by Defendants, Lead Plaintiffs

23  purchased AppLovin Class A common stock at artificially inflated prices and in doing so relied upon

24  the price of the common stock, the integrity of the market for the common stock, and/or upon

25  statements disseminated by Defendants, and were damaged thereby.

26        225.  During the Class Period, AppLovin Class A common stock was traded on an active

27  and efficient market.  Lead Plaintiffs, relying upon the integrity of the market, purchased AppLovin

28  Class A common stock at prices artificially inflated by Defendants' wrongful conduct.  Had Lead

1   Plaintiffs known the truth, they would not have purchased said AppLovin Class A common stock, or

2   would not have purchased them at the inflated prices paid.  At the time of the purchases and/or

3   acquisitions by Lead Plaintiffs, the true value of AppLovin Class A common stock was substantially

4   lower than the prices paid by Lead Plaintiffs.  The market price of AppLovin Class A common stock

5   declined upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs.

6          226.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly

7   or indirectly, have violated §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5

8   promulgated thereunder.

9          227.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs

10  suffered damages in connection with their respective purchases, acquisitions, and/or sales of

11  AppLovin Class A common stock during the Class Period, as the truth about AppLovin's operations

12  and prospects began to be disclosed to the investing public.

13                              **COUNT II**
                    **For Violation of §20(a) of the Exchange Act**
14                          **Against All Defendants**

15         228.    Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully

16  set forth herein.

17         229.    This Count is based upon §20(a) of the Exchange Act, 15 U.S.C. §78t(a), and is

18  brought against all Defendants.

19         230.    During the Class Period, the Individual Defendants participated in and oversaw the

20  operation and management of AppLovin, and conducted and participated, directly and indirectly, in

21  the conduct of AppLovin's business affairs.  The Individual Defendants exercised control over

22  AppLovin's operations and possessed the power to control, and did control, the specific activities

23  which comprise the primary violations about which Lead Plaintiffs complain.

24         231.    The Individual Defendants acted as controlling persons of AppLovin within the

25  meaning of §20(a) of the Exchange Act.  By virtue of their senior management positions as officers

26  and/or directors of AppLovin, their participation in and awareness of the Company's operations, and

27  their personal knowledge of the statements filed by the Company with the SEC and/or disseminated

28  to the investing public, these defendants had the power to influence and control and did influence

1   and control, directly or indirectly, AppLovin's decision-making, including the content and

2   dissemination of the allegedly false and misleading statements and other acts in furtherance of a

3   fraudulent scheme.

4          232.   In particular, each of the Individual Defendants had direct or supervisory

5   responsibility over the day-to-day operations of the Company and, therefore, is presumed to have

6   had the power to control or influence the particular business and/or operating practices and

7   expenditures and deficient control environment giving rise to the securities violations alleged in

8   Count I, and exercised that power.

9          233.   AppLovin had the power to control and influence the Individual Defendants and other

10  Company executives through its power to hire, fire, supervise, and otherwise control the actions of

11  its employees and their salaries, bonuses, incentive compensation, and other employment

12  considerations.  By virtue of the foregoing, AppLovin had the power to influence and control, and

13  did influence and control, directly or indirectly, the decision-making of the Individual Defendants

14  including the content of their public statements.

15         234.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs

16  suffered damages in connection with their purchases and/or acquisitions of AppLovin Class A

17  common stock during the Class Period when the relevant truth was revealed.

18         235.   By reason of the foregoing, the Defendants in this Count violated §20(a) of the

19  Exchange Act.

20                          **COUNT III**
                **For Violation of §20A of the Exchange Act**
21                  **Against the Individual Defendants**

22         236.   Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully

23  set forth herein.

24         237.   This Count is based upon §20A of the Exchange Act, 15 U.S.C. §78t-1, and is

25  brought against the Individual Defendants on behalf of Lead Plaintiffs who were damaged by these

26  defendants' insider trading.

27         238.   As detailed herein, the Individual Defendants were in possession of material,

28  nonpublic information concerning AppLovin.  They took advantage of their possession of material,

1   nonpublic information regarding AppLovin to obtain millions of dollars in insider trading profits

2   during the Class Period.

3       239.    As set forth in **Appendix 2**, the Individual Defendants' sales of AppLovin shares

4   were made contemporaneously with Lead Plaintiffs' purchases of AppLovin shares during the Class

5   Period.

6       240.    Lead Plaintiffs who purchased shares of AppLovin shares contemporaneously with

7   sales by these defendants suffered damages because: (a) in reliance on the integrity of the market,

8   they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange

9   Act as alleged herein; and (b) they would not have purchased AppLovin Class A common stock at

10  the prices they paid, or at all, if they had been aware that the market prices had been artificially

11  inflated by the misconduct alleged herein.

