QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
Victoria Blohm Parker (Bar No. 290862)
vickiparker@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600

Alexander Benjamin Spiro (pro hac vice)
Hope Skibitsky (pro hac vice)
Brenna Nelinson (pro hac vice to be filed)
alexspiro@quinnemanuel.com
hopeskibitsky@quinnemanuel.com
brennanelinson@quinnemanuel.com
295 5th Avenue
New York, NY 10016
Telephone: (212) 849-7000

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

BEN BROWNBACK, Individually and on
Behalf of All Others Similarly Situated,

              Plaintiff,

        v.

APPLOVIN CORPORATION, ADAM
FOROUGHI, HERALD CHEN, MATTHEW
STUMPF, and VASILY (BASIL) SHIKIN,

              Defendants.

Case No. 4:25-cv-02772-HSG

**DEFENDANTS' NOTICE OF
MOTION AND MOTION TO
DISMISS AMENDED COMPLAINT**

Date: March 12, 2026
Time: 2:00 p.m.
Location: Courtroom 2, 4th Floor
Before: Honorable Haywood S. Gilliam

## NOTICE OF MOTION AND MOTION TO DISMISS AMENDED COMPLAINT

PLEASE TAKE NOTICE THAT, on March 12, 2026, at 2:00 p.m. before the Honorable Haywood S. Gilliam, Jr. in Courtroom 2, 4th Floor, 1301 Clay Street, Oakland, California, Defendants AppLovin Corporation ("AppLovin"), Adam Foroughi, Herald Chen, Matthew Stumpf, and Vasily (Basil) Shikin (collectively, "Defendants") will move this Court for an order dismissing with prejudice Plaintiffs' Amended Complaint (Dkt. 61, "Complaint"). This Motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, and is based upon the following Memorandum; the Declaration of Hope Skibitsky, filed concurrently herewith; Defendants' Request for Judicial Notice, filed concurrently herewith; the argument of counsel; and any additional material as may be submitted to the Court before decision. Defendants seek an order dismissing the Complaint with prejudice for failure to state a claim upon which relief can be granted.

## STATEMENT OF THE ISSUES

1.     Whether Plaintiffs fail to adequately plead that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 where the Complaint does not plead that the alleged misstatements were made with scienter, identifies no materially false or misleading statements, and does not plead that any alleged conduct caused Plaintiffs or the purported class losses.

2.     Whether Plaintiffs fail to plead that the Individual Defendants violated Section 20(a) of the Securities Exchange Act of 1934 where the Complaint fails to plead a primary violation.

1    DATED: November 14, 2025           QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP
2

3                              By:  */s/ Alexander Benjamin Spiro*
                                    _____
4                                   Victoria Blohm Parker (Bar No. 290862)
                                    vickiparker@quinnemanuel.com
5                                   50 California Street, 22nd Floor
                                    San Francisco, California 94111
6                                   Telephone: (415) 875-6600

7                                   Alexander Benjamin Spiro (pro hac vice)
                                    Hope Skibitsky (pro hac vice)
8                                   Brenna Nelinson (pro hac vice to be filed)
                                    alexspiro@quinnemanuel.com
9                                   hopeskibitsky@quinnemanuel.com
                                    brennanelinson@quinnemanuel.com
10                                  295 5th Avenue
                                    New York, NY 10016
11                                  Telephone: (212) 849-7000

12                                  *Attorneys for Defendants*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

2

3    MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 1

4    FACTUAL BACKGROUND ........................................................................................... 2

5    LEGAL STANDARD ...................................................................................................... 6

6    ARGUMENT .................................................................................................................. 7

7    I.    PLAINTIFFS FAIL TO PLEAD SCIENTER ...................................................... 7

8          A.    Plaintiffs Fail To Account For More Compelling, Non-Culpable Inferences ........... 8

9          B.    Plaintiffs' Insider Trading Allegations Are Irrelevant and Insufficient .................... 9

10         C.    Plaintiffs Fail To Plead Knowledge Of Falsity Or Deliberate Recklessness ........... 12

11   II.   PLAINTIFFS FAIL TO PLEAD A MISREPRESENTATION OR OMISSION ............... 13

12   III.  PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION ....................................... 24

13   CONCLUSION ............................................................................................................. 25

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### <u>Cases</u>

*In re Accuray, Inc. Sec. Litig.*,
   757 F. Supp. 2d 936 (N.D. Cal. 2010) ......................................................................20

*Bodri v. GoPro, Inc.*,
   252 F. Supp. 3d 912 (N.D. Cal. 2017) ...............................................................13, 18

*In re BofI Holding, Inc. Sec. Litig.*,
   977 F.3d 781 (9th Cir. 2020) ...................................................................... 2, 24, 25

*Bonanno v. Cellular Biomedicine Grp., Inc.*,
   2016 WL 4585753 (N.D. Cal. Sept. 2, 2016) .........................................................25

*Cai v. Eargo, Inc.*,
   2025 WL 66041 (9th Cir. Jan. 10, 2025) ...............................................................23

*In re Cisco Sys. Inc. Sec. Litig.*,
   2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) ........................................................16

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ................................................................................17

*City of Royal Oak Ret. Sys. v. Juniper Networks*,
   2013 WL 2156358 (N.D. Cal. May 17, 2013) .........................................................11

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
   880 F. Supp. 2d 1045 (N.D. Cal. 2012) ........................................................ 9, 12, 16

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*,
   412 F. Supp. 3d 206 (E.D.N.Y. 2019) ...................................................................11

*In re Copper Mountain Sec. Litig.*,
   311 F. Supp. 2d 857 (N.D. Cal. 2004) ...................................................................16

*Curry v. Yelp Inc.*,
   2015 WL 7454137 (N.D. Cal. Nov. 24, 2015) ........................................................11

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010) ..............................................................................19

*Damri v. LivePerson, Inc.*,
   772 F. Supp. 3d 430 (S.D.N.Y. 2025) .....................................................................9

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ..............................................................................14

*Denny v. Canaan Inc.*,
    2023 WL 2647855 (S.D.N.Y. Mar. 27, 2023) ................................................................ 12

*In re Dropbox Sec. Litig.*,
    2020 WL 6161502 (N.D. Cal. Oct. 21, 2020) ............................................................... 20

*In re eHealth, Inc. Sec. Litig.*,
    2023 WL 6390593 (N.D. Cal. Sept. 28, 2023) ............................................................. 24

*Espy v. J2 Glob., Inc.*,
    99 F.4th 527 (9th Cir. 2024) ....................................................................................... 25

*In re Fusion-io, Inc. Sec. Litig.*,
    2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ............................................................... 20

*Gaylinn v. 3Com Corp.*,
    185 F. Supp. 2d 1054 (N.D. Cal. 2000) ...................................................................... 12

*Glazer Cap. Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) .................................................................................. 7, 13

*In re Herbalife, Ltd. Sec. Litig.*,
    2015 WL 12732428 (C.D. Cal. 2015) .......................................................................... 24

*Hershewe v. JOYY Inc.*,
    2021 WL 6536670 (C.D. Cal. Nov. 5, 2021) .......................................................... 14, 15

*Hershewe v. Joyy, Inc.*,
    2023 WL 3316328 (9th Cir. May 9, 2023) .............................................................. 2, 14

*Hoang v. ContextLogic, Inc.*,
    2023 WL 6536162 (N.D. Cal. Mar. 10, 2023) ............................................................ 11

*Hong v. Extreme Networks, Inc.*,
    2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) ............................................................ 22

*In re Impax Labs., Inc. Sec. Litig.*,
    2007 WL 5076983 (N.D. Cal. 2007) ........................................................................... 24

*In re Infonet Servs. Corp. Sec. Litig.*,
    310 F. Supp. 2d 1080 (C.D. Cal. 2003) ...................................................................... 18

*In re Intel Corp. Sec. Litig.*,
    2023 WL 2767779 (N.D. Cal. Mar. 31, 2023) ............................................................ 17

*See In re Intel Corp. Sec. Litig.*,
    2019 WL 1427660 (N.D. Cal. Mar. 29, 2019) ............................................................ 22

*Kang v. PayPal Holdings, Inc.*,
    620 F. Supp. 3d 884 (N.D. Cal. 2022) ..................................................................... 7, 12

*In re Leapfrog Enter., Inc. Sec. Litig.*,
    200 F. Supp. 3d 987 (N.D. Cal. 2016) .................................................................. 16

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ...................................................................... 7, 19

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ........................................................................... 24

*Long Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020) .................................................................. 8

*Lozada v. TaskUs, Inc.*,
    710 F. Supp. 3d 283 (S.D.N.Y. 2024) ................................................................ 10

*Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*,
    39 F.4th 1092 (9th Cir. 2022) ................................................................. 7, 15, 16

*McGovney v. Aerohive Networks, Inc.*,
    367 F. Supp. 3d 1038 (N.D. Cal. 2019) .............................................................. 21

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) .......................................................... 2, 7, 19, 23

*Meyer v. Organogenesis Holdings Inc.*,
    727 F. Supp. 3d 368 (E.D.N.Y. 2024) ................................................................ 22

*Monachelli v. Hortonworks, Inc.*,
    225 F. Supp. 3d 1045 (N.D. Cal. 2016) .............................................................. 20

*In re Nektar Therapeutics*,
    2020 WL 3962004 (N.D. Cal. July 13, 2020) ................................................. 8, 15

*In re Nektar Therapeutics Sec. Litig.*,
    34 F.4th 828 (9th Cir. 2022) .............................................................................. 24

*In re Netflix, Inc. Sec. Litig.*,
    647 F. App'x 813 (9th Cir. 2016) ....................................................................... 20

*Ng v. Berkeley Lights, Inc.*,
    2024 WL 695699 (N.D. Cal. Feb. 20, 2024) ............................................. 8, 15, 24

*Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*,
    2016 WL 7475555 (N.D. Cal. Dec. 29, 2016) ..................................................... 19

*Nowakowski v. AXT Inc.*,
    2025 WL 1518322 (N.D. Cal. May 28, 2025) ............................................... 15, 23

*In re Nuveen Funds/City of Alameda Sec. Litig.*,
    2011 WL 1842819 (N.D. Cal. 2011) ................................................................... 25

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ........................................................................6

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
    780 F. App'x 480 (9th Cir. 2019) ..................................................................8

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) .....................................................................................16

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ...................................................................7, 16

*In re Palo Alto Networks, Inc. Sec. Litig.*,
    2025 WL 1093247 (N.D. Cal. Apr. 11, 2025) .............................................24

*Patterson v. Jump Trading LLC*,
    710 F. Supp. 3d 692 (N.D. Cal. 2024) ........................................................19

*Petersen v. TriplePoint Venture Growth BDC Corp.*,
    2024 WL 5384678 (N.D. Cal. Aug. 7, 2024) ...........................................5, 24

*Plumley v. Sempra Energy*,
    847 F. App'x 426 (9th Cir. 2021) ................................................................10

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    2012 WL 1868874 (N.D. Cal. May 22, 2012) .............................................13

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ..............................................12, 13, 16, 21

*In re Rackable Sys., Inc. Sec. Litig.*,
    2010 WL 3447857 (N.D. Cal. Aug. 27, 2010) ...........................................23

*In re Read-Rite Corp.*,
    335 F.3d 843 (9th Cir. 2003) .......................................................................19

*In re Redback Networks, Inc. Sec. Litig.*,
    2007 WL 963958 (N.D. Cal. Mar. 30, 2007) .............................................20

*Sakkal v. Anaplan Inc.*,
    557 F. Supp. 3d 988 (N.D. Cal. 2021) ........................................................11

*Saraf v. Ebix, Inc.*,
    632 F. Supp. 3d 389 (S.D.N.Y. 2022) .........................................................13

*In re SentinelOne Inc. Sec. Litig.*,
    2025 WL 2807321 (N.D. Cal. Oct. 2, 2025) ...............................2, 9, 10, 11, 12

*Sneed v. AcelRx Pharm., Inc.*,
    2022 WL 4544721 (N.D. Cal. Sept. 28, 2022) .............................................7

*Sneed v. AcelRx Pharm., Inc.*
    2023 WL 4412164 (N.D. Cal. July 7, 2023)................................................................23

*In re Sorrento Therapeutics, Inc. Sec. Litig.*,
    97 F.4th 634 (9th Cir. 2024) ......................................................................................19

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    160 F. Supp. 2d 1059 (N.D. Cal. 2001) .................................................................8, 19

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    2000 WL 1727377 (N.D. Cal. Sept. 29, 2000) ..........................................................18

*Stephens v. Maplebear Inc.*,
    2025 WL 1359125 (N.D. Cal. May 9, 2025) ..............................................................16

*In re Syntex Corp. Sec. Litig.*,
    855 F. Supp. 1086 (N.D. Cal. 1994) ..........................................................................23

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) .....................................................................................................7

*Thant v. Rain Oncology Inc.*,
    2025 WL 588994 (N.D. Cal. Feb. 24, 2025) ..............................................................16

*In re Tibco Software, Inc.*,
    2006 WL 1469654 (N.D. Cal. May 25, 2006) ............................................................17

*In re Twitter, Inc. Sec. Litig.*,
    506 F. Supp. 3d 867 (N.D. Cal. 2020) .......................................................................11

*In re VEON Ltd. Sec. Litig.*,
    2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017) ...........................................................20

*Weller v. Scout Analytics, Inc.*,
    230 F. Supp. 3d 1085 (N.D. Cal. 2017) .....................................................................21

*Wenger v. Lumisys, Inc.*,
    2 F. Supp. 2d 1231 (N.D. Cal. 1998) ....................................................................8, 10

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007)......................................................................12

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ..............................................................................16, 17

*Wozniak v. Align Tech., Inc.*,
    2011 WL 2269418 (N.D. Cal. June 8, 2011)..............................................................11

*Wozniak v. Align Tech., Inc.*,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012) .....................................................................25

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ..................................................................................................7, 9

**<u>Statutes</u>**

15 U.S.C. § 78u-5(c)(1)..............................................................................................................17

PSLRA, 15 U.S.C. § 78u-4 ..........................................................................................2, 6, 7, 8, 17

Securities Exchange Act of 1934, 15 U.S.C. § 78a ................................................................1, 6, 7

**<u>Other Authorities</u>**

Fed. R. Civ. P. 9(b)........................................................................................................................6

# MEMORANDUM OF POINTS AND AUTHORITIES

AppLovin went public in 2021 at $70 a share with a total valuation of approximately $24 billion.  The Company posted a nearly 300% gain in 2023 (from $10.81 to $39.85) and surged over 700% in 2024 (from $39.41 to $335.38), significantly outperforming the NASDAQ composite index.  AppLovin trades today at approximately $560 a share and has a market cap of nearly $200 billion.

This meteoric increase reflects the innovative nature of AppLovin's products and significant value generation for AppLovin's shareholders.  As often happens, AppLovin's success attracted self-interested "short sellers" who, in early 2025, sought to enrich themselves by first "short selling" the Company's stock, then publicizing baseless and inherently unreliable allegations designed to drive down AppLovin's stock price for their own financial gain.  The largely repetitive short sellers' reports—which disclaimed their own accuracy and touted their intention to benefit from any subsequent declines in AppLovin's stock price—purported to characterize AppLovin's "practices" as deceptive and fraudulent (the "Short Reports").  The Short Reports alleged that AppLovin owed its success not to advancements in the Company's AI-powered advertising recommendation engine (Axon) and other growth vectors like expansion into e-commerce, but to deceptive practices such as alleged "backdoor" app installs and allegedly fraudulent information collection and tracking.

AppLovin's stock price declined following the release of the Short Reports, each time quickly rebounding.  This lawsuit inevitably followed, asserting claims against AppLovin and certain of its officers under Section 10(b) of the Securities Exchange Act of 1934.  The Complaint relies *exclusively* on the unsubstantiated speculation in the Short Reports, which Plaintiffs would have this Court accept as fact.  For example—without a shred of factual support—the Complaint alleges that Defendants made "false" statements concerning Axon and AppLovin's ability to leverage Axon for growth because those statements concealed AppLovin's allegedly deceptive practices.  But following the Short Reports, AppLovin's business has continued to soar, while the short sellers' accusations of nefarious conduct—and that such conduct would lessen AppLovin's value—have *never* materialized.  Plaintiffs' allegations are defective for three independent reasons, each requiring dismissal.

*First*, the Complaint falls far short of pleading particularized facts that give rise to a strong inference of scienter.  The Complaint includes *none* of the typical hallmarks of scienter pleading, let

alone any detailed factual allegations that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct.  Instead, the Complaint relies on self-interested short sellers, which Ninth Circuit courts have rejected.  Plaintiffs' attempt to remedy this deficiency with insider trading allegations fares no better because Defendants' Class Period sales aligned with their ordinary trading patterns and represented modest amounts, both of which refute an inference of scienter.  *See In re SentinelOne Inc. Sec. Litig.*, 2025 WL 2807321, at *5 (N.D. Cal. Oct. 2, 2025) (Gilliam, J.).

*Second*, Plaintiffs do not allege a single fact establishing that any of Defendants' statements about Axon or AppLovin's prospects in the e-commerce sector were false or misleading when made. Plaintiffs instead again rely solely on the Short Reports' vague accusations of misconduct. But absent "indicia of reliability" not present here, self-interested reports from short sellers cannot establish falsity under the PSLRA.  *Hershewe v. Joyy, Inc.*, 2023 WL 3316328, at *1 (9th Cir. May 9, 2023). In any event, the Ninth Circuit has explicitly rejected Plaintiffs' conclusory approach to pleading falsity and dismissed attempts to predicate securities violations on nonspecific allegations of misconduct.  *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

*Third*, Plaintiffs do not plead any causal connection between the alleged misrepresentations and their losses, i.e., loss causation.  Nor could they:  Reports from "anonymous short-sellers" like those at issue here are not corrective because "it is not plausible that the market reasonably perceived these posts as revealing the falsity of [AppLovin's] prior misstatements[.]"  *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 797 (9th Cir. 2020).

Plaintiffs' Complaint should be dismissed in its entirety, with prejudice.

## FACTUAL BACKGROUND

### A.  AppLovin's Business And Expansion Into E-Commerce

Since its founding, AppLovin has focused on building solutions for business' growth by improving the marketing and monetization of their content.  Ex. A at 2.[1]  Like many early startups,

---

[1] References to "¶ _" are to the Amended Complaint, Dkt. 61.  Unless otherwise indicated, this brief omits internal quotation marks and citations, adopts alterations, and adds any emphasis.  Exhibits ("Ex. _") are attached to the Declaration of Hope Skibitsky In Support Of Defendants' Motion To Dismiss filed concurrently herewith.  As explained in Defendants' Motion for Judicial Notice also filed concurrently herewith, all Exhibits are either incorporated into the Complaint by reference or properly the subject of judicial notice.

1  AppLovin needed a way to promote and grow its business and realized that the available marketing

2  tools did not meet advertisers' needs.  *Id.*  AppLovin built its AI-based advertising recommendation

3  engine, Axon (and other solutions), to solve broader marketing challenges and help developers grow

4  their businesses and audiences.  *Id*.  AppLovin now provides businesses with software solutions to

5  reach their target audience and optimize advertising revenue.  Ex. B at 10.