12  **XII.    PRAYER FOR RELIEF**

13          WHEREFORE, Lead Plaintiffs demand judgment against Defendants as follows:

14      A.      Declaring this action to be a class action properly maintained pursuant to Federal

15  Rule of Civil Procedure 23(a) and (b)(3) and certifying Lead Plaintiffs as Class Representatives and

16  Grant & Eisenhofer P.A. and Robbins Geller Rudman & Dowd LLP as Class Counsel.

17      B.      Awarding compensatory damages in favor of Lead Plaintiffs against all Defendants,

18  jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount

19  to be proven at trial, including interest thereon.

20      C.      Awarding Lead Plaintiffs their reasonable costs and expenses incurred in this action,

21  including reasonable attorneys' fees, accountants' fees, and experts' fees, and other costs and

22  disbursements.

23      D.      Awarding Lead Plaintiffs such other injunctive or equitable relief, including

24  disgorgement and/or the imposition of a constructive trust, that may be deemed just and proper by

25  the Court.

26

27

28

1

**XIII.   JURY DEMAND**

2

      Lead Plaintiffs hereby demand a trial by jury.

3

DATED: September 12, 2025

4

                                                      */s/ J. Marco Janoski Gray*

5

                                                      Ashley M. Kelly (Cal. Bar ID 281597)
J. Marco Janoski Gray (Cal. Bar ID 306547)

6

Justin Gary Oetting (Cal. Bar ID 350807)
ROBBINS GELLER RUDMAN & DOWD LLP

7

655 West Broadway, Suite 1900
San Diego, CA  92101

8

Tel.: (619) 231-1058
Fax: (619) 231-7423

9

Email: ashleyk@rgrdlaw.com

10

Email: mjanoskiv@rgrdlaw.com
Email: joetting@rgrdlaw.com

11

12

Shawn A. Williams (Cal. Bar ID 213113)
ROBBINS GELLER RUDMAN & DOWD LLP

13

Post Montgomery Center
One Montgomery Street, Suite 1800

14

San Francisco, CA  94104
Tel.: (415) 288-4545

15

Fax: (415) 288-4534
Email: shawnw@rgrdlaw.com

16

17

DATED: September 12, 2025

18

                                                    */s/ Karin E. Fisch*

19

                                                      Karin E. Fisch (admitted *pro hac vice*)
Vincent J. Pontrello (admitted *pro hac vice*)

20

GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor

21

New York, NY  10017
Tel.: (646) 722-8500

22

Fax: (646) 722-8501
Email: kfisch@gelaw.com

23

Email: vpontrello@gelaw.com

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

M. Elizabeth Graham (Cal. Bar ID 143085)
GRANT & EISENHOFER P.A.
2325 3rd Street, Suite 329
San Francisco, CA 94107
Tel.: (415) 229-9720
Fax: (415) 789-4367
Email: egraham@gelaw.com

*Counsel for Lead Plaintiffs and Lead Counsel
for the Class*

Thomas C. Michaud
VANOVERBEKE, MICHAUD
 & TIMMONY, P.C.
79 Alfred Street
Detroit, MI 48201
Tel.: (313) 578-1200
Fax: (313) 578-1201
Email: tmichaud@vmtlaw.com

*Additional Counsel*

**APPENDIX 1**

**Individual Defendants' Class Period Sales of AppLovin Class A Common Stock**

| Foroughi's Insider Sales | | | | |
|---|---|---|---|---|
| Transaction Date | Daily Proceeds | Daily Shares Sold | Average Sale Price (Daily Proceeds/Daily Shares Sold) | Code |
| 11/20/2024 | $258,350,540 | 794,387 | $352.22 | F |
| 12/09/2024 | $17,280,661 | 50,000 | $345.61 | S |
| 12/10/2024 | $16,606,318 | 50,000 | $332.13 | S |
| 12/11/2024 | $16,597,378 | 50,000 | $331.95 | S |
| 02/20/2025 | $4,114,441 | 9,143 | $450.01 | F |
| 02/21/2025 | $18,999,624 | 45,000 | $422.21 | S |
| 02/24/2025 | $18,481,607 | 45,000 | $410.70 | S |
| TOTAL | $350,430,570 | 1,043,530 | | |

| Chen's Insider Sales | | | | |
|---|---|---|---|---|
| Transaction Date | Daily Proceeds | Daily Shares Sold | Average Sale Price (Daily Proceeds/Daily Shares Sold) | Code |
| 12/09/2024 | $59,558,140 | 172,351 | $345.56 | S |
| 12/10/2024 | $72,197,060 | 217,649 | $331.71 | S |
| 12/11/2024 | $33,307,352 | 100,000 | $333.07 | S |
| 12/12/2024 | $32,945,713 | 100,000 | $329.46 | S |
| 02/28/2025 | $64,930,457 | 200,000 | $324.65 | S |
| TOTAL | $262,938,721 | 790,000 | | |