6  AppDiscovery (rebranded within the broader Axon Ads Manager platform as of October 1)

7  represents the core of AppLovin's advertising solutions.  ¶ 165.  The Axon Ads Manager enables

8  advertisers to automate, optimize, and manage their marketing efforts across a broad global network

9  of mobile apps.  ¶¶ 29-34.  Axon, the Company's AI-powered advertising recommendation engine,

10  powers these solutions and aims to achieve advertisers' marketing objectives by making predictions

11  about the users most likely to engage with the advertisers' products and serving ads to those users.

12  Ex. B at 24; ¶ 2.  In mid-2023, AppLovin Launched Axon 2.0, a more advanced AI-powered

13  recommendation engine with better technical capabilities, especially for an expanded advertiser base.

14  ¶¶ 31, 39.  AppLovin also offers an in-app monetization tool, known as MAX, which helps mobile

15  publishers monetize (or sell) their available advertising inventory by running a real-time competitive

16  auction where many advertisers simultaneously bid on the same advertising inventory.  ¶ 30; Ex. A

17  at 2.  Prior to AppLovin's expansion into non-gaming verticals, including the e-commerce segment,

18  AppLovin historically focused on advertisers in the mobile gaming app segment.  ¶ 39.  Today, the

19  mobile gaming segment continues to drive most of AppLovin's advertising revenue.  Ex. A at 22.

20  Confident that Axon could benefit businesses beyond mobile gaming, in early 2024,

21  AppLovin began expanding its capabilities to e-commerce advertisers.  ¶ 5.  Beginning with a limited

22  pilot program, AppLovin announced in late 2024 that it would use Axon to serve end users with ads

23  for direct-to-consumer (or e-commerce) advertisers.  ¶¶ 38-40.  AppLovin rolled out the e-commerce

24  pilot in limited fashion, making it available only to select advertisers as AppLovin continued to build

25  out the necessary technical and business infrastructure.  Ex. C at 1-2; Ex. AC at 5, 9.  Regarding this

26  new segment, AppLovin explained during its Q2 2024 earnings call that it did "not expect significant

27  capital investment [] since [the Company] plan[ned] to expand [its] teams in a very lean and targeted

28  manner."  Ex. C at 2-3; *see also* Ex. D at 6 (e-commerce pilot is "run pretty lean").  Adam Foroughi,

AppLovin's CEO, explained that, for the pilot, AppLovin "exclusively focused on sort of mid-market D2C [direct-to-consumer]. I call that somewhere in the neighborhood of $10 million to $250 million of GMV. These are companies that tend to move fast, and they don't need a big team on the other side to bring them on board. . . . We haven't gone after the very large brands . . . and then, we're not focused on the very, very small while we have to manually go after these folks." Ex. E at 6.

Market reaction to the Company's e-commerce pilot was decidedly positive, and AppLovin predicted that its expansion would be a significant revenue driver in the future. *See* ¶¶ 41-44. During AppLovin's Q3 2024 earnings call with investors on November 6, 2024, Foroughi addressed the early success of the e-commerce pilot, *e.g.*, ¶ 116, noting that "[e]arly data has exceeded our expectations, with the advertisers in the pilot seeing substantial returns[.]" ¶ 118; Ex. D at 2. He also expressed confidence in the future of AppLovin's e-commerce pilot, noting that the Company was "increasingly confident this vertical will scale significantly in 2025 and become a strong contributor for us over the next year and beyond." *Id.*; *see also id.* at 7 (AppLovin will "start scaling out" the e-commerce platform which "hopefully will show a material impact in '25 and beyond."). At the same time, Foroughi emphasized that the product was "in pilot," ¶ 120, and would take time to "ramp up," making it "too early for e-commerce to make a financial impact that's material," *id.*; *see* Ex. D at 7 ("we're really just early stages here . . . for e-commerce to really drive material impact, and let's define that by 10% plus, is going to take some time to ramp up to.").

In February 2025, AppLovin released its Q4 2024 financial results. ¶ 54. AppLovin reported strong results, with a year-over-year revenue increase of 44% and adjusted EBITDA increasing 78% to $848 million, achieving a 62% adjusted EBITDA margin. Ex. F.

**B. A Series Of Short Sellers Publish Repetitive Short Reports Attacking AppLovin**

In February 2025, short sellers targeted AppLovin with unsubstantiated claims aimed at undermining AppLovin's ongoing success—especially its proprietary Axon engine and early success in the e-commerce segment—and driving down AppLovin's increasing stock price for their own, admitted financial gain. The Short Reports, released by Culper Research on February 26, 2025 (Ex. G), Fuzzy Panda Research on February 26, 2025 (Ex. H), and Muddy Waters Research on March 27, 2025 (Ex. I), sought to undermine AppLovin's ongoing success and drive down AppLovin's

increasing stock price. A report published by The Bear Cave on February 20, 2025 (Ex. J) had the same agenda. Although Plaintiffs allege that The Bear Cave "does not take positions against companies profiled in The Bear Cave," ¶ 60 n. 10,[2] authority in this District has considered Bear Cave a short seller, *see, e.g.*, *Petersen v. TriplePoint Venture Growth BDC Corp*., 2024 WL 5384678, at 11 (N.D. Cal. Aug. 7, 2024), as do Wall Street analysts, *e.g*., Ex. K (Wedbush Report) (referring to the "Bear Cave short report"). And the author of The Bear Cave publicly describes himself and the Bear Cave as part of the "short world" and touts his readership by "short-sellers." Ex. L.

The Short Reports all made largely the same accusations: that AppLovin's success stemmed not from its proprietary Axon engine, but rather from "using" or "exploiting" certain "third-party data" and engaging in "silent," "backdoor" app installations on users' devices without their consent. Each Short Report purported to be based entirely on publicly available or accessible information. *See* Ex. J at 1, 5-8; Ex. G at 1; Ex. H at 35-36; Ex. I at 2. Each report, however, also blankly asserted that it relied on some combination of anonymous purported former employee interviews, purported in-depth assessments of AppLovin's "code," purported anonymous "ad tech experts," or simply the author's own "opinion[s]." *See* Exs. G at 3, H at 20-22, I at 41, J at 8.

Each Short Report also expressly disclaimed its accuracy. Ex. G at 1 ("Culper makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information[.]"); Ex. H at 35 (similar); Ex. I at 2 ("This report contains a large measure of analysis and opinion. All expressions of opinion are subject to change without notice."); Ex. L at 11 ("Any assertions made in The Bear Cave represent[ ] the author's opinion."). And all but The Bear Cave disclosed its short position in AppLovin stock and intention to benefit from any subsequent declines. Ex. G at 1-2, 5, 28; Ex. H at 2-3, 29, 35; Ex. I at 2. In response, AppLovin published extensive explanations which detailed the baseless nature of the Reports' accusations. Exs. M, AD, AF, AG.

Wall Street analysts uniformly criticized the Short Reports. BTIG analysts stated that "most of the issues that have been highlighted recently have almost no merit." Ex. N at 1. HSBC analysts

---

[2]    For ease of reference, "Short Reports" as referred to in this brief includes The Bear Cave. Importantly, the substance of The Bear Cave "report" bears little relation to Plaintiffs' allegations.

found "little merit" in the "short seller reports," which "reflect[ed] [a] lack of genuine understanding of the business or are intentionally headline grabbing." Ex. O at 1. Piper Sandler maintained its "buy" rating for AppLovin and said they were "buyers of [AppLovin] following the selloff." Ex. P at 1. Benchmark Equity Research commented that the Short Reports "are based on speculation, mischaracterization, and misinformation . . . We believe AppLovin's rapid success in AI-driven advertising is not the result of deceptive tactics but rather its ability to innovate and create value for advertisers." Ex. Q at 1. The allegations in the Short Reports remain unsubstantiated to this day.

## C. AppLovin's Success Continues Through And Beyond The Class Period

AppLovin's innovation in the advertising marketplace has not gone unnoticed. On November 7, 2024 (the first day of the Class Period), the price of AppLovin's Class A common stock increased to $77.98 per share, resulting from year-over-year revenue growth of 39%, net income growth of 300%, and adjusted EBITDA growth of 72%. ¶¶ 6, 51. In 2024, AppLovin's share price increased more than 700%. ¶ 6. As a reflection of its confidence in its continued success, on February 28, 2025, AppLovin announced that its Board of Directors made $500 million available for the repurchase of shares and ultimately repurchased $1.2 billion in AppLovin shares in Q1 2025. Ex. R.

Post-Class Period, AppLovin has continued to succeed. Its revenue grew 77% year-over-year to $1.26 billion in Q2 2025 and grew 68% year-over-year to $1.405 billion in Q3 2025. Exs. S at 1; T at 1. Adjusted EBITDA doubled year-over-year to $1.02 billion in Q2 2025 (an 81% adjusted EBITDA margin) and rose to $1.158 billion in Q3 2025 (an 82% adjusted EBITDA margin). *Id.* In September 2025, S&P Dow Jones Indices added AppLovin to the leading S&P 500 index, Ex. U, and in October 2025, AppLovin announced that its Board increased the preexisting share repurchase authorization by $3.2 billion, Ex. T at 4. Today, AppLovin trades at approximately $560.

## LEGAL STANDARD

To state a claim for securities fraud, Plaintiffs must allege particularized facts showing (1) a misrepresentation or omission of a material fact; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014). Section 10(b) claims are subject to the heightened pleading requirements of Rule 9(b) and the PSLRA, which apply to "all elements of a

1   securities fraud action," *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc*., 774 F.3d 598, 604-05 (9th Cir.

2   2014), and "present no small hurdle for the securities fraud plaintiff," *Macomb Cnty. Emps.' Ret. Sys.*

3   *v. Align Tech., Inc*., 39 F.4th 1092, 1096 (9th Cir. 2022); *accord Metzler*, 540 F.3d at 1054-55, 1070

4   (securities fraud pleading requirements are "formidable").   Plaintiffs cannot clear this hurdle:  they

5   fail to allege a material misrepresentation, scienter, and loss causation, each of which is dispositive.