| Stumpf's Insider Sales | | | | |
|---|---|---|---|---|
| Transaction Date | Daily Proceeds | Daily Shares Sold | Average Sale Price (Daily Proceeds/Daily Shares Sold) | Code |
| 11/20/2024 | $9,894,493 | 30,424 | $325.22 | F |
| 11/22/2024 | $7,019,627 | 21,101 | $332.67 | S |
| TOTAL | $16,914,120 | 51,525 | | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Shikin's Insider Sales | | | | |
|---|---|---|---|---|
| Transaction Date | Daily Proceeds | Daily Shares Sold | Average Sale Price (Daily Proceeds/ Daily Shares Sold) | Code |
| 11/20/2024 | $16,828,509 | 51,745 | $325.22 | F |
| 11/21/2024 | $189,573,540 | 593,588 | $319.37 | S |
| 11/22/2024 | $51,735,181 | 165,986 | $311.68 | S |
| 11/25/2024 | $74,746,660 | 230,000 | $324.99 | S |
| 02/20/2025 | $9,633,814 | 21,408 | $450.01 | F |
| 03/10/2025 | $19,936,371 | 82,500 | $241.65 | S |
| TOTAL | $362,454,075 | 1,145,227 | | |

**APPENDIX 2**

**Individual Defendants' Class Period Sales Made Contemporaneously
with Lead Plaintiffs' Purchases**

| Defendant ("Def.") or Lead Plaintiff ("Pl.") | Transaction Date | Price | Shares Sold (Def.) or Bought (Pl.) | Proceeds (Def.) or Cost (Pl.) |
|---|---|---|---|---|
| Foroughi | 11/20/2024 | $325.22 | 794,387 | $258,350,540 |
| Shikin | 11/20/2024 | $325.22 | 51,745 | $16,828,509 |
| Stump | 11/20/2024 | $325.22 | 30,424 | $9,894,493 |
| Shikin | 11/21/2024 | $319.37 | 593,588 | $189,573,540 |
| Shikin | 11/22/2024 | $311.68 | 165,986 | $51,735,181 |
| Stumpf | 11/22/2024 | $332.67 | 21,101 | $7,019,627 |
| Shikin | 11/25/2024 | $324.99 | 230,000 | $74,746,660 |
| Chen | 12/09/2024 | $345.56 | 172,351 | $59,558,140 |
| Foroughi | 12/09/2024 | $345.61 | 50,000 | $17,280,661 |
| Chen | 12/10/2024 | $331.71 | 217,649 | $72,197,060 |
| Foroughi | 12/10/2024 | $332.13 | 50,000 | $16,606,318 |
| Chen | 12/11/2024 | $333.07 | 100,000 | $33,307,352 |
| Foroughi | 12/11/2024 | $331.95 | 50,000 | $16,597,378 |
| Chen | 12/12/2024 | $329.46 | 100,000 | $32,945,713 |
| NorCal Pipe | 12/19/2024 | $319.72 | 2,536 | $810,810 |
| NorCal Pipe | 12/20/2024 | $332.18 | 2,392 | $794,575 |
| NorCal Pipe | 01/29/2025 | $366.78 | 1,786 | $655,069 |
| NorCal Pipe | 01/30/2025 | $377.33 | 485 | $183,005 |
| Monroe County | 02/13/2025 | $502.36 | 5 | $2,512 |
| Monroe County | 02/13/2025 | $459.44 | 200 | $91,888 |
| Monroe County | 02/13/2025 | $471.67 | 200 | $94,334 |
| Monroe County | 02/14/2025 | $494.54 | 390 | $192,871 |
| NorCal Pipe | 02/14/2025 | $507.87 | 2,211 | $1,122,901 |
| NorCal Pipe | 02/18/2025 | $498.56 | 2,157 | $1,075,394 |
| Foroughi | 02/20/2025 | $450.01 | 9,143 | $4,114,441 |
| Shikin | 02/20/2025 | $450.01 | 21,408 | $9,633,814 |
| Foroughi | 02/21/2025 | $422.21 | 45,000 | $18,999,624 |
| Foroughi | 02/24/2025 | $410.70 | 45,000 | $18,481,607 |
| Chen | 02/28/2025 | $324.65 | 200,000 | $64,930,457 |
| Shikin | 03/10/2025 | $241.65 | 82,500 | $19,936,371 |
| NorCal Pipe | 03/19/2025 | $294.90 | 617 | $181,953 |