6   Because Plaintiffs do not allege a Section 10(b) violation, there can be no liability under Section

7   20(a).  *Lipton v. Pathogenesis Corp*., 284 F.3d 1027, 1035 n.15 (9th Cir. 2002).[3]

8                                       **ARGUMENT**

9           Plaintiffs' claims repurpose the unsubstantiated allegations of deceptive practices in the Short

10  Reports.   This "short cut" fails:   The Short Reports—and therefore Plaintiffs—lack a single

11  particularized allegation sufficient to withstand scrutiny under the PSLRA.   Plaintiffs fail to plead

12  scienter, falsity,[4] and loss causation, each of which is an independent basis for dismissal.

13  **I.      PLAINTIFFS FAIL TO PLEAD SCIENTER**

14          To plead scienter, Plaintiffs must allege "specific contemporaneous statements or conditions

15  that demonstrate the intentional or the deliberately reckless false or misleading nature of the

16  statements when made."  *Metzler*, 540 F.3d at 1066; *see also Glazer Cap. Mgmt., LP v. Magistri*, 549

17  F.3d 736, 743 (9th Cir. 2008) (scienter requires "specific facts indicating no less than a degree of

18  recklessness that strongly suggests actual intent").   Plaintiffs must "plead with particularity facts that

19  give rise to a strong—i.e., a powerful or cogent—inference," *Tellabs, Inc. v. Makor Issues & Rts.,*

20  *Ltd*., 551 U.S. 308, 323 (2007), that is "***at least as compelling*** as any opposing inference," *Zucco*

21  *Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 991 (9th Cir. 2009) (emphasis in original).  Plaintiffs

22  must also state with particularity facts giving rise to a strong inference that ***each*** defendant acted with

23  scienter.  *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc*., 780 F. App'x 480, 484 (9th Cir. 2019).

24  The Complaint does not provide a ***single allegation*** setting forth what specific facts ***any Defendant***

---

[3]  Plaintiffs also do not allege scheme liability pursuant to Rules 10b-5(a) and (c), ¶¶ 98-114, because
that claim rests on the same inadequate allegations as the 10b-5(b) misstatements claim and, thus,
fails for the same reasons, *e.g.*, *Sneed v. AcelRx Pharm., Inc*., 2022 WL 4544721, at *6 (N.D. Cal.
Sept. 28, 2022); *Kang v. PayPal Holdings, Inc*., 620 F. Supp. 3d 884, 902 (N.D. Cal. 2022).

[4]  To aid the Court, Appendix A hereto identifies the alleged misstatements in the Complaint and the
arguments applicable to each statement.

possessed, let alone which specific statements these facts undermine. The Complaint should be dismissed on this basis alone.

## A.  Plaintiffs Fail To Account For More Compelling, Non-Culpable Inferences

The Complaint includes none of the typical hallmarks of scienter, such as internal reports circulated to senior personnel, confidential witnesses professing to have knowledge of wrongdoing by senior company personnel, any discernable motive, or allegations suggesting Defendants engaged in *conscious* misconduct, let alone any subsequent disclosure of actual wrongdoing. Instead, Plaintiffs ask the Court to assume scienter based *solely* on accusations of misconduct in the inherently unreliable Short Reports, none of which have materialized. This request is procedurally improper and substantively defective, especially in view of compelling non-culpable inferences.

Plaintiffs prop up their purported inference of scienter on allegations of stock sales and knowledge of AppLovin operations, both of which are insufficient to satisfy the exacting pleading requirements of the PSLRA. *E.g.*, *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1079, 1083, 1085 (N.D. Cal. 2001) (no scienter where "somewhat suspicious" stock sales together with "generalized pleadings" about internal roles and access to unspecified information failed "to raise a strong inference of deliberate recklessness"); *accord Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1251 (N.D. Cal. 1998) (no scienter based on stock sales). These allegations fail to establish knowledge, motive, or *any* coherent theory of fraud given that Plaintiffs do not allege that *a single one of* Defendants' statements turned out to be false.

Plaintiffs otherwise rely *exclusively* on the Short Reports, but courts have repeatedly dismissed similar complaints for failure to plead scienter. *See*, *e.g.*, *In re Nektar Therapeutics*, 2020 WL 3962004, at *12  (N.D. Cal. July 13, 2020) (allegations based on a short-seller do not show any knowledge or intent of fraud); *Ng v. Berkeley Lights, Inc.*, 2024 WL 695699, at *13 (N.D. Cal. Feb. 20, 2024) (nonspecific allegations of fraud in short report insufficient to plead scienter); *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 802 (S.D.N.Y. 2020) (dismissing complaint that did "no more than recapitulate the [short-seller] Report's characterization of purported interviews with anonymous sources"). In the face of Plaintiffs' flimsy allegations, absence of any motive, and the fact that AppLovin did not disclose *any* negative news during the Class Period (or after), the more compelling,

non-culpable inference is that AppLovin experienced genuine, exponential growth as a result of its proprietary AI engine and other growth factors.

### B. Plaintiffs' Insider Trading Allegations Are Irrelevant and Insufficient

Plaintiffs' insider trading allegations are smoke and mirrors. For alleged stock sales to contribute to a strong inference of scienter, Plaintiffs must plead that those sales were suspicious and "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *SentinelOne*, 2025 WL 2807321, at *5. Courts consider three factors: "(1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's trading history." *Id.*; *accord City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1069 (N.D. Cal. 2012) (no inference of scienter from trading allegations). Plaintiffs allege none of these factors.

*First*, Plaintiffs allege that Defendants' Class Period sales are "highly suspicious" because they resulted in proceeds totaling approximately $1 billion. ¶¶ 150-52. Plaintiffs compare Defendants' Class Period sales to a "[c]ontrol [p]eriod" beginning six months earlier, ¶ 152, and then summarily conclude that Defendants' sales were suspicious, *id.* But Plaintiffs conspicuously ***avoid*** providing the detailed trading history required by the Ninth Circuit, *see Zucco*, 552 F.3d at 1005, which shows the opposite: that Defendants' Class Period trading was nearly identical to their pre-Class Period trading, *see* Appendix B.

Specifically, Defendants consistently sold Class A common shares during the control period, just as they did during the Class Period. During the control period, Defendants who are current officers at AppLovin (Foroughi, Stumpf, and Shikin) sold 2,039,648 shares. During the Class Period, those Defendants sold 2,246,229 shares. *See* Appendix B. And Foroughi sold virtually identical amounts between the two periods, 77% of which were tax withholdings rather than actual sales.[5] *Id.* at 1. This pattern eliminates any inference of scienter. *See, e.g.*, *SentinelOne*, 2025 WL 2807321, at *5 (no scienter where "Plaintiff has not identified anything unusual or suspicious about [defendant's]

---

[5] "Sales" to cover tax withholding obligations do not support an inference of scienter. *E.g.*, Appendix B. *See Damri v. LivePerson, Inc.*, 772 F. Supp. 3d 430, 468 (S.D.N.Y. 2025) (no scienter where stock sales were "to cover [] tax liabilities upon acquisition of shares upon vesting of options").

trading during the Class Period."); *Plumley v. Sempra Energy*, 847 F. App'x 426, 429 (9th Cir. 2021) (where "sales were consistent with [] prior trading history," the "more reasonable inference to draw is that Reed followed her usual practice with respect to selling a portion of her stock in 2016 to pay her tax liability on the additional income[.]").  And because AppLovin's stock price tripled—or quadrupled—during the Class Period (and to this day), the Class Period proceeds from Defendants' sales naturally exceeded those from earlier trading periods.  *See generally* Ex. V.  Plaintiffs' focus on the amount of proceeds (as opposed to the actual number of shares) is irrelevant.

*Second*, Plaintiffs' allegations concerning the percentage of holdings sold fare no better.  *See* ¶ 153.  Plaintiffs allege that Foroughi sold 26.9% of his holdings, Chen sold 49.3%, Stumpf sold 22.5%, and Shikin sold 22.5%.  *Id.*  Courts in this District have held sales of similar ownership percentages not suspicious.  *E.g.*, *Wenger*, 2 F. Supp. 2d at 1251; *SentinelOne*, 2025 WL 2807321, at *6 (24.2% of ownership not suspicious).  Here, "[a]ny inference of fraudulent motive is undercut by the fact that [Defendants] retained significant ownership stakes in the company after the two offerings."  *Lozada v. TaskUs, Inc.*, 710 F. Supp. 3d 283, 321 (S.D.N.Y. 2024); *see id.* ("the more plausible inference regarding [defendants'] stock sales is that, as co-founders of a highly successful company, these individuals reasonably sought to profit from that success in the IPO and the SPO").

*Third*, because "none of the sales occurred at suspicious times such as immediately before a negative earnings announcement," Plaintiffs' argument that Defendants timed their sales "to maximize" the benefit makes no sense.  ¶ 50; *see Wenger*, 2 F. Supp. 2d at 1251.  Plaintiffs premise their allegations of corrective disclosures on the publication of the **third-party** Short Reports, but do not allege that any Defendant knew about the upcoming publication and sold stock to avoid the potential decline.  And Plaintiffs do not (and cannot) allege that AppLovin made any **actual** disclosures of negative information following the Short Reports, or at all.  *See Lozada*, 710 F. Supp. 3d at 321 (stock sales not suspicious where there was no "suggestion that [defendants] expected any negative news to emerge regarding the [company,]" and "no allegations that the company restated its financials or otherwise updated its public disclosures" following a short report).

To the contrary, Plaintiffs bizarrely emphasize Defendants' trades **after** publication of the Short Reports; in other words, **after** the alleged corrective disclosures.  *E.g.*, ¶ 154.  These sales are

1    irrelevant:  "Sales after corrective disclosures do not support an inference of scienter."  *Hoang v.*

2    *ContextLogic, Inc.*, 2023 WL 6536162, at *26 (N.D. Cal. Mar. 10, 2023); *see also City of Warren*

3    *Police & Fire Ret. Sys. v. Foot Locker, Inc*., 412 F. Supp. 3d 206, 227 (E.D.N.Y. 2019) (sales after

4    corrective disclosure that allegedly revealed fraud did not support inference of scienter).  Indeed, for

5    these sales, Defendants traded on public information available to all investors.  Thus, by definition,

6    the sales were not designed to "maximize personal benefit from undisclosed inside information."

7    *SentinelOne*, 2025 WL 2807321, at *7.  Instead, they occurred at the only time they could: during

8    one of the Company's four limited open trading windows.  *See* Ex. X at 6.

9         *Fourth*, Defendant Shikin traded pursuant to a Rule 10(b)5-1 trading plan, *see, e.g.*, Ex. W;

10    Appendix B at 3, which "do[es] not support a strong inference of scienter."  *In re Twitter, Inc. Sec.*

11    *Litig.*, 506 F. Supp. 3d 867, 890 (N.D. Cal. 2020), *aff'd sub nom.* 29 F.4th 611 (9th Cir. 2022).

12        *Fifth*, like in *Curry v. Yelp Inc.*, 2015 WL 7454137, at *13 n.12 (N.D. Cal. Nov. 24, 2015),

13    *aff'd*, 875 F.3d 1219 (9th Cir. 2017), Plaintiffs argue that Foroughi and Chen's sales of Class A shares

14    were  suspicious—despite  that  they  retained  Class  B  shares—because  "they  were  highly

15    disincentivized from selling [Class B] shares in order to maintain their voting control of" AppLovin,

16    ¶ 153 n. 23.  But "that Defendants were incentivized to sell their Class A shares first while maintaining

17    their Class B shares does not support a finding of scienter.  Rather, Defendants simply appear to have

18    decided to sell their less valuable shares first."  2015 WL 7454137, at *13 n. 12.

19        *Sixth*, Plaintiffs' allegations concerning sales made by private equity investor KKR, ¶¶ 160-

20    61, and non-defendant AppLovin employees, ¶ 162, are "irrelevant to the determination of the named

21    defendant[s'] scienter," *Wozniak v. Align Tech., Inc*., 2011 WL 2269418, at *14 (N.D. Cal. June 8,

22    2011); *accord City of Royal Oak Ret. Sys. v. Juniper Networks*, 2013 WL 2156358, at *9 (N.D. Cal.

23    May 17, 2013) (same).  As AppLovin disclosed, KKR's sales occurred as KKR exited its investment

24    through transactions beginning years prior to 2024, and the other sales occurred during one of

25    AppLovin's limited open trading windows.  *E.g*., Ex. A at 81; Ex. X at 6.

26        *Finally*, "allegations of insiders' stock sales, even if suspicious, cannot on their own provide

27    sufficient evidence of scienter."  *Sakkal v. Anaplan Inc.*, 557 F. Supp. 3d 988, 999 (N.D. Cal. 2021);

28    *see also Juniper Networks*, 880 F. Supp. 2d at 1069 ("[A]n allegation that only one Defendant

1    displayed unusual stock trades . . . is insufficient to support a strong inference of scienter").

2        **C.    Plaintiffs Fail To Plead Knowledge Of Falsity Or Deliberate Recklessness**

3        The Complaint is devoid of specific allegations of contemporaneous facts known to even one

4    of the Defendants to suggest they knew that any of their public statements were false.

5        ***Core Operations.***    Once Plaintiffs' makeweight scienter arguments are stripped away,

6    Plaintiffs are left with their primary contention—that the Court should simply ***assume*** scienter based

7    on the nature of the allegations. Plaintiffs rely on a core operations theory, alleging that because the

8    misstatements related to AppLovin's "primary business segment," Defendants must have known of

9    the falsity of their statements. ¶¶ 164-72. Proceeding under this theory is "not easy." *SentinelOne*,

10   2025 WL 2807321, at *7. Plaintiffs "must produce either specific admissions by one or more

11   corporate executives of detailed involvement in the minutia of a company's operations," such as data

12   monitoring, "or [specific] witness accounts demonstrating that executives had actual involvement in

13   creating false reports." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063

14   (9th Cir. 2014). Plaintiffs do not set forth a single fact—let alone an admission or specific witness

15   account—supporting any Defendant's involvement in the alleged fraud. *See Kang v. PayPal*

16   *Holdings, Inc.*, 620 F. Supp. 3d 884, 900 (N.D. Cal. 2022) (scienter cannot "be inferred from

17   Plaintiff['s] insistence that the misconduct involved products of critical importance.").

18       ***Executive Positions.***    Plaintiffs' next scienter argument—based entirely on Defendants'

19   positions at AppLovin, ¶¶ 163, 177—likewise fails because there can be no "inference of scienter

20   based on allegations that a particular defendant must have known" information by virtue of "that

21   individual['s] position at the company," *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1174

22   (C.D. Cal. 2007); *accord Gaylinn v. 3Com Corp.*, 185 F. Supp. 2d 1054, 1065 (N.D. Cal. 2000)

23   (same). Similarly, Plaintiffs claim that Defendants Foroughi and Chen had scienter because they

24   "maintained concentrated control over AppLovin," ¶ 178, fares no better because the allegations lack

25   any detail about who knew what, when, and how. *See, e.g.*, *Denny v. Canaan Inc.*, 2023 WL 2647855,

26   at *12-15 (S.D.N.Y. Mar. 27, 2023) (allegations that board chairman "controlled 69.4% of the voting

27   power as of December 31, 2020" insufficient to allege scienter).

28       ***Access to reports.***    Plaintiffs' allegations that scienter should be inferred because Defendants

had "access to reports concerning the Company's AXON and e-commerce products," ¶ 173, are likewise insufficient, *see Intuitive Surgical*, 759 F.3d at 1063 ("[m]ere access to reports containing undisclosed sales data is insufficient to establish a strong inference of scienter"), and lacks the requisite particularity, *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 2012 WL 1868874, at *19 (N.D. Cal. May 22, 2012) ("particularity requires pleading the who, what, where, when, and how regarding each Defendant's access to the relevant information"), *aff'd*, 759 F.3d 1051 (9th Cir. 2014).

***Prior deceptive conduct.***  Grasping at straws, Plaintiffs allege that "Foroughi repeatedly worked at and built companies premised upon deceptive advertising practices," ¶ 190, as support for an inference of scienter.  These nonspecific allegations about alleged misconduct at unrelated companies have no relevance to scienter in this case, particularly because Plaintiffs cannot even point to any deceptive behavior on the part of any Defendant at ***those*** companies, let alone link that purported behavior to the alleged misstatements here.  *See Saraf v. Ebix, Inc.*, 632 F. Supp. 3d 389, 400-01 (S.D.N.Y. 2022) (past misconduct and government investigations not probative of scienter).

***SOX certifications.***  Plaintiffs allege that Foroughi and Stumpf's execution of SOX certifications "enhance[s]" scienter. ¶ 194.  But absent more specific allegations of fraud, the negative inference that Plaintiffs attempt to draw proves no more cogent and compelling than ***at most*** an unintended mistake.  *See Glazer Cap. Mgmt.*, 549 F.3d at 747 (SOX certifications only probative of scienter if plaintiff alleges severe recklessness in certifying the accuracy of the financial statements).

***Stock buyback.***  Without a single supporting allegation, Plaintiffs allege that AppLovin's stock buyback, which began ***years*** prior to the Class Period, supports an inference of scienter.  ¶¶ 181-89.  The opposite is true.  *See* Ex. A at 43; *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 933 (N.D. Cal. 2017) (share repurchase "undercuts a finding of intent," because a company "would [not] have been repurchasing its shares" if it knew the price would fall).

## II.    PLAINTIFFS FAIL TO PLEAD A MISREPRESENTATION OR OMISSION

Plaintiffs allege that Defendants' statements concerning AppLovin's success with its Axon engine and e-commerce pilot were false and misleading based entirely on the Short Reports' accusations of deceptive practices.  But Ninth Circuit courts are clear that short reports—published by anonymous, self-interested authors based on anonymous sources—are not reliable to establish

1    falsity in a securities fraud case.  And even if the Court considered the Short Reports, Plaintiffs fail

2    to allege that any statement is materially false or misleading for the reasons set forth below.

3        ***The Short Reports Cannot Establish Falsity.***    Absent certain "indicia of reliability,"

4    securities fraud plaintiffs cannot rely on short seller reports to allege falsity.  *Hershewe*, 2023 WL

5    3316328, at *1-2 (affirming district court's refusal to credit a Muddy Waters report because it "lacked

6    indicia of reliability" and affirming dismissal of securities fraud claims where that report lacked

7    details explaining its analyses and plaintiff "failed to allege additional facts" supporting its claim of

8    fraud); *see also Hershewe v. JOYY Inc*., 2021 WL 6536670, at *4-5 (C.D. Cal. Nov. 5, 2021) (Muddy

9    Waters report insufficient as basis for falsity of securities fraud claims where report "hardly discusses

10   its purported sources at all" and "reli[ed] on unverified and unverifiable information").  These indicia

11   include reliance on "publicly filed documents[,] respected trade publications," or "signed, named

12   affidavits from corporate insiders."  *Hershewe*, 2021 WL 6536670, at *5.

13       Like the Muddy Waters report in *Hershewe*, the Short Reports lack these indicia.  To start,

14   both the Muddy Waters report and the Fuzzy Panda report were published by anonymous sources, so

15   they "fall[] under the umbrella of information provided by confidential witnesses."[6] *Id.* at *4 (cleaned

16   up).  In this Circuit, a plaintiff must describe a confidential witness with "sufficient particularity to

17   support the probability that a person in the position occupied by the source would possess the

18   information alleged" and provide "adequate corroborating details."  *In re Daou Sys., Inc.*, 411 F.3d

19   1006, 1015 (9th Cir. 2005).  Here, the Short Reports' sources are "not described at all, much less with

20   sufficient particularity."  *Hershewe*, 2021 WL 6536670, at *4.  Plaintiffs thus fail to allege that Muddy

21   Waters and Fuzzy Panda "would possess the information alleged" about AppLovin's practices.  *Id.*

22       More to the point, whether published anonymously or not, each of the Short Reports purports

23   to reach lofty conclusions about AppLovin's practices, "but hardly discuss[] [their] purported sources

24   at all.  The [Short Reports'] reliance on unverified and unverifiable information raises significant

25   reliability concerns."  *Id.* at *5; *see also Nowakowski v. AXT Inc.*, 2025 WL 1518322, at *2-3 (N.D.

26

27   ───────────────

     [6]    The fact that the authors of the Fuzzy Panda and Culper Reports have been unmasked does not
28   cure those Reports' unreliability given the myriad other issues with those Reports discussed herein.

Cal. May 28, 2025) (short seller report insufficient to allege falsity where the complaint "does not allege the source or sources on which J Capital Research relied, much less a source that is of the type on which a securities fraud claim can be based"); *Berkeley Lights*, 2024 WL 695699, at *10 (short report insufficient to allege falsity given "obvious self-interest in BLI's stock price declining and the lack of sufficient indicia plausibly demonstrating the report's reliability"). Here, like in *Hershewe*, "[t]hese concerns are magnified by the failure of Plaintiffs and [the short sellers] to provide basic information about the soundness or quality of the technical analysis contained in the Report, including the qualifications of the unidentified 'researchers' to perform the analysis [and] the accuracy of the methodology used to perform the analysis[.]"  2021 WL 6536670, at *5.  The Culper report, for example, purports to have "decompiled AppHub's code."  Ex. G at 9.  Muddy Waters supposedly mined websites for those that contained "APP's Axon pixel."  Ex. I at 10.  But no report states that these tasks were "conducted by a data scientist, machine learning engineer, mathematician, computer scientist, or any other individual with expertise in" this area.  *Hershewe*, 2021 WL 6536670, at *5.  Simply, "given [the Shorts'] disclosures detailing that [they] stood to benefit from a poor performance in [AppLovin's] stock price and the lack of any information establishing why [the Short Reports'] opinions on the highly-technical matters at issue here are reliable, Plaintiffs fail to sufficiently show that the Report[s] support their allegations of falsity."  *Nektar*, 2020 WL 3962004, at *10.

Setting aside the fundamental issues with the Short Reports, the alleged misstatements are inactionable for several reasons, set forth below and in Appendix A.

**<u>Inactionable Puffery and Corporate Hyperbole.</u>**  Defendants' generic positive statements concerning the success of AppLovin's e-commerce pilot and its growth "plainly fit beneath the umbrella of puffery." *Align Tech.*, 39 F.4th at 1099.  In particular, statements that the e-commerce pilot was a "***super compelling*** product" and "looking so ***strong***," (#7), "the ***fastest-growing*** product I've ever seen. . . . ***we've never seen anything that looks like this*** in terms of strength in market," (#12), "the ***most exciting product*** that we've ever launched," (#15), "the ***most compelling*** one we've seen yet," (#16), and similar statements, are classic "[s]tatements of mere corporate puffery, vague statements of optimism" which are not actionable because "professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives," *Intuitive Surgical*,

759 F.3d at 1060; *see also Align Tech*, 39 F.4th at 1099 (statements that initiative was "a great growth market," "a huge market opportunity," "a market that's growing significantly for us," and "possessing 'really good' 'dynamics'" are inactionable puffery); *Stephens v. Maplebear Inc.*, 2025 WL 1359125, at *7 (N.D. Cal. May 9, 2025) ("generic discussions of growth and opportunity" inactionable puffery); *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *13 (N.D. Cal. Mar. 29, 2013) (statement concerning "compelling financial model" inactionable puffery); *Juniper Networks*, 880 F. Supp. 2d at 1064 (statements that "our demand indicators are strong, our product portfolio is robust" inactionable puffery); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 868-69 (N.D. Cal. 2004) ("run-of-the-mill" statements such as "business remained strong" not actionable). *See also* #8-9, #13, #17, #20.  Similarly inactionable are statements of hyperbole, including that Axon is "as powerful as any advertising AI model in the world," (#25), and "there's a long, long line out the door," (#34); *see also* #21, #29, #32, #35.  *Thant v. Rain Oncology Inc.*, 2025 WL 588994, at *8 (N.D. Cal. Feb. 24, 2025) (claims such as "'best-in-class' are classic statements of puffery and corporate hyperbole").  These statements should be dismissed as a matter of law.

**_Inactionable Statements of Opinion_**.  Defendants' statements that "Early data **_has exceeded our expectations_**," (#4), Defendants are "**_increasingly confident_**" in the e-commerce vertical, (#5), "**_think [it] will be impactful_** to the business . . . for the long term," (#8), and, "if it does scale **_the way we think it will_**, it's going to make an impact," (#12), are opinion statements because they are not "capable of objective verification." *Apollo Grp.*, 774 F.3d at 606.  *See also* #7, #11, #13-14, #20-21, #23, #27, #31-33, #35-36.  There are "substantial limits" to asserting claims for these "statement[s] of honest opinion." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188-89 (9th Cir. 2021) (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015)).  Opinions "are actionable only if the statement is not genuinely believed, there is no reasonable basis for that belief, or the speaker is aware of undisclosed facts that seriously undermine the accuracy of the statement." *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1009 (N.D. Cal. 2016); *see Wochos*, 985 F.3d at 1189 ("a 'pure statement of opinion' is generally not actionable").

Plaintiffs set forth no allegations that Defendants' opinions in the alleged misstatements were not subjectively held or that there was no reasonable basis for their beliefs, as *Omnicare* requires.

1    Indeed, the Complaint contains no allegations of subjective falsity *at all*—Plaintiffs do not allege any

2    facts showing that any Defendant disbelieved, for example, the likely success of the e-commerce

3    pilot, the strength of the "early data," or the potential for the product to benefit "any business in any

4    vertical."  Nor do Plaintiffs set forth allegations that "seriously" undermine the accuracy of these

5    opinions.  Instead, relying on the unsubstantiated accusations in the Short Reports, Plaintiffs merely

6    speculate that Defendants must have been aware of the allegedly deceptive practices, but set forth no

7    factual allegations that render those opinions misleading.  *See City of Dearborn Heights Act 345*

8    *Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616-18 (9th Cir. 2017) (opinion statements

9    not false where complaint contained "no allegations of subjective falsity").

10        ***Forward-Looking Statements.***    Many of Defendants' statements are forward-looking

11    statements that are inactionable under the PSLRA Safe Harbor because they are "identified as []

12    forward-looking" and "accompanied by meaningful cautionary statements."  *See Wochos*, 985 F.3d

13    at 1189 (citing 15 U.S.C. § 78u-5(c)(1)).  These include statements that "We're increasingly confident

14    this vertical *will scale significantly in 2025* and become a strong contributor for us *over the next year*

15    *and beyond*," (#2), "we think [the e-commerce pilot] will be impactful to the business *financially '25*

16    *and then for the long term*," (#8), "*10 years from now*, we think every advertiser that has a

17    transactional model . . . can buy on our platform and do it at scale," (#11), "the business is *going to*

18    *show* compelling growth," (#33) and "the growth potential *in the coming years* is substantial," (#36).

19    *See also* #5, #12, #17, #20, #22, #29, #32.  The PSLRA insulates these forward-looking statements

20    of "plans or objectives relating to [AppLovin's] products or services," 15 U.S.C. § 78u-5(i)(1)(B),

21    from liability, *see In re Intel Corp. Sec. Litig*., 2023 WL 2767779, at *11 (N.D. Cal. Mar. 31, 2023)

22    (statements setting forth "projected launch date" and "development cadence" "are plainly forward-

23    looking statements of plans and objectives"); *In re Tibco Software, Inc*., 2006 WL 1469654, at *26

24    (N.D. Cal. May 25, 2006) (statement providing expected revenues is forward-looking).

25        These statements were accompanied by meaningful cautionary language, rendering them

26    inactionable.  *See* #2, #5, #8, #11-12, #17, #20, #22, #29, #32-33, #36.[7]  And while Plaintiffs do not

27    

28    [7]    Ex. D at 1; Ex. E at 2; Ex. F ("Forward looking statements in this press release include . . . our

allege that *any* of the theoretical "risks" in the Short Reports ever materialized (nor could they), AppLovin issued detailed risk disclosures during the Class Period warning of such *potential* risks. *See Bodri*, 252 F. Supp. 3d at 931.  For example, AppLovin warned that its "future growth may involve expansion into new business opportunities, and any efforts to do so that are unsuccessful or are not cost-effective could adversely affect our business," that future revenue could be impacted by the "ability to attract and retain clients, including, for example, in new markets such as e-commerce and social," that "there can be no assurance that we will achieve broader adoption among e-commerce advertisers or that we will effectively develop technology for our AXON platform," that "[t]he revenue we generate from our Advertising solutions may experience seasonality in the fourth quarter of the year due in part to seasonal holiday demand," and that "the costs of acquiring new clients . . . and otherwise marketing our Advertising Solutions[] will continue to rise." Ex. A at 6, 15, 18, 25. AppLovin further disclosed that "[t]he development and use of AI in our business, combined with an uncertain regulatory environment, may adversely affect our business, reputation, financial condition or results of operations," and that "[t]he introduction of AI technologies into new or existing products may result in new or enhanced governmental or regulatory scrutiny, litigation, confidentiality, privacy, data protection, or security risks, ethical concerns, or other complications that could adversely affect our business[.]" *Id.* at 29.  *See In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1091-92 (C.D. Cal. 2003), 310 F. Supp. 2d 1080, 1091-92 (C.D. Cal. 2003) (dismissing claim where cautionary language addressed risks at issue).

The Safe Harbor protects AppLovin's forward-looking statements for the independent reason that Plaintiffs have not alleged, "in great detail," facts showing that Defendants made the statements with "actual knowledge that they were false." *Splash Tech*, 160 F. Supp. 2d at 1069; *see also In re*

---

growth prospects.").   And to the extent forward-looking statements were made in industry conferences, (#20, #22), the Bespeaks Caution doctrine shields those statements from liability.  *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727377, at *10-11 (N.D. Cal. Sept. 29, 2000) (Bespeaks Caution Doctrine protects oral forward-looking statements when cautionary statements were in SEC filings).  Because AppLovin's SEC filings were "formal documents of considerable legal weight," any forward-looking statements made "in less formal press releases and interviews which were all closely proximate in time to" those filings "may be fairly limited by cautionary statements contained in" AppLovin's Class Period SEC filings, in particular, AppLovin's 2024 Form 10-K.  *See In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1092-93 (C.D. Cal. 2003).

*Cutera Sec. Litig.*, 610 F.3d 1103, 1113 (9th Cir. 2010) (under the Safe Harbor, lack of actual knowledge is an independent basis for protection). As discussed *supra* pp. 6-13, Plaintiffs have not alleged particularized facts showing that AppLovin's financial projections or any of the alleged forward-looking misstatements were made with scienter—much less facts meeting the "stricter standard of actual knowledge of falsity." *See Lipton*, 284 F.3d at 1039 n.18.

**_No contemporaneous falsity_**. Even if the alleged misstatements were actionable, Plaintiffs do not—and cannot—plead how any of the alleged misstatements were false when made. *See Patterson v. Jump Trading LLC*, 710 F. Supp. 3d 692, 713 (N.D. Cal. 2024) ("Plaintiffs' complaint fails to provide any specific allegations as to why this first statement was misleading in the absence of the information plaintiffs contend was improperly omitted."). Quite the opposite, Plaintiffs blankly proclaim that the Short Reports' vague accusations must be taken as fact and assert that, as a result, virtually every statement by Defendants about Axon, e-commerce, and AppLovin's financial health and performance more broadly must be false. Plaintiffs must do more than allege that "a company's class period statements regarding its financial well-being are *per se* false based on the plaintiff's allegations of fraud generally." *Metzler*, 540 F.3d at 1070, 1072 (affirming dismissal where complaint alleged company-wide scheme to inflate enrollment figures but failed to explain with particularity how challenged statements were false). *Metzler* rejected this sort of conclusory pleading as "decidedly vague." *Id.* at 1070. But that is precisely what Plaintiffs do.

Instead, Plaintiffs must allege particularized, "contemporaneous facts that would establish a contradiction between the alleged materially misleading statements and reality." *Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*, 2016 WL 7475555, at *3 (N.D. Cal. Dec. 29, 2016); *cf. In re Sorrento Therapeutics, Inc. Sec. Litig.*, 97 F.4th 634, 642 (9th Cir. 2024) (no contemporaneous falsity because "failure to survive testing is hardly evidence that the developer's initial enthusiasm was unwarranted or inherently false at the time"). The particularized facts must be "necessarily inconsistent" with the challenged statements. *In re Read-Rite Corp.*, 335 F.3d 843, 848 (9th Cir. 2003). Plaintiffs do not set forth a **_single_** particularized fact—whether the alleged practices were in place during the Class Period, who instructed that AppLovin use these practices, or how any specific statement was rendered false by the alleged practices. *See In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 945 (N.D. Cal.

2010) (dismissing complaint where allegations were "vague as to the time"); *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *18 (N.D. Cal. Feb. 12, 2015) (dismissing complaint where allegations "not contemporaneous" with the challenged statements). Even if the Short Reports could be credited as "facts" (they cannot), Plaintiffs do not establish the falsity of the challenged statements:

> ***Statements accurately reporting historical performance***. Plaintiffs challenge several statements that ***accurately*** report historical performance, including Defendants' statements that growth in AppLovin's Advertising business was "driven by continued development of our Axon engine through ongoing self-learning and directed model enhancements," (#1); *see also* #6; AppLovin saw "meaningful growth driven by advancements to AXON," (#3), that "early data has exceeded [AppLovin's] expectations, with the advertisers in the pilot seeing substantial returns," (#4); 2024 "brought significant growth—marked by a remarkable 75% increase in revenue in [its] advertising business," (#24), and AppLovin "captured meaningful holiday shopping dollars," (#27). *See also* #6, #21, #26, #28, #31, #33, #36. Plaintiffs ***concede*** that these statements accurately reported AppLovin's growth and revenue. They are thus not actionable, regardless of Plaintiffs' allegations that improper conduct drove those results. *See In re Dropbox Sec. Litig.*, 2020 WL 6161502, at *7 (N.D. Cal. Oct. 21, 2020) ("accurate [reporting of] historical data" not false or misleading); *Monachelli v. Hortonworks, Inc.*, 225 F. Supp. 3d 1045, 1055 (N.D. Cal. 2016) ("disclosures of accurate historical data accompanied by general statements of optimism . . . are not actionable"); *In re Redback Networks, Inc. Sec. Litig.*, 2007 WL 963958, at *5 (N.D. Cal. Mar. 30, 2007) (rejecting allegation that "revenues from 'improper' sales misled investors into believing that Redback stock was a better investment than it really was" where revenue was reported accurately); *In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, at *6 (S.D.N.Y. Sept. 19, 2017) ("[A]ccurately reported income derived from illegal sources is non-actionable despite a failure to disclose the illegality.").

Nor do Plaintiffs adequately plead that any accurate statement was misleading. For a true statement to be materially misleading, it must "affirmatively create[] an impression of a state of affairs that differs in a material way from the one that actually exists." *In re Netflix, Inc. Sec. Litig.*, 647 F. App'x 813, 815 (9th Cir. 2016); *accord Weller v. Scout Analytics, Inc.*, 230 F. Supp. 3d 1085, 1093 (N.D. Cal. 2017). Plaintiffs cannot satisfy this standard. While Plaintiffs set forth nonspecific

allegations of deceptive conduct based on the Short Reports, Plaintiffs do not explain how those allegations cast doubt on Defendants' *accurate* statements of historical performance. *See, e.g.*, *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1059 (N.D. Cal. 2019) (rejecting argument that "literally true" statements were nonetheless misleading).

Plaintiffs' conclusory allegations that AppLovin's growth and revenue were not sustainable similarly fall flat. *E.g.*, ¶¶ 125, 129. Plaintiffs cannot point to any statement addressing the sustainability of the Company's success. But beyond that, "[n]othing about the statements . . . would give a reasonable investor the impression that . . . growth was different than it was in reality. The statements accurately reflect the company's growth" and "do not purport to speak to any trends in . . . [revenue] growth or revenues." *Intuitive Surgical*, 759 F.3d at 1061. AppLovin has consistently met or exceeded revenue projections.

***Statements attributing growth to AXON advancements and enhancements.*** Plaintiffs challenge statements that growth was "driven by continued development of our AXON engine through ongoing self-learning and directed model enhancements," (#1), that there were "step changes, with meaningful growth driven by advancements to AXON," (#3), and that "improvements in our AXON technology . . . contributed to further growth," (#6). *See also* #2. Plaintiffs allege these statements were false because "AppLovin's growth was not driven solely by technological breakthroughs or genuine performance, but also by deceptive and undisclosed practices that artificially inflated its reported results." ¶ 121.

But Plaintiffs ***do not—and cannot—allege*** that Axon did not contribute to the Company's growth or that AppLovin did not implement enhancements and refinements to AXON (in fact, they acknowledge the opposite, *see* ¶¶ 31, 38). Plaintiffs speculate about additional undisclosed practices, but multiple contributing factors do not render statements about one ***undisputed*** factor false. Statements attributing growth to Axon "drivers" or "advancements" describe one factor that Plaintiffs admit; these true statements cannot be contradicted by allegations of other alleged factors, particularly where Plaintiffs plead ***no facts***, for example, concerning how much growth was attributed to alleged deceptive practices as opposed to "enhancements and ongoing refinements." *See Meyer v. Organogenesis Holdings Inc.*, 727 F. Supp. 3d 368, 393 (E.D.N.Y. 2024) (allegations insufficient

where complaint "does not contain any allegations that financial results . . . were inaccurate or that certain factors identified by Defendants did not contribute to the Company's growth").

*Statements about advertiser returns and e-commerce pilot performance.* Plaintiffs challenge statements that "early data has exceeded our expectations, with the advertisers in the pilot seeing substantial returns," and experiencing "nearly 100% incrementality," (#4), and that the pilot could scale "organically" and expand "to the entirety of e-commerce," (#9-12), *see also* #21, #22, #28, because "Defendants were deliberately constraining the growth of AppLovin's e-commerce program, and its limited and purported 'really strong' performance was favorably distorted by" generous incentives, purported data manipulation, and seasonality, ¶¶ 121, 125, 129, 137, 145, 148. But "the reasons Plaintiffs offer as to why the statements are false or misleading bear no connection to the substance of the statements themselves[.]" *Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *15 (N.D. Cal. Apr. 27, 2017). For example, the alleged misstatements say nothing about the advertiser base in AppLovin's e-commerce pilot, the specific revenue derived from the pilot, or the availability of any alleged incentives. In fact, Defendants *disclosed* that the pilot was "exclusively focused on sort of mid-market D2C" and that the Company was "not in any sort of rush," because it needed to build out the necessary technical and business infrastructure to support this new advertiser segment. Ex. E at 6; Ex. D at 4; *see also* Ex. AC at 3, 11. These statements thus cannot be rendered false by Plaintiffs' allegations that Defendants "deliberately constrain[ed] the growth of AppLovin's e-commerce" pilot. ¶ 125. Nor can they be rendered false by the fact that the pilot may have benefited from "seasonal holiday shopping" or that AppLovin offered nominal credits to newly onboarded advertisers, which AppLovin publicly disclosed on its website. Ex. AE at 6. *See In re Intel Corp. Sec. Litig.*, 2019 WL 1427660, at *10 (N.D. Cal. Mar. 29, 2019) (plaintiffs "must demonstrate that a particular statement, when read in light of all the information then available to the market conveyed a false or misleading impression.") (cleaned up). Plaintiffs plead *no facts* that would enable this Court to infer that those circumstances rendered any of Defendants' statements false.

*Statements about platform scalability and market opportunity.* Plaintiffs allege the statement that "any company that is online with a website that has a business model, that drives to some KPI will be able to buy advertising through our platform," (#22), concealed AppLovin's alleged

deceptive practices, ¶ 137.  *See also* #28 ("any business in any vertical can harness the power of our platform."), #13-14.  But the Short Reports do not allege that AppLovin's platform lacked the ability to serve diverse advertisers or that companies would be unable to buy (or uninterested in buying) advertising through the platform.  *See Metzler*, 540 F.3d at 1071-72 (dismissing claims where complaint "fails to sufficiently allege facts that demonstrate the falsity of Corinthian's characterizations of its financial health and business practices during the Class Period").  Indeed, AppLovin's undisputed success belies those claims.  *Supra* p. 6; *see In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1094 (N.D. Cal. 1994) (no claim where "predictions proved to be accurate"), *aff'd*, 95 F.3d 922 (9th Cir. 1996).

**Statements about advertiser demand.**  Plaintiffs challenge statements that "there's a long, long line out the door," (#34), and "demand from advertisers wanting to join our platform is high," (#30), because the e-commerce program "remained available by invite only" and relied on "cherry-picked advertisers," ¶ 148.  But the Short Reports do not dispute that demand existed or that AppLovin limited access to the e-commerce pilot for reasons the Company disclosed.  *Supra* p. 4.  AppLovin's limited rollout of the pilot does not become nefarious simply by Plaintiffs' say so.  *See In re Rackable Sys., Inc. Sec. Litig.*, 2010 WL 3447857, at *6-7 (N.D. Cal. Aug. 27, 2010) (dismissing 10(b) claim where plaintiff alleged no "facts to refute [the company's] explanations" for its accounting decisions).

**Risk factors.**  Plaintiffs allege as false AppLovin's risk disclosures in its 2024 Form 10-K which provided that the Company's "actual or perceived failure to comply" with laws and regulations concerning "privacy, information security, data protection" and other areas could adversely impact its business.  #18-19.  Risk factors are not actionable without factual allegations indicating that the risks had already "come to fruition."  *Sneed v. AcelRx Pharm., Inc*. 2023 WL 4412164, at *7 (N.D. Cal. July 7, 2023).  The Complaint contains no well-pled facts showing that, at the time the risk disclosures were made, AppLovin had experienced an "actual or perceived failure to comply" with any unidentified laws and regulations.  *See Nowakowski*, 2025 WL 1518322, at *2 (short report insufficient to establish falsity of risk factors).  Plaintiffs do not cite a single law or regulation that AppLovin violated, do not allege when any alleged misconduct or violation occurred—let alone whether during the Class Period—and does not allege any noncompliance that had an adverse impact

on AppLovin's business.  *See Cai v. Eargo, Inc*., 2025 WL 66041, at \*1-2 (9th Cir. Jan. 10, 2025)

(dismissing 10(b) claims based on risk factors); *In re Palo Alto Networks, Inc. Sec. Litig*., 2025 WL

1093247, at \*9 (N.D. Cal. Apr. 11, 2025) (risk factors not actionable absent particularized facts about

when adverse events occurred or that those events had any negative impact).  Plaintiffs ask this Court

to accept as fact the unproven speculation in the Short Reports—an effort this Court should reject.

## III.    PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION

Loss causation requires Plaintiffs to allege that the misstatements "concealed something from

the market that, when disclosed, negatively affected the value of the security."  *In re Impax Labs.,*

*Inc. Sec. Litig*., 2007 WL 5076983, at \*3 (N.D. Cal. 2007).  "[A] corrective disclosure must by

definition reveal new information to the market that has not yet been incorporated into the stock

price," and the Ninth Circuit imposes a "high bar" for short reports to qualify.  *In re Nektar*

*Therapeutics Sec. Litig*., 34 F.4th 828, 839 (9th Cir. 2022).  The Short Reports are the **only** corrective

disclosures alleged in the Complaint.  ¶¶ 195-209.  Each fails as a matter of law.

*First*, the "character of the [Short Reports]—produced by . . . self-interested short-seller[s]

who disavowed any accuracy" render them inadequate as a matter of law.  *Berkeley Lights*, 2024 WL

695699, at \*17.  The Ninth Circuit has held that commentary from "anonymous short-sellers" is not

corrective because "it is not plausible that the market reasonably perceived these posts as revealing

the falsity of [AppLovin's] prior misstatements."  *BofI*, 977 F.3d at 797.  These short sellers "had a

financial incentive to convince others to sell, and the posts included disclaimers from the authors

stating that they made 'no representation as to the accuracy or completeness of the information set

forth'" in the articles.  *Id.*; *accord Nektar*, 34 F.4th at 840 (market would not perceive short report

"as revealing false statements"); *In re eHealth, Inc. Sec. Litig*., 2023 WL 6390593, at \*8 (N.D. Cal.

Sept. 28, 2023) (Muddy Waters report not a corrective disclosure); *Petersen*, 2024 WL 5384678, at

11 (Bear Cave report not a corrective disclosure).

*Second*, the Short Reports cannot serve as corrective disclosures because they disclosed only

an alleged "'risk' or 'potential' for widespread fraudulent conduct," not proof of that conduct.  *In re*

*Herbalife, Ltd. Sec. Litig.*, 2015 WL 12732428, at \*2 (C.D. Cal. 2015).  Information that discloses

only an alleged **risk** or **potential** must be "coupled with a subsequent revelation of the inaccuracy of

[the alleged] misrepresentation" to "serve as a corrective disclosure." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1203 (9th Cir. 2016). Plaintiffs do not, and cannot, point to any such revelation.

*Third*, the Short Reports purport to rely exclusively on publicly available information and Plaintiffs do not "allege particular facts plausibly suggesting that other market participants had not done the same analysis." *BofI*, 977 F.3d at 794-95; *see also Espy v. J2 Glob., Inc.*, 99 F.4th 527, 542 (9th Cir. 2024) (short reports insufficient to plead loss causation because they relied on publicly accessible information). Short seller reports otherwise relying entirely on public information, like those here, are by definition not corrective, but rather "simply an individual's summary and comments on publicly available facts." *Bonanno v. Cellular Biomedicine Grp., Inc.*, 2016 WL 4585753, at *4 (N.D. Cal. Sept. 2, 2016). If the Short Reports' disclaimers are true, then the Reports are based on public information and Plaintiffs provide no "facts plausibly explaining why [this] information was not yet reflected in [defendant's] stock price." *BofI*, 977 F.3d at 794-95. Plaintiffs find themselves in an impossible position given their choice to rely exclusively on the Short Reports for their securities fraud claims. To the extent the Reports are based on allegedly non-public information and analysis from undisclosed sources, the Reports are unreliable and cannot be credible for purposes of establishing falsity. *Supra* pp. 14-15. And to the extent the Reports are based on public information as their disclaimers suggest, the Reports are not "corrective" and cannot establish loss causation.

*Finally*, if the Short Reports could qualify as corrective disclosures, they do not reveal the falsity of any alleged misstatement. *In re Nuveen Funds/City of Alameda Sec. Litig.*, 2011 WL 1842819, at *10 (N.D. Cal. 2011) (corrective disclosure "must relate back to the misrepresentation"). Even a cursory review of the Short Reports reveals the absence of even a tenuous connection between them and any alleged misrepresentation. Plaintiffs do not explain how the Reports' accusations of deceptive practices revealed any "truth" about AppLovin's growth or revenue, the success of the e-commerce pilot, or the ways AppLovin was leveraging Axon. *See Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1046 (N.D. Cal. 2012). This is particularly true for the Muddy Waters Report, published one month after the other Short Reports without providing any new information.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Complaint with prejudice.

1    DATED: November 14, 2025          QUINN EMANUEL URQUHART &
                                       SULLIVAN, LLP
2

3                                 By: */s/ Alexander Benjamin Spiro*

4                                      Victoria Blohm Parker (Bar No. 290862)
                                       vickiparker@quinnemanuel.com
5                                      50 California Street, 22nd Floor
                                       San Francisco, California 94111
6                                      Telephone: (415) 875-6600

7                                      Alexander Benjamin Spiro (pro hac vice)
                                       Hope Skibitsky (pro hac vice)
8                                      Brenna Nelinson (pro hac vice to be filed)
                                       alexspiro@quinnemanuel.com
9                                      hopeskibitsky@quinnemanuel.com
                                       brennanelinson@quinnemanuel.com
10                                     295 5th Avenue
                                       New York, NY 10016
11                                     Telephone: (212) 849-7000

12

13                                     *Attorneys for Defendants*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28