1   Shawn A. Williams (Cal. Bar Id. 213113)
    **ROBBINS GELLER RUDMAN**
2   **& DOWD LLP**
    Post Montgomery Center
3   One Montgomery Street, Suite 1800
    San Francisco, CA 94104
4   Tel.: (415) 288-4545
    Fax: (415) 288-4534
5   Email: shawnw@rgrdlaw.com

6   [Additional counsel appear below]

7   *Counsel for Lead Plaintiffs and Lead Counsel for the Class*

8                  **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
9                      **OAKLAND DIVISION**

10  BEN BROWNBACK, Individually and on          Case No. 4:25-cv-02772-HSG
    Behalf of All Others Similarly Situated,
11                                              CLASS ACTION
                              Plaintiff,
12                                              LEAD PLAINTIFFS' OPPOSITION TO
           vs.                                  DEFENDANTS' MOTION TO DISMISS
13                                              THE AMENDED COMPLAINT
    APPLOVIN CORPORATION, et al.,
14                                              DATE:     March 12, 2026
                              Defendants.       TIME:     2:00 p.m.
15                                              CTRM:     2, 4th Floor
                                                JUDGE:    Honorable Haywood S. Gilliam, Jr.
16

17

18

19

20

21

22

23

24

25

26

27

28

4912-7961-6135.v1

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................1

II.     SUMMARY OF FACTUAL ALLEGATIONS .........................................................3

III.    LEGAL STANDARD..................................................................................5

IV.     SECTION 10(b) LIABILITY IS PROPERLY PLED .........................................5

      A.      The Complaint Alleges a Deceptive Scheme..............................................6

            1.      The Nature, Purpose, and Effect of Defendants' Scheme ..........................6

            2.      The Reports of Defendants' Deceptive Practices Are Reliable ..................8

      B.      The Complaint Alleges False and Misleading Statements .......................................9

            1.      Misleading Omissions of Deceptive Advertising Practices......................10

            2.      Misleading Statements Regarding E-Commerce Pilot ............................11

             3.      Misleading Risk Factor Statements ............................................14

             4.      Misleading Blog Post in Response to Short Seller Reports......................14

      C.      The Complaint Alleges a Strong Inference of Scienter .........................................15

            1.      Defendants' Knowledge and Intimate Involvement in the Core
                Operations at Issue Establishes a Strong Inference of Scienter ................15

            2.      Defendants' Enormous Stock Sales Further Evidence Scienter ...............18

            3.      A Holistic Analysis Confirms the Strong Inference of Scienter...............22

      D.      The Complaint Alleges Loss Causation................................................23

V.      CONCLUSION.......................................................................................25

<table>
<tr><td>1</td><td></td></tr>
</table>

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)..................................................................................................5

*Backe v. Novatel Wireless, Inc.,*
   642 F. Supp. 2d 1169 (S.D. Cal. 2009)...................................................................19

*Bernstein v. Ginkgo Bioworks Holdings, Inc.,*
   2023 WL 11996105 (N.D. Cal. Mar. 10, 2023).......................................................25

*Berson v. Applied Signal Tech., Inc.,*
   527 F.3d 982 (9th Cir. 2008) ...............................................................9, 14, 15, 18

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.,*
   412 F. Supp. 3d 206 (E.D.N.Y. 2019) ....................................................................21

*Curry v. Yelp Inc.,*
   2015 WL 7454137 (N.D. Cal. Nov. 24, 2015), *aff'd,*
   875 F.3d 1219 (9th Cir. 2017) ................................................................................20

*Dura Pharms., Inc. v. Broudo,*
   544 U.S. 336 (2005)................................................................................................23

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford,*
   794 F.3d 297, 309 (2d Cir. 2015)...........................................................................22

*ESG Cap. Partners, LP v. Stratos,*
   828 F.3d 1023 (9th Cir. 2016) ................................................................................15

*Freudenberg v. E*Trade Fin. Corp.,*
   712 F. Supp. 2d 171 (S.D.N.Y. 2010).....................................................................22

*Garbaccio v. Starbucks Corp.,*
   2025 WL 3228275 (W.D. Wash. Nov. 19, 2025) ....................................................16

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.,*
   63 F.4th 747 (9th Cir. 2023) ...................................................................................13

*Glazer Cap. Mgmt. LP v. Magistri,*
   549 F.3d 736 (9th Cir. 2008) ..................................................................................17

*Hershewe v. JOYY Inc.,*
   2021 WL 6536670 (C.D. Cal. Nov. 5, 2021)............................................................8

Page

*Hoang v. ContextLogic, Inc.*,
2023 WL 6536162 (N.D. Cal. Mar. 10, 2023)...................................................................21

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ...................................................................8, 14, 15

*In re Amgen Inc. Sec. Litig.*,
544 F. Supp. 2d 1009 (C.D. Cal. 2008) .......................................................13

*In re Apple Comput. Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) .......................................................13

*In re Apple Inc. Sec. Litig.*,
2020 WL 2857397 (N.D. Cal. June 2, 2020) .......................................................10

*In re Bofl Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) .......................................................21

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) .......................................................17, 21

*In re Diamond Foods, Inc. Sec. Litig.*,
2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) .......................................................17

*In re Doximity, Inc. Sec. Litig.*,
2025 WL 1449598 (N.D. Cal. May 13, 2025) .......................................................18

*In re Facebook, Inc. Sec. Litig.*,
87 F.4th 934 (9th Cir. 2023) .......................................................5, 14

*In re Galena Biopharma, Inc. Sec. Litig.*,
117 F. Supp. 3d 1145 (D. Or. 2015) .......................................................6, 7, 20

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
97 F.4th 1171 (9th Cir. 2024) .......................................................8, 24, 25

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) .......................................................5

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014) .......................................................12

*In re LendingClub Sec. Litig.*,
254 F. Supp. 3d 1107 (N.D. Cal. 2017) .......................................................11

*In re Mylan N.V. Sec. Litig.*,
2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) .......................................................23

**Page**

*In re Nektar Therapeutics*,
   2020 WL 3962004 (N.D. Cal. July 13, 2020)..........................................................................23

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ....................................................................................13, 19

*In re QuantumScape Sec. Class Action Litig.*,
   580 F. Supp. 3d 714 (N.D. Cal. 2022) ..............................................................8, 9, 12, 25

*In re SentinelOne, Inc. Sec. Litig.*,
   2025 WL 2807321 (N.D. Cal. Oct. 2, 2025)...................................................................16, 19

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   160 F. Supp. 2d 1059 (N.D. Cal. 2001) .............................................................................22

*In re Twitter, Inc. Sec. Litig.*,
   506 F. Supp. 3d 867 (N.D. Cal. 2020), *aff'd sub nom.*
   *Weston Fam. P'ship LLLP v. Twitter, Inc.*,
   29 F.4th 611 (9th Cir. 2022) ...............................................................................................22

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009) ................................................................................21

*In re Vaxart, Inc. Sec. Litig.*,
   2023 WL 3637093 (N.D. Cal. May 25, 2023) .....................................................................7

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) ..........................................................................................9, 23

*Johnson v. Aljian*,
   394 F. Supp. 2d 1184 (C.D. Cal. 2004), *aff'd in part*,
   490 F.3d 778 (9th Cir. 2007) ..............................................................................................19

*Kang v. PayPal Holdings, Inc.*,
   620 F. Supp. 3d 884 (N.D. Cal. 2022) ...............................................................................16

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) .........................................................................................10, 14

*Lamartina v. VMware, Inc.*,
   2023 WL 2763541 (N.D. Cal. Mar. 31, 2023).....................................................................18

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
   416 F.3d 940 (9th Cir. 2005) ..............................................................................................13

*Lorenzo v. SEC*,
   587 U.S. 71 (2019)................................................................................................................5

**Page**

*Lozada v. TaskUs, Inc.*,
  710 F. Supp. 3d 283 (S.D.N.Y. 2024).................................................................19

*McIntire v. China MediaExpress Holdings, Inc.*,
  927 F. Supp. 2d 105 (S.D.N.Y. 2013)..................................................................8

*Miao v. Fanhua, Inc.*,
  442 F. Supp. 3d 774 (S.D.N.Y. 2020)................................................................23

*Middlesex Ret. Sys. v. Quest Software Inc.*,
  527 F. Supp. 2d 1164 (C.D. Cal. 2007) ............................................................19

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018) ......................................................................1, 23

*Ng. v. Berkeley Lights, Inc.*,
  2024 WL 695699 (N.D. Cal. Feb. 20, 2024) ....................................................23

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ...................................................................20, 24

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) .............................................................14, 19

*N.Y. City Emps.' Ret. Sys. v. Berry*
  616 F. Supp. 2d 987 (N.D. Cal. 2009) ...........................................................5, 6

*Okla. Firefighters Pension Fund & Ret. Sys. v. Snap Inc.*,
  2024 WL 5182634 (9th Cir. Dec. 20, 2024).............................................16, 17, 18

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015).......................................................................................12

*Pampena v. Musk*,
  705 F. Supp. 3d 1018 (N.D. Cal. 2023) ...........................................................24

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software*,
  2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019) ....................................................22

*Plumley v. Sempra Energy*,
  847 F. App'x 426 (9th Cir. 2021) ....................................................................19

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  2012 WL 1868874 (N.D. Cal. 2012), *aff'd*,
  759 F.3d 1051 (9th Cir. 2014) ........................................................................17

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ..................................................................16, 17

|  | Page |
|---|---|

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) ...............................................................13

*Pujo v. EHang Holdings Ltd.*,
    2025 WL 1242324 (C.D. Cal. Mar. 26, 2025)....................................8, 24

*Rabkin v. Lion Biotechnologies, Inc.*,
    2018 WL 905862 (N.D. Cal. Feb. 15, 2018) ...........................................6

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ...............................................................16

*Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*,
    790 F. Supp. 3d 763 (N.D. Cal. 2025) ...................................................17

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ...............................................................15

*Saskatchewan Healthcare Emp.'s Pension Plan v. KE Holdings, Inc.*,
    718 F. Supp. 3d 344 (S.D.N.Y. 2024)......................................................9

*SEC v. Farnsworth*,
    692 F. Supp. 3d 157 (S.D.N.Y. 2023)......................................................6

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) .................................................18

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009), *aff'd*,
    563 U.S. 27 (2011)................................................................................14

*Snellink v. Gulf Res., Inc.*,
    870 F. Supp. 2d 930 (C.D. Cal. 2012) .....................................................8

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ................................................................5

*Stocke v. Shuffle Master, Inc.*,
    615 F. Supp. 2d 1180 (D. Nev. 2009).....................................................23

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)....................................................................5, 15, 22

*Todd v. STAAR Surgical Co.*,
    2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ........................................13

*Uniformed Sanitationmen's Ass'n Comp. Accrual Fund v. Equinix, Inc.*,
    2025 WL 39936 (N.D. Cal. Jan. 6, 2025)......................................8, 18, 25

Page

*United Ass'n Nat'l Pension Fund v. Carvana Co.*,
    759 F. Supp. 3d 926 (D. Ariz. 2024) ...................................................................11, 16, 17, 23

*United Nurses Ass'ns of Cal. v. Nat'l Lab. Rels. Bd.*,
    871 F.3d 767 (9th Cir. 2017) ...................................................................................................7

*United States v. Cox*,
    7 F.3d 1458 (9th Cir. 1993) ......................................................................................................8

*Va. Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991) .............................................................................................................13

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    57 F. Supp. 3d 950 (D. Minn. 2014) .........................................................................................6

*Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*,
    2012 WL 3835078 (N.D. Cal. Sep. 4, 2012) ...........................................................................13

*Wenger v. Lumisys, Inc.*,
    2 F. Supp. 2d 1231 (N.D. Cal. 1998) ......................................................................................19

*York Cnty. ex rel. Cnty. of York Ret. Fund v. HP Inc.*,
    738 F. Supp. 3d 1182 (N.D. Cal. 2024) .....................................................................................6

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
    §78j(b) ............................................................................................................................ *passim*
    §78t(a) ................................................................................................................................1, 25
    §78t-1 ................................................................................................................................1, 25
    §78u-4(b) ...........................................................................................................................9, 15

Federal Rules of Civil Procedure
    Rule 9(b) .....................................................................................................................................6
    Rule 15(d) ...................................................................................................................................4
    Rule 12(b)(6) ............................................................................................................................23

17 C.F.R.
    §240.10b-5 ...................................................................................................................... *passim*

1   Lead Plaintiffs Northern California Pipe Trades Trust Funds and Monroe County Employees'

2   Retirement System (together, "Lead Plaintiffs"), respectfully submit this opposition to Defendants'

3   Motion to Dismiss Amended Complaint (ECF No. 71) ("MTD").[1]

4   **I.    INTRODUCTION**

5   This securities fraud class action is brought on behalf of purchasers of AppLovin's Class A

6   common stock between November 7, 2024 and March 27, 2025, inclusive (the "Class Period"), for

7   violations of §§10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act").

8   AppLovin is an advertising technology ("ad tech") company that specializes in monetizing digital

9   advertising space within free-to-play mobile games, and this case arises from a number of deceptive

10  business practices and misleading public statements that artificially inflated the price of AppLovin

11  stock during the Class Period.  The operative Complaint sets forth a straightforward case of §10(b)

12  liability under both Rule 10b-5(a) and (c) and Rule 10b-5(b), and its allegations readily satisfy the

13  challenged elements of falsity, scienter, and loss causation.

14  *First*, Rule 10b-5(a) and (c) scheme liability is adequately alleged.  *Infra*, §IV.A.  The

15  Complaint details the nature, purpose, and effect of a set of deceptive practices that inflated

16  AppLovin's performance metrics, including: (i) nonconsensual application ("app") installations;

17  (ii) manipulative advertisements ("ads"); (iii) a curated and non-representative e-commerce pilot;

18  (iv) fingerprinting and unauthorized data tracking; and (v) attribution tactics that claimed credit for

19  sales driven by Meta Platforms, Inc. ("Meta").  The purpose and effect of the scheme was to drive up

20  AppLovin's valuation and enable Company insiders to sell more than $2.6 billion in stock while

21  investors purchased shares at artificially-inflated prices.  Defendants do not offer any targeted

22  challenges to scheme liability, and the investigative short seller reports that uncovered Defendants'

23  misconduct reliably detail the facts, methodologies, sources, and analyses that led to their findings.

24  *Second*, the Complaint adequately pleads falsity for Rule 10b-5(b) misrepresentations.  *Infra*,

25  §IV.B.  Throughout the Class Period, Defendants credited AppLovin's revenue growth to advances in

---

[1]   "Defendants" are AppLovin Corporation ("AppLovin" or the "Company") together with Adam Foroughi, Herald Chen, Matthew Stumpf, and Vasily (Basil) Shikin (the "Individual Defendants"). Unless otherwise noted, "¶__" and "¶¶__" references are to the Amended Complaint for Violations of the Federal Securities Laws (ECF No. 61) (the "Complaint"), emphasis is added, and citations are omitted.

1  its AXON recommendation engine while omitting the Company's deceptive ad practices. Defendants
2  also repeatedly touted the results and organic scalability of the Company's nascent e-commerce
3  platform, when in reality Defendants had constrained the initiative to a non-representative cohort of
4  advertisers receiving material incentives, and its results relied on claiming credit for and retargeting
5  users already primed by Meta (*i.e.*, Facebook and Instagram). Defendants further maintained
6  boilerplate risk warnings that misleadingly framed privacy and platform-compliance harms as
7  hypothetical, notwithstanding ongoing practices that had already materialized such risks. Finally,
8  Defendants' blog post claims that AppLovin does not earn revenue on "clicks or mere impressions"
9  and that "every download results from an explicit user choice," *inter alia*, are contradicted by the
10 Company's own revenue recognition disclosures, and user complaints and source code analyses.

11     ***Third***, the Complaint adequately pleads scienter. *Infra*, §IV.C. The misconduct at issue
12 concerns AppLovin's core Advertising segment, and Defendants repeatedly tied AXON's capabilities
13 to revenue growth and positioned e-commerce expansion as a key near-term revenue driver—
14 demonstrating actual access to the disputed information at issue. Defendants' hands-on, founder-led
15 structure, and post-Class Period admissions concerning a constrained e-commerce initiative further
16 support scienter, making it "absurd" to suggest ignorance of these central matters. The inference of
17 scienter is reinforced by massive stock sales during the Class Period—with the Individual Defendants
18 collecting nearly $1 billion in aggregate proceeds, representing unusually large percentages of holdings
19 and multiples of annual compensation, which were timed to capitalize on inflation and amidst rolling
20 partial disclosures. The existence of ongoing government investigations into AppLovin's data
21 practices, and the Company's recent shuttering of its Array product shortly after publication of further
22 evidence of nonconsensual installations, *inter alia*, further bolster the inference of scienter.

23     ***Fourth***, the Complaint adequately pleads loss causation. *Infra*, §IV.D. Defendants concede
24 AppLovin's stock price suffered significant declines after the publication of several short seller reports,
25 each of which is alleged to have partially revealed the truth about the Company's deceptive practices
26 and inflated e-commerce narrative. Contemporaneous media also directly attributed the stock price
27 drops to those disclosures. Defendants' contentions that the short seller reports are inherently
28 unreliable, that the information was already public, or that stock price rebounds (that occurred months

1   later) negate causation have no merit, as the reports at issue reliably synthesized nontrivial, dispersed

2   data into digestible revelations and provided new facts to the market.

3   **II.      SUMMARY OF FACTUAL ALLEGATIONS**.

4           AppLovin's business has long centered on monetizing digital ads within free-to-play mobile

5   games.  ¶23.  The Company's advertising products coordinate the sale and placement of digital ad

6   space from owners of ad space (*e.g.*, mobile game developers) to advertisers via high-speed auctions.

7   ¶¶26-27.  Revenue is generated upon completion of an agreed-upon action (*e.g.*, an install or purchase)

8   or number of displayed ads, with AppLovin typically recognizing revenue on a "cost-per-install basis."

9   ¶28.  The vast majority of the Company's advertising revenue historically was derived from "'games

10  running ads inside other games.'"  ¶¶39, 45-46.  By mid-2024, however, Defendants began to emphasize

11  their expansion into the direct-to-consumer ("DTC") e-commerce space.  ¶¶40-44.  After meetings with

12  Defendants in September 2024, many analysts raised their valuations and reported that this new e-

13  commerce business would materially contribute to 2025 advertising revenues.  ¶¶42-45, 172.

14          It is in this context that, beginning in November 2024, Defendants issued a series of materially

15  misleading public statements regarding AppLovin's nascent e-commerce business and key revenue

16  drivers that artificially inflated the price of its stock.  For instance, Defendants repeatedly told investors

17  in November 2024 that AppLovin's e-commerce platform was "going to make an impact in '25," "will

18  scale significantly in 2025," was "the most innovative advertising technology that the world has yet

19  seen," and had allowed many e-commerce advertisers to "experience[e] nearly 100% incrementality"

20  (*i.e.*, additional new growth attributable to AppLovin ads).  ¶¶48-51; *infra*, §IV.B.1.  Defendants

21  continued this narrative in February 2025, claiming that they remained very confident in a "material

22  portion of revenue from the e-commerce opportunity in 2025" and that there was a long, long line out

23  the door of customers waiting to be included in the e-commerce pilot.  ¶¶54-57; *infra*, §IV.B.3.

24          AppLovin's valuation skyrocketed and became inextricably tied to the success of the

25  Company's e-commerce platform.  ¶¶51-58, 134, 146.  As valuation soared, Defendants launched an

26  insider selling spree that culminated in nearly $1 billion of AppLovin stock sales during the four-

27  month Class Period.  ¶¶152-159; *infra* §IV.C.2.  Just two weeks into the Class Period, Kohlberg Kravis

28  Roberts & Co. L.P. ("KKR"), a key private equity investor with special access to Company

1   information, completely exited its AppLovin position with a $1.6 billion single-day sale.  ¶¶160-161.

2           Beginning in late February 2025, investigative reports from short sellers and other market

3   commentators[2] began revealing that AppLovin's growth was fueled by a number of deceptive ads and

4   business practices, including, *inter alia*: (i) installing apps onto users' devices without their knowledge;

5   (ii) flooding users with manipulative ads designed to maximize clicks and inflate engagement;

6   (iii) running ads in the background without users ever seeing them; and (iv) retargeting and

7   remarketing e-commerce consumers by engaging in artificial ad exposure to manipulate attribution and

8   claim credit for sales actually driven by Meta.  ¶¶98-114; *infra*, §IV.A.  These deceptive practices

9   exaggerated AppLovin's results and prospects, as each forced install and ad impression inflated

10  AppLovin's reported revenues.  ¶¶69-71, 100, 105.

11          The public disclosure of AppLovin's deceptive practices in the reports—which were based on,

12  *inter alia*, consultations with ad tech industry experts, forensic review of AppLovin and partner app

13  code, app download data, and interviews and reports from former AppLovin employees and customers

14  (¶¶60, 67)—further revealed that the Company's e-commerce pilot was not as scalable or

15  demonstrative of the future growth as Defendants had led investors to believe.  Accordingly, the price

16  of AppLovin stock significantly declined in response to each of these investigative reports published

17  between February 20, 2025 and March 27, 2025.  ¶¶195-209; *infra*, §IV.D.

18          Events subsequent to the filing of the Complaint corroborate the alleged fraud.[3]  The U.S.

19  Securities and Exchange Commission ("SEC") and multiple state attorneys general have launched

20  investigations into AppLovin's data collection practices in response to a sealed whistleblower

21  complaint and the short seller reports in question.  *See* ¶¶78, 81, 88-89, 113; Suppl., §XIV.A.

22  AppLovin also recently announced the shuttering of its Array product amid publication of evidence

23  demonstrating the Company's use of nonconsensual installation practices.  *See* ¶¶69-72, 99-105;

24  Suppl., §XIV.B.  Defendants have also continued to conceal the state of their e-commerce business by:

---

25  [2]    These are the: (i) February 20, 2025 Bear Cave Report (¶¶60-65); (ii) February 26, 2025 Culper

26  and Fuzzy Panda Reports (¶¶66-84); and (iii) March 27, 2025 Muddy Waters Report (¶¶85-91).

27  [3]    Pursuant to Federal Rule of Civil Procedure 15(d), Lead Plaintiffs have concurrently moved to
    supplement the Complaint.  *See* Lead Plaintiffs' Motion to Supplement the Amended Complaint
    ("Motion to Supplement"), filed concurrently herewith.  All references herein to "Suppl." refer to the

28  proposed supplement attached as Exhibit A to the Motion to Supplement.

1  (i) refusing to provide any break-out for e-commerce financial results or customer metrics; and

2  (ii) continually delaying and limiting the availability of the e-commerce platform. *See* ¶¶45, 47-55,

3  106-114; Suppl., §XIV.C. As a result, market analysts have now begun to show "less conviction

4  around how much e-commerce scales over time relative to the high expectations priced into shares" or

5  have significantly lowered their estimates for 2026-2027 e-commerce revenue. Suppl., §XIV.C.

6  **III.    LEGAL STANDARD**

7         A court must "consider the complaint in its entirety," "accept all factual allegations in the

8  complaint as true," and construe those allegations in the light most favorable to the plaintiff. *Tellabs,*

9  *Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007). A complaint need only state a claim

10 that is "'plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint may be

11 dismissed only if a "defendant's plausible alternative explanation is so convincing that plaintiff's

12 explanation is ***im***plausible." *Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011). "[S]o long as the

13 plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best

14 reserved for later stages." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

15 **IV.    SECTION 10(b) LIABILITY IS PROPERLY PLED**

16        Section 10(b) of the Exchange Act prohibits "any manipulative or deceptive device or

17 contrivance" in violation of any SEC rule. 15 U.S.C. §78j(b). Rule 10b-5(a) and (c) impose liability

18 for a scheme or deceptive course of conduct, while Rule 10b-5(b) imposes liability for material

19 misrepresentations. 17 C.F.R. §240.10b-5; *Lorenzo v. SEC*, 587 U.S. 71, 78 (2019). The Complaint

20 here alleges both scheme and misrepresentation claims. Complaint, §§V, VI & n.18.

21        To state a Rule 10b-5(a) or (c) scheme claim, a plaintiff must allege "a device, scheme or

22 artifice to defraud, or an act, practice or course of business which would operate as a fraud, in addition

23 to alleging the standard elements of a §10(b) and Rule 10b-5 violation: (1) scienter; (2) connection

24 with the purchase or sale of securities; (3) reliance; (4) economic loss; and (5) loss causation." *N.Y.*

25 *City Emps.' Ret. Sys. v. Berry*, 616 F. Supp. 2d 987, 996 (N.D. Cal. 2009). To state a Rule 10b-5(b)

26 misrepresentation claim, a plaintiff must allege a material misrepresentation or omission ("falsity")

27 alongside the aforementioned elements. *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 947 (9th Cir.

28 2023). Here, Defendants challenge only falsity, scienter, and loss causation. MTD, §§I-III.

### A.   The Complaint Alleges a Deceptive Scheme

"'While Rule 10b-5(b) addresses liability for material misstatements or omissions, "Rules 10b-5(a) and (c) encompass conduct beyond disclosure violations."'" *Berry*, 616 F. Supp. 2d at 995; *Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, at *16 (N.D. Cal. Feb. 15, 2018). For scheme liability, a "'plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim.'" *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1193 (D. Or. 2015). As "'the exact mechanism of the scheme is likely to be unknown to the plaintiffs, allegations of the ***nature, purpose, and effect*** of the fraudulent conduct and the roles of the defendants are sufficient'" to satisfy Federal Rule of Civil Procedure 9(b). *Id.*; *York Cnty. ex rel. Cnty. of York Ret. Fund v. HP Inc.*, 738 F. Supp. 3d 1182, 1206 (N.D. Cal. 2024).[4]

### 1.   The Nature, Purpose, and Effect of Defendants' Scheme

The Complaint explains at length and with specificity the ***nature*** of the scheme by detailing how Defendants implemented a series of deceptive business practices to boost AppLovin's performance metrics and lure investors with a misleading portrayal of its business. *See* ¶¶4, 98-114; *HP*, 738 F. Supp. 3d at 1207 (scheme liability where defendant "approv[ed] steep discounts and sales" with sub-distributors "in order to artificially inflate sales numbers"); *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 981 (D. Minn. 2014) (scheme liability when defendants' manipulation of studies "had the effect of artificially propping up Medtronic stock prices"); *SEC v. Farnsworth*, 692 F. Supp. 3d 157, 190 (S.D.N.Y. 2023) (scheme liability where deceptive activity was "directed towards customers . . . in order to manipulate key metrics"). These deceptive acts and practices included, *inter alia*:

- **Nonconsensual Installations**. AppLovin embedded permissions through its software development kit ("SDK") that allowed apps to "bind" to the Company's Array/AppHub product, inheriting one-click direct-install privileges and enabling downloads outside traditional app-store safeguards. ¶¶69-72, 99-102, 105.[5] This allowed AppLovin to employ a

---

[4]   Scheme liability claims are not subject to the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Galena*, 117 F. Supp. 3d at 1193.

[5]   AppHub was a component of the Company's Array product offered to promote and preload apps on devices. ¶32. Ad fraud researcher Dr. Ben Edelman concluded that allowing advertiser apps to bind to AppHub served no meaningful purpose other than to drive unwanted installations (¶¶72, 101), and that, based on review of AppLovin's code, the Company had the ability to "'end all direct downloads on a moment's notice'" if it faced criticism of the practice. ¶102. That has since happened,

"backdoor installation scheme," whereby ads could, without the user's knowledge, install apps directly on the user's phone and serve ads. *Id.*

- **Manipulative Ads**. AppLovin flooded users with manipulative ads designed to maximize clicks and inflate engagement and unwanted downloads. ¶¶71, 103-105. These ads often initiated installations without any intentional action by users. *Id.*

- **Distorted E-Commerce Pilot Results**. AppLovin restricted its e-commerce pilot to an initial group of high-spending advertisers in order to overstate initial growth—extending credits up to $10,000 to those already spending at least $600,000 a month on Meta advertising. ¶¶47, 61-63, 74-77, 107.[6] This enabled AppLovin to retarget users already exposed to Meta ads. *Id.*

- **Fingerprinting and Targeting**. AppLovin violated platform rules and privacy safeguards by tracking and retargeting consumers using behavioral signals and persistent identifiers to target "high-value" consumers at the final stages of purchase. ¶¶78, 81, 85-89, 113. The SEC and multiple state attorneys general are investigating these practices. Suppl., ¶¶241-243.

- **Attribution for Meta-Driven E-Commerce Sales**. AppLovin systematically sought to claim credit for transactions attributable to Meta by retargeting high-value users already exposed to Meta ads and inserting itself into the attribution process through the AXON pixel to simulate "click through[s]." ¶¶69, 74-75, 78-80, 88, 107-112. Industry insiders found "extremely high correlation" between AppLovin-reported conversions and increases in Meta ad spend, with analyses showing AppLovin's incrementality to be only 25%-35%. *Id.*

- **Misleading Public Statements**. As discussed below, Defendants issued a series of false and misleading public statements throughout the Class Period regarding AppLovin's nascent e-commerce business, key revenue drivers, and risks. *Infra*, §IV.B.

The ***purpose*** of the scheme was to drive up AppLovin's stock price so that the Individual Defendants and other Company insiders could reap ***more than $2.6 billion*** in Class Period stock sales. *See* ¶¶149-162; *infra*, §IV.C.2.; *In re Vaxart, Inc. Sec. Litig.*, 2023 WL 3637093, at *3 (N.D. Cal. May 25, 2023) (selling shares to profit from misstatements is deceptive conduct); *Galena*, 117 F. Supp. 3d at 1203 (same). The ***effect*** of the scheme was that Defendants deceived and misled investors into buying AppLovin stock at artificially inflated prices. ¶¶105, 114, 195-212.[7]

---

with the Company recently confirming that it shut down Array just days after Dr. Edelman published further evidence of nonconsensual installation practices. Suppl., ¶¶244-245.

[6] Defendants admitted in November 2025 that the e-commerce pilot launched in the latter half of 2024 was comprised of a "filtered set of advertisers" from a list that they had "curated." Suppl., ¶246. And the Company's post-Class Period earnings results have further confirmed that the e-commerce pilot's initial growth was not organically scalable. ¶¶92-97; Suppl., ¶¶246-247.

[7] Defendants' only challenge to scheme liability is a one-sentence footnote where they argue the scheme claim fails "because that claim rests on the same inadequate allegations as the 10b-5(b) misstatements claim." MTD at 7 n.3. Such a "perfunctory argument is inadequately briefed and therefore waived" (*United Nurses Ass'ns of Cal. v. Nat'l Lab. Rels. Bd.*, 871 F.3d 767, 780 (9th Cir. 2017)), and Defendants may not use their reply brief to offer belated challenges to these allegations.

## 2.    The Reports of Defendants' Deceptive Practices Are Reliable

Courts routinely accept allegations based on short seller reports where, as here, the specific facts of the case provide indicia of reliability.  *See In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1178, 1181-83 (9th Cir. 2024) (crediting allegations from "[a]ctivist short sellers"); *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 731-32 (N.D. Cal. 2022) (crediting short seller report that "relie[d] entirely on anonymous former employees and experts"); *Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 939 (C.D. Cal. 2012) (holding it "permissible for Plaintiffs to rely on a short seller report" and "inappropriate to decide [its] accuracy" at the pleading stage).  Contrary to Defendants' suggestion (MTD at 14-15), "a securities fraud complaint is not automatically doomed just because it relies primarily or exclusively on a short-seller report quoting anonymous sources." *Uniformed Sanitationmen's Ass'n Comp. Accrual Fund v. Equinix, Inc.*, 2025 WL 39936, at *4 (N.D. Cal. Jan. 6, 2025); *Pujo v. EHang Holdings Ltd.*, 2025 WL 1242324, at *4 (C.D. Cal. Mar. 26, 2025) (same; collecting cases).[8]  Rather, whether such reports can support a claim "depends on the amount of detail and specificity, the corroborative nature of the allegations, the plausibility of those allegations given the context, the number of sources quoted, and other factors." *Equinix*, 2025 WL 39936, at *4.

Here, each of the reports that Defendants challenge was extensively researched and based on a significant number of clearly-identified sources that all build upon and corroborate each other:

- The ***Bear Cave Report*** by Edwin Dorsey based its findings on public documents, three named industry experts, reports from former AppLovin customers, Company disclosures, and dozens of hours playing mobile games in AppLovin's ecosystem.  ¶¶60-61; ECF No. 71-11.

- The ***Culper Report*** by Christian Lamarco was the culmination of several months of investigation and research, which included "a decompiling and forensic review of AppLovin and partner app code, app download data, consultations with a renowned ad fraud researcher

---

*United States v. Cox*, 7 F.3d 1458, 1463 (9th Cir. 1993); *see also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021) (reversing dismissal of scheme liability claims "when [defendant] had not targeted those claims in its motion to dismiss").

[8]    "The majority of courts that have addressed the issue have held that a short-seller report, 'such as the Muddy Waters Report . . . "does not implicate the same skepticism as a traditional anonymous source."'" *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 123-24 (S.D.N.Y. 2013).  Rather, Defendants' own cited authority acknowledges that "'[i]t is permissible for Plaintiffs to rely on a short seller report'" so long as there is "certain *indicia of reliability*." *Hershewe v. JOYY Inc.*, 2021 WL 6536670, at *4 (C.D. Cal. Nov. 5, 2021).  Indeed, Defendants' cases (MTD at 14-15) do not create a bright-line rule excluding short seller reports, and further demonstrate that the reliability of a short seller report turns on the particular facts of each case.

[Dr. Edelman], interviews with former employees, customers across both mobile gaming and e-commerce, competitors, and industry experts, as well as extensive reviews of AppLovin filings and disclosures, public announcements, social media comments, AppLovin employee profiles, and more." ¶¶67, 70-72, 75; ECF No. 71-8.

- The **Fuzzy Panda Report** was based on, *inter alia*, a review of tracking data found in AppLovin's SDK, a review of AppLovin-served ads after searches conducted on Facebook/Meta, lawsuits filed against the Company, consultations with anonymous ad fraud experts and Dr. Edelman, and reports from former AppLovin executives, current e-commerce customers, and former and current senior Meta employees. ¶78; ECF No. 71-9.

- The **Muddy Waters Report** was based on analyses of, *inter alia*: (i) "conversion log-level files" covering "over 37 million unique users" to determine incremental e-commerce conversions; (ii) 776 advertisers to ascertain which websites retained the presence of AppLovin tracking pixels to calculate advertiser churn rate; and (iii) AppLovin's code to identify the creation of "Persistent Identity Graphs" and data "fingerprinting." ¶¶86, 89; ECF No. 71-10.

Each of these reports "contains sufficient indicia of reliability to support [Lead Plaintiffs'] claims," as: (i) they explain "the methodology that [they] used" to arrive at their findings; (ii) they "corroborate [their] analysis of the Company's accessible data" with interviews of employees and by "cross-checking their results with other publicly available databases"; and (iii) their "investigative efforts were documented in the Report[s] with photographs . . . and screenshots." *See Saskatchewan Healthcare Emp.'s Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 381-84 (S.D.N.Y. 2024) (Muddy Waters report reliable where it "reveal[ed] the basis for the short-seller's factual assertions"). These reports were deemed reliable enough to trigger SEC and state attorneys general investigations into the Company's data collection practices and caused AppLovin to shut down the Array product at the source of its nonconsensual downloads. Suppl., ¶¶241-246. "[E]ach publication has the minimum indicia of reliability to make i[t] past the pleadings stage." *QuantumScape*, 580 F. Supp. 3d at 732.

## B.    The Complaint Alleges False and Misleading Statements

A complaint alleges falsity under the PSLRA when it "'specifi[es] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.'" *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012) (quoting 15 U.S.C. §78u-4(b)(1)(B)). "[A] statement is misleading if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Even an objectively true statement "may be misleading if it **omits**

1  material information," and "'once defendants [choose] to tout positive information to the market, they

2  [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse

3  information.'" *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018).

4      Here, the Complaint properly alleges that—beginning in November 2024 and continuing

5  through February 2025—Defendants issued a series of misleading statements that, *inter alia*, touted

6  the Company's AI technology as a key revenue driver while omitting the Company's deceptive practices

7  that had driven growth, overstated the early results of AppLovin's e-commerce pilot, portrayed the risk

8  of terms of service and privacy policy violations as mere hypotheticals when ongoing violations had

9  materialized, and offered misleading defenses of the Company's download practices and e-commerce

10  pilot. Defendants' categorical attacks on falsity (MTD, §II) ignore these well-pled allegations.[9]

11      **1.    Misleading Omissions of Deceptive Advertising Practices**

12      Defendants repeatedly claimed in their November 6, 2024 earnings materials for third quarter

13  2024 ("3Q24") that the Company's recent advertising revenue growth was being "driven by continued

14  development of [their] AXON engine through ongoing self-learning and directed model

15  enhancements." ¶116; *see also* ¶118 (touting "meaningful growth driven by advancements to

16  AXON"); ¶119 ("[I]mprovements in our AXON technology . . . contributed to further growth of our

17  software platform."). The following quarter, with fourth quarter 2024 earnings released on

18  February 12, 2025, Defendants similarly tethered the "remarkable 75% increase in revenue in [their]

19  advertising business" in 2024 to "the transformative potential of AI and automation." ¶138.

20      The Complaint alleges that each of these statements crediting revenue growth to unidentified

21  "enhancements" and "advancements" in AXON's purported AI technology was materially misleading,

22  as they omitted that AppLovin's advertising growth was also driven by deceptive and undisclosed

23  practices that inflated its results. ¶¶117, 121, 140. "[W]here a party goes beyond describing historical

24  results and touts specific factors driving those results, it is obligated to disclose negative information

25  related to those factors." *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *10 (N.D. Cal. June 2,

26

27  ───────────────
    [9]    Defendants extraneously argue by way of Appendix A (ECF No. 73-1) that virtually every alleged
28  misstatement in this case is either an accurate statement of historical performance, nonactionable
    puffery, opinion, or a forward-looking statement protected by the PSLRA's safe harbor.

2020); *United Ass'n Nat'l Pension Fund v. Carvana Co.*, 759 F. Supp. 3d 926, 961 (D. Ariz. 2024); *In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1118 (N.D. Cal. 2017) (defendant touting "organic matches" was obligated to disclose matches were inflated through self-dealing).  Once Defendants chose to tout AXON "enhancements" as a revenue driver, they were obligated to disclose their growth was also driven by junk ads, background ads, and unwanted installations.  ¶¶99-105.

### 2.      Misleading Statements Regarding E-Commerce Pilot

Defendants also repeatedly assured investors on the November 6, 2024 earnings call that AppLovin's nascent e-commerce platform "will scale significantly in 2025," as early results from the pilot program allowed many e-commerce advertisers to "see[] substantial returns" and "experience[e] nearly 100% incrementality." ¶118.[10]  Defendants further described the e-commerce pilot as the "best" and "fastest growing" product ever released by the Company (¶¶120, 124), causing a "line out the door of companies that want to jump on to this platform" (¶127).  The following month at an investor conference on December 11, 2024, Defendants again stated that the e-commerce platform was the "best and fastest-growing product [they]'ve ever released" (¶135), and that data from the pilot proved that AppLovin could sell advertising to "any company that is online with a website" and "can go out and expand this product to millions and millions of customers in the future" (¶136).  And again, on the February 12, 2025 earnings call, Defendants stated that they remained "very confident" in a "material portion of revenue from the e-commerce opportunity in 2025" (¶142), and claimed that "[d]emand from advertisers wanting to join our platform is high" (¶141) with a "long, long line out the door" of customers waiting to be included in the e-commerce pilot (¶144).[11]

These statements were materially false or misleading.  In reality, Defendants knew that their initial e-commerce pilot growth was not representative of the actual growth opportunity for the Company, and was favorably distorted by: (i) the generous incentives to a curated list of e-commerce

[10]  *See also* ¶120 ("[e]-commerce . . . is looking so strong that it's something that we think will be impactful to the business financially '25"); ¶122 (claiming e-commerce would "organically grow"); ¶124 ("[I]f it does scale the way we think it will, it's going to make an impact in '25.").

[11]  *See also* ¶141 ("Early pilots have shown positive outcomes for a range of advertisers, suggesting that any business in any vertical can harness the power of our platform."); ¶143 (claiming to "have a lot of proof of life in e-commerce" which would allow "hundreds of thousands of customers to come on over the coming quarters and years" and the business "to continue to show compelling growth").

1    advertisers who were required to spend substantial advertising dollars on Meta; and (ii) artificially

2    exposing devices to AppLovin ads and claiming attribution for purchases actually driven by Meta.

3    ¶¶121, 125, 129, 137, 145; *see also* ¶¶106-114; Suppl., ¶246.  Contrary to the claim of "nearly 100%

4    incrementality," an analysis of conversion log data conducted by Muddy Waters in early 2025 found the

5    true incrementality of AppLovin's e-commerce ads to be only ***25%-35%***.  ¶86.  And Defendants'

6    repeated claim it could "organically grow" from the "long, long line out the door" of customers

7    waiting to join the e-commerce platform is further belied by AppLovin's post-Class Period sequential

8    slowdowns in e-commerce growth (¶¶93-94), its launch of a paid marketing plan to attract new e-

9    commerce customers (¶97), and Defendants' admissions that e-commerce customers that came onto

10   the platform in 2025 had been "filtered through referrals" and were smaller in spend than the "filtered

11   set of advertisers [that came on] when [Defendants] curated the list" in 2024 (Suppl., ¶246).  Indeed,

12   while Defendants have refused to provide e-commerce results or customer metrics with their quarterly

13   earnings, their post-Class Period disclosures confirm that the pilot's results were not organically

14   scalable so as to materially impact the Company's 2025 results.  ¶¶92-97; Suppl., ¶¶246-247.[12]

15        The challenged statements are not inactionable opinion or puffery (MTD at 15-17).  When read

16   in context, these statements "express 'certainty' about an existing thing or occurrence" (*i.e.*, the

17   scalability of the e-commerce pilot results), with many of the challenged assertions lacking basic

18   "opinion-qualifying language such as 'I think' or 'I believe.'"  *See QuantumScape*, 580 F. Supp. 3d at

19   739.  Even where such qualifying language is present, the statements are actionable for containing

20   untrue "embedded statements of fact" and/or for "lack[ing] the basis for making those statements that a

21   reasonable investor would expect."  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*

22   *Pension Fund*, 575 U.S. 175, 183-85, 196 (2015).  Similarly, the doctrine of puffery applies only

23   where a statement is "'not capable of objective verification'" and "'lack[s] a standard against which a

24   reasonable investor could expect them to be pegged.'"  *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp.

25   3d 821, 834 (N.D. Cal. 2014).  The statements here "cannot be discounted as mere 'puffery'" when

26

27   ───────────────────

     [12]   Based on Defendants' representations, market analysts expected e-commerce to account for at least
28   10% of the Company's revenues in 2025.  ¶¶43, 48, 57.  However, several market analysts have since
     lowered their estimates for future e-commerce revenue.  ¶¶92-97; Suppl., ¶¶246-247.

1    they are "'provid[ing] a concrete description'" of the purported state of AppLovin's e-commerce pilot

2    and "most of the challenged statements were made in response to specific questions asked by financial

3    analysts." *See Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770-71 (9th Cir. 2023).

4            Nor are these statements inactionable under the PSLRA's safe harbor (MTD at 17-19), which

5    does not apply when Defendants "make a materially false or misleading statement about current or past

6    facts, and combine that statement with a forward-looking statement." *In re Quality Sys., Inc. Sec.*

7    *Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017); *see, e.g.*, ¶120 ("[e]-commerce . . . ***is looking so strong***

8    that it's something that we think will be impactful to the business financially '25"); ¶124 (***"[W]e've***

9    ***never seen anything that looks like this in terms of strength in market***. And so if it does scale the

10   way we think it will, it's going to make an impact in '25."). Further, courts have regularly held that

11   "'to the extent Plaintiffs . . . challenge Defendants' alleged ***omission of present facts*** with respect to

12   the challenged statements, the PSLRA's safe harbor does not apply.'" *Todd v. STAAR Surgical Co.*,

13   2016 WL 6699284, at *10 (C.D. Cal. Apr. 12, 2016) (emphasis in original). Further, the boilerplate

14   cautionary language that Defendants cite (MTD at 18) does not come close to meeting the Ninth

15   Circuit's "stringent" standard for meaningful cautionary language. *Livid Holdings Ltd. v. Salomon*

16   *Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005).[13]

17           Finally, the statements are also not rendered inactionable by the flawed truth-on-the-market

18   arguments Defendants offer. *Compare* MTD at 22, *with* ¶¶47, 106-114. Truth-on-the-market defenses

19   are "intensely fact-specific, so courts rarely dismiss a complaint on this basis." *In re Amgen Inc. Sec.*

20   *Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008). "[T]o avoid Rule 10b-5 liability, any material

21   information which insiders fail to disclose must be transmitted to the public with ***a degree of intensity***

22   ***and credibility sufficient to effectively counter-balance*** any misleading impression created by the

23   insiders' one-sided representations." *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir.

24   1989). Defendants have not and cannot make that showing.

25

26   _____

     [13]    True cautionary language "must be 'precise' and 'directly address'" (*Provenz v. Miller*, 102 F.3d
     1478, 1493 (9th Cir. 1996)) the misrepresentation such that "the risk of real deception drops to nil."

27   *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991). Cautionary language does not apply
     when "some of the potential perils identified have in fact been realized." *Washtenaw Cnty. Emps. Ret.*

28   *Sys. v. Celera Corp.*, 2012 WL 3835078, at *4 (N.D. Cal. Sep. 4, 2012).

### 3.  Misleading Risk Factor Statements

AppLovin's 3Q24 Form 10-Q and 2024 Form 10-K misleadingly presented the risk that any "actual" or "perceived failure" to comply with privacy policies, regulations, or terms of service "could" cause reputational harm (¶¶130-132) as merely a hypothetical, while at the same time actively concealing inherently risky business strategies (*i.e.*, nonconsensual downloads and improper fingerprinting) that directly and negatively affected the Company's reputation (¶133).  The Ninth Circuit has long held that such "[r]isk disclosures that 'speak[] entirely of as-yet-unrealized risks and contingencies' and do not 'alert[] the reader that some of these risks may already have come to fruition' can mislead reasonable investors."  *Alphabet*, 1 F.4th at 703 (quoting *Berson*, 527 F.3d at 985-87); *Facebook*, 87 F.4th at 948-50; *Khoja*, 899 F.3d at 1016; *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011).[14]

### 4.  Misleading Blog Post in Response to Short Seller Reports

On February 26, 2025, Foroughi published a blog post responding to the Fuzzy Panda and Culper Reports.  ¶¶82, 147.  In defense of the Company's direct downloads, Foroughi stated that AppLovin "earn[s] revenue based on the value [it] drive[s]—not on clicks or mere impressions," and that "[e]very download results from an explicit user choice—whether via the App Store or [its] Direct Download experience."  ¶147.  With respect to the e-commerce pilot, he claimed that "[t]he current requirement for a minimum monthly media spend is designed to justify the resources needed for manual onboarding" and that the pilot was experiencing "a run rate of roughly $1 billion a year of gross advertiser spend in the e-commerce category alone from around 600 customers."  *Id.*

These statements were false or misleading when made.  *See* ¶148.  Foroughi's claim that AppLovin does not earn revenue on "clicks or mere impressions" is contradicted by AppLovin's own SEC filings (signed by Foroughi himself) admitting that the Company recognizes revenue when an "agreed upon action is completed or when the ad is displayed to users" (*i.e.*, a click, download, or view/impression).  *See* ¶¶28, 35; *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d

---

[14]  The risk factors in question are not limited to violations of "laws and regulations" (*see* MTD at 23), but rather expressly encompass the "failure or perceived failure" to abide by privacy terms of service (¶131), like the conduct at issue here (*e.g.*, fingerprinting and nonconsensual downloads) that had already come to fruition.  ¶¶89, 113.

1226, 1230 (9th Cir. 2004) ("The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement."). Similarly, the assertion that "[e]very download results from an explicit user choice" is directly at odds with the source code, permission structures, and hundreds of user complaints evidencing that AppLovin directly installed apps onto users' devices without their knowledge. *See* ¶¶69-72, 99-105; Suppl., ¶¶244-245. And Foroughi's statements defending the e-commerce pilot's minimum spend requirement and touting $1 billion annual run rate were materially misleading, as they conveyed "'a state of affairs that differ[ed] in a material way from the one that actually exist[ed].'" *See Berson*, 527 F.3d at 985. In reality, the Company's e-commerce pilot was intentionally constrained and "curated" by Defendants to portray inflated short-term results that were not sustainable nor representative of the actual market opportunity for the Company (*see* ¶¶92-97; Suppl., ¶¶246-247), and owed much of its success to deceptive practices that allowed AppLovin to claim credit for purchases driven by Meta (¶¶47, 106-114).

### C. The Complaint Alleges a Strong Inference of Scienter

Scienter requires a showing that the defendant acted intentionally or with deliberate recklessness. 15 U.S.C. §78u-4(b)(2); *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008). The scienter inference need not be "irrefutable" nor the "'most plausible of competing inferences'"; rather, the inquiry is: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 324, 326. "[I]f two possible inferences—one fraudulent and the other nonfraudulent—are equally compelling, a plaintiff has demonstrated a strong inference of scienter." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1032-33 (9th Cir. 2016).[15]

#### 1. Defendants' Knowledge and Intimate Involvement in the Core Operations at Issue Establishes a Strong Inference of Scienter

A strong inference of scienter is independently established from the Complaint's well-pleaded allegations that both: (i) Defendants had "'actual access to the disputed information'"; and/or (ii) that

---

[15]  As "senior controlling officers," the Individual Defendants' scienter "'may be attributed to the corporation itself to establish liability as a primary violator of §10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority.'" *Alphabet*, 1 F.4th at 705.

1   the facts at issue were so central to AppLovin's business that it would be "absurd" to suggest

2   management was unaware.  *Okla. Firefighters Pension Fund & Ret. Sys. v. Snap Inc.*, 2024 WL

3   5182634, at *1-*2 (9th Cir. Dec. 20, 2024) (scienter adequately pled "under both the holistic inquiry

4   and core-operations theory"); *Reese v. Malone*, 747 F.3d 557, 577 (9th Cir. 2014) ("Both the absurdity

5   and actual knowledge analysis are sufficient to create a strong inference of scienter.").

6        Here, there is no dispute that the alleged misconduct concerns AppLovin's core Advertising

7   segment—powered by AXON, the AI engine Defendants touted as the "core offering" and "key

8   catalyst" for driving advertising revenue—which accounted for 68% of the Company's total revenue in

9   2024.  *See* ¶¶23, 166, 171, 174.  AppLovin is a founder-led company run by a small group of senior

10  executives who routinely displayed their granular, personal knowledge of AppLovin's advertising

11  business.  *See* ¶¶7, 163, 175-176; *Carvana*, 759 F. Supp. 3d at 977 (finding allegations that defendants

12  "employed a hands-on management style . . . further supports an inference of scienter"); *Garbaccio v.*

13  *Starbucks Corp.*, 2025 WL 3228275, at *21 (W.D. Wash. Nov. 19, 2025) (finding scienter where

14  statements concerned "'the core of the Company's business,'" CEO "was involved in the company's

15  day-to-day operations[,] had access to key information," and "'repeatedly touted his knowledge'" of

16  the same).  Defendants repeatedly discussed AXON's technical operation, its reliance on "cutting-edge

17  AI technologies," its direct correlation with advertising revenue growth, and its scalability into e-

18  commerce (and the nascent e-commerce pilot) as a major growth initiative and future revenue driver.

19  *See, e.g.*, ¶¶44, 118, 141-142, 168-170.  Foroughi's post-Class Period admissions that Defendants

20  deliberately constrained and curated the e-commerce rollout further exemplify his involvement in, and

21  knowledge of, the granular details of the Company's e-commerce initiative.  ¶173; Suppl., ¶246.[16]

---

[16]  Defendants' core-operations cases are inapposite.  *See Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 900 (N.D. Cal. 2022) (misconduct only involved "1.2% of [the] company's revenue"); *In re SentinelOne, Inc. Sec. Litig.*, 2025 WL 2807321, at *7 (N.D. Cal. Oct. 2, 2025) (failed to plead individual defendants' role in calculating relevant metric); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (failed to allege "specific admissions by individual defendants regarding their involvement with Intuitive's operations").

1    Defendants incorrectly assert that Lead Plaintiffs' scienter argument is "based entirely on

2  Defendants' positions at AppLovin." MTD at 12. To the contrary, the Complaint details Defendants'

3  demonstrated knowledge of, and repeated public statements to investors concerning, AppLovin's

4  advertising business. Defendants' repeated public discussions of AXON's purported AI-driven

5  capabilities and its impact on revenue support the inference that they reviewed internal, nonpublic

6  information[17] reflecting that the Company's reported revenue growth was also materially driven by

7  deceptive practices (¶¶98-114). *See Snap*, 2024 WL 5182634, at *2 (defendant was the head of global

8  advertising, was focused on the advertising business, "and spoke to investors about the [advertising]

9  business every quarter sufficiently meets this pleading standard"); *Carvana*, 759 F. Supp. 3d at 977

10  (scienter adequately alleged where the "hands-on" CEO and CFO "had access to confidential

11  proprietary information concerning the Company's operations and financials" and repeatedly discussed

12  the conduct underlying the alleged misstatements); *Retail Wholesale Dep't Store Union Loc. 338 Ret.*

13  *Fund v. Stitch Fix, Inc.*, 790 F. Supp. 3d 763, 779 (N.D. Cal. 2025) (finding a strong inference of

14  scienter where executives who oversaw and were responsible for the company's "core product" and

15  repeatedly promoted it as "working" and "incremental" had access to contrary information); *In re*

16  *Diamond Foods, Inc. Sec. Litig.*, 2012 WL 6000923, at *11 (N.D. Cal. Nov. 30, 2012) (CEO's scienter

17  strengthened by allegations of his "hands-on approach to management" and his own statements).[18]

18    Scienter is independently supported under the Ninth Circuit's "'absurdity' test, which satisfies

19  the PSLRA 'without accompanying particularized allegations . . . where the nature of the relevant fact

20  is of such prominence that it would be "absurd" to suggest that management was without knowledge of

---

21  [17]  Defendants' "access to reports" cases (MTD at 12-13) are inapposite, as they involved only
22  speculative or role-based access to information. *See Intuitive Surgical*, 759 F.3d at 1063 (plaintiffs
    alleged only role-based or theoretical access to reports, rather than facts showing defendants' direct
23  involvement in the company's core business or their repeated discussions with investors); *Police Ret.
    Sys. of St. Louis v. Intuitive Surgical, Inc.*, 2012 WL 1868874, at *18 (N.D. Cal. 2012) (allegations
24  based solely on CEO statement that "'[a]ll of our information is on one database'"), *aff'd*, 759 F.3d
    1051 (9th Cir. 2014).

25  [18]  Defendants' reliance on *Glazer Cap. Mgmt. LP v. Magistri*, 549 F.3d 736 (9th Cir. 2008), is
26  misplaced, as it involved a discrete scheme that could have been concealed from management, not
    misstatements and conduct regarding the core business operations routinely discussed with investors.
    *Id.* at 746. Further, Defendants' stock buybacks also support scienter, as they allowed Defendants to
27  continue their sales at propped up prices. ¶¶181-189; *see In re Countrywide Fin. Corp. Sec. Litig.*, 588
    F. Supp. 2d 1132, 1187 (C.D. Cal. 2008) (stock buyback may "augment[] market demand" by letting
28  defendants offload shares "without depressing prices").

1   the matter.'" *Snap*, 2024 WL 5182634, at *3 (finding it "absurd" that the Chief Business Officer did

2   not know the disputed information that "threatened more than half of Snap's revenue"); *see also*

3   *Berson*, 527 F.3d at 987-88 (inferring scienter where the issues were so central to the company's

4   operations that it would be "'absurd to suggest'" senior management was unaware).    Given

5   AppLovin's tightly held structure, the concentration of revenue in its Advertising segment, and

6   Defendants' publicly demonstrated knowledge of that business, it would be "absurd" to suggest that

7   Defendants lacked awareness of the facts underlying the alleged misstatements.  *See Shenwick v.*

8   *Twitter, Inc.*, 282 F. Supp. 3d 1115, 1145-46 (N.D. Cal. 2017) (finding scienter and holding that "it

9   would be 'absurd' for [defendant CEO and CFO] not to have been aware of adverse . . . trends" in a

10  metric described "as one of its five 'major growth drivers'"); *Snap*, 2024 WL 5182634, at *3; *Equinix*,

11  2025 WL 39936, at *5 (supporting scienter where the CEO and CFO repeatedly referred to the

12  disputed information as the "'core metric'" and "'the bedrock of long-term value creation'"); *In re*

13  *Doximity, Inc. Sec. Litig.*, 2025 WL 1449598, at *9 (N.D. Cal. May 13, 2025) ("[a]s CEO of a social

14  media company dependent on advertisers for 90% of its revenue, it is implausible . . . that [the CEO]

15  would not have been aware of user engagement metrics").[19]

16              **2.      Defendants' Enormous Stock Sales Further Evidence Scienter**

17          Defendants' massive stock sales further support the strong inference of scienter.  During the

18  four-and-a-half-month Class Period, the Individual Defendants collectively sold over three million

19  shares of AppLovin stock for nearly $1 billion in proceeds: (i) Foroughi sold nearly 27% of his

20  Class A stock for more than $350 million; (ii) Chen sold more than 49% for nearly $263 million;

21  (iii) Shikin sold 22.5% for more than $362 million; and (iv) Stumpf sold 22.5% for nearly $17 million.

22  ¶153.  These extraordinary stock sales tick all the "unusual" boxes: they were large in magnitude and

23  as a percentage of their holdings; suspiciously timed; and inconsistent with Defendants' "prior trading

24  practices."  *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *14 (N.D. Cal. Mar. 31, 2023).  The

---

25  [19]  Defendants' insistence that scienter cannot be inferred absent confidential witnesses, internal
26  documents, or an admission of wrongdoing is equally misplaced.  The Ninth Circuit has repeatedly
    rejected any such rigid pleading requirement, recognizing that scienter may be inferred where
27  defendants had actual access to contradictory information concerning a company's core operations, or
    where the alleged facts were so central to the business that ignorance would be implausible and
28  "absurd."  *Snap*, 2024 WL 5182634, at *2.

1   magnitude of Defendants' Class Period proceeds was unprecedented, and the amounts realized

2   exceeded their annual compensation by staggering multiples: (i) Foroughi (876x); (ii) Chen (657x);

3   (iii) Stumpf (42x); and (iv) Shikin (906x). ¶¶152-153; *see also Quality Sys.*, 865 F.3d at 1146 (insider's

4   sale suspicious where it was "made near the apogee of [the] stock price . . . and shortly before the stock

5   went into a steep decline" and netted the defendant "more than seven times" their prior salary).[20]

6        Defendants attempt to sidestep the extraordinary size of the proceeds by focusing solely on the

7   number of shares sold (which was still more than 10% higher during the Class Period than the control

8   period), even though courts repeatedly emphasize that insider sales support scienter when the dollar

9   amounts **or** percentages of holdings sold are unusually large. *Johnson v. Aljian*, 394 F. Supp. 2d 1184,

10  1199-1200 (C.D. Cal. 2004) (finding that defendants' sale of 18% of their holdings for proceeds

11  exceeding $661.6 million over a four-month period constituted "significant evidence of scienter"),

12  *aff'd in part*, 490 F.3d 778 (9th Cir. 2007); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d

13  1164, 1185-87 (C.D. Cal. 2007) (finding sales suspicious based solely on "the amount of shares sold");

14  *Oracle*, 380 F.3d at 1232 ("where . . . sales result in a truly astronomical figure, less weight should be

15  given to the fact that they may represent a small portion of the defendant's holdings").[21]  Defendants'

16  cases (MTD at 9-10) involved sales of far smaller magnitude, and in one case the insider's proceeds

17  were "nearly identical" before and during the class period.  *See SentinelOne*, 2025 WL 2807321, at *6

18  (proceeds totaled approximately $840,000 and $22.8 million and, the insiders "pre-Class Period sales

19  and . . . Class Period sales [we]re ***nearly identical***"); *Plumley v. Sempra Energy*, 847 F. App'x 426,

20  429 (9th Cir. 2021) (sale following a stock award was consistent with prior trading history, and the

21  proceeds alleged totaled approximately $6.7 million).

22        Defendant' sales further support scienter because they profited from the stock's inflation before

23  _____

    [20]   The Complaint contains a chart comparing control period and Class Period trading, providing the
24  "meaningful trading history" the Ninth Circuit looks for when evaluating insider trading allegations.
    ¶152; *see also Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1185 (S.D. Cal. 2009) (insider
25  sales chart in complaint constituted "a meaningful comparison").

    [21]   Defendants' cases involved materially different trading contexts and timing.  *See Wenger v.*
26  *Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1243-44, 1251 (N.D. Cal. 1998) (insider sales did not support
    scienter because they were not made at suspicious times and defendants' prior trading history was
27  irrelevant due to a lock-up preventing earlier trade); *Lozada v. TaskUs, Inc.*, 710 F. Supp. 3d 283, 320-
    21 (S.D.N.Y. 2024) (finding no scienter where the trades occurred in connection with an IPO/SPO and
28  none immediately preceded a negative announcement).

1   (and immediately after) the corrective disclosures.  ¶154.  AppLovin's stock price surged from under

2   $100 per share before the Class Period to more than $510 per share in the wake of Defendants'

3   misstatements.  *Id*.  During this surge, Defendants sold massive portions of their holdings, personally

4   reaping more than $37 million (Foroughi), nearly $65 million (Chen), and nearly $20 million (Shikin).

5   ¶¶149-151 & Appendix 1.[22]  The day after the short seller reports were published, Foroughi filed a

6   Notice of Proposed Sale of Securities with the SEC and sold 90,000 shares, generating more than $36

7   million in proceeds over just two trading days.  ¶65.  Analysts that closely followed the Company

8   noted the "Insider Selling Spree" calling it "one of the most significant red flags" for the Company and

9   stating that the "unprecedented insider selling activity . . . raises concerns about insider sentiments on

10  the stock's current valuation levels."  ¶¶155-157 (analysts noting "the complete absence of offsetting

11  insider purchases" where "no insider purchases were recorded during the whole year").  Defendants'

12  assertion that the sales did not occur at "'suspicious times such as immediately before a negative

13  earnings announcement'" (MTD at 10) also fails.  The relevant inquiry is whether Defendants' sales

14  were timed "to maximize the personal benefit from undisclosed inside information," which they were.

15  *Galena*, 117 F. Supp. 3d at 1167 (insider sales supported scienter where the defendant sold majority of

16  holdings, outside any Rule 10b5-1 plan, timed to capitalize on undisclosed activity).

17          Likewise, despite Defendants' contention (MTD at 10), Lead Plaintiffs are not required to

18  allege that Defendants had advance notice of the publication of the short seller reports, nor that

19  Defendants themselves issued the corrective disclosures.  The proper question is whether Defendants

20  sold stock while in possession of material, nonpublic information and before—and in some instances

21  immediately after—that information entered the market through events outside Defendants' control.

22  *See Galena*, 117 F. Supp. 3d at 1167 (finding scienter where "the sales were timed to maximize the

23  price increase that had resulted from the paid promotional campaign, which was material, nonpublic

24  information" even where the sales occurred after the stock price had already begun to decline).  Here,

---

25  [22]   Contrary to Defendants' claim that Foroughi and Chen merely sold "'their less valuable shares
26  first'" (MTD at 11), courts recognize that selling non-voting shares while retaining voting stock may
    support an inference of scienter.  *See No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W.*
27  *Holding Corp.*, 320 F.3d 920, 940-41 (9th Cir. 2003).  *Curry v. Yelp Inc.*, 2015 WL 7454137 (N.D.
    Cal. Nov. 24, 2015), *aff'd*, 875 F.3d 1219 (9th Cir. 2017), is inapposite because those plaintiffs "failed
28  to provide any historical context for the insider sales" and the percentages sold were modest.

1    Lead Plaintiffs allege that Defendants sold substantial portions of their holdings both before and after

2    the issuance of the short seller reports, capitalizing on an inflated stock price while adverse information

3    remained undisclosed and as the truth was being revealed.

4    Defendants' position that sales occurring after certain corrective disclosures cannot support

5    scienter also fails. MTD at 10-11.[23] Defendants improperly treat the four separate short seller reports

6    as a single "corrective disclosure," even though the reports were released over the span of several

7    weeks. ¶¶59-97. The staggered timing of the short seller reports created a rolling series of partial

8    disclosures that the market had not yet absorbed or credited, and AppLovin's stock continued to trade

9    at fraud-inflated levels. *See In re Bofl Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020)

10   ("[T]he true facts concealed by the defendant's misstatements may be revealed over time through a

11   series of partial disclosures."). Thus, the Individual Defendants were not "trad[ing] on public

12   information available to all investors" (MTD at 11) after the market had digested a single, fully

13   corrective event; rather, they were selling into an ongoing informational gap while in possession of

14   material non-public information. Courts recognize that such sales are suspicious and support scienter.

15   *See Countrywide*, 588 F. Supp. 2d at 1187 (insider selling during partial disclosure supports scienter,

16   as it suggests insiders anticipated additional adverse disclosures).

17   Defendants' assertion that Shikin's use of a Rule 10b5-1 trading plan "does not support a

18   finding of scienter" is misplaced. MTD at 11. First, the existence of a Rule 10b5-1 trading plan is an

19   affirmative defense that cannot form the basis for dismissal at the pleading stage. *See, e.g.*, *In re

20   UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009). It is also telling that ***no

21   other*** Individual Defendant utilized Rule 10b5-1 trading plans. ¶159. Even so, Shikin adopted his

22   plan mid-fraud on December 9, 2024, after the stock price was already artificially inflated and while

23   Shikin possessed material non-public information. *See* ECF No. 71-24. Courts also routinely

24

---

25   [23] Defendants' cited cases in support of that proposition are misplaced. *See Hoang v. ContextLogic,
     Inc.*, 2023 WL 6536162, at *26 (N.D. Cal. Mar. 10, 2023) (holding insider sales not suspicious where

26   plaintiffs failed to allege critical information, including percentage of holdings sold, and did not
     respond to defendants' argument that the timing of the sales was not suspicious); *City of Warren

27   Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 227 (E.D.N.Y. 2019) (insiders sold
     only small percentages of holdings, 5.4% and 10.9%, largely pursuant to preexisting trading plans, and

28   one sale occurred after the fraud was fully disclosed).

---

1   recognize that a trading plan does not inoculate insider sales where the plan itself was adopted or

2   modified during the period of alleged misconduct. *See Plumbers & Pipefitters Nat'l Pension Fund v.*

3   *Tableau Software*, 2019 WL 2360942, at *6 (S.D.N.Y. Mar. 4, 2019) ("[W]here 10b5-1 trading plans

4   are entered into during the class period, they 'provide **no defense** to scienter allegations."); *Emps.' Ret.*

5   *Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015) (same); *Freudenberg v. E*Trade*

6   *Fin. Corp.*, 712 F. Supp. 2d 171, 200-01 (S.D.N.Y. 2010) (trading plans may support scienter because

7   "'a clever insider might "maximize" their gain from knowledge of an impending price drop over an

8   extended amount of time, and . . . disguise their conduct with a 10b5-1 plan'").[24]

9       Defendants also argue that KKR's sales "are 'irrelevant to the determination of the named

10  defendant[s'] scienter.'" MTD at 11. Not so. KKR's complete liquidation at peak valuation, while it

11  retained special access to Company information and influence over AppLovin pursuant to the

12  August 15, 2018 Investors' Rights Agreement, and while Chen (former KKR executive) remained on

13  the board of directors, further reinforces the inference of scienter. ¶160. In stark contrast to its control

14  period sales (approximately $146 million), KKR sold more than $1.6 billion of AppLovin stock in a

15  single day during the Class Period, fully exiting its position. ¶¶160-161; *see In re Splash Tech.*

16  *Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1082 n.22 (N.D. Cal. 2001) (non-defendant insider

17  sales may support scienter when plaintiffs allege "'specific facts suggesting that defendants intended

18  their manipulation of [company] stock to assist these specific colleagues'").

19              **3.    A Holistic Analysis Confirms the Strong Inference of Scienter**

20      Defendants' attempt to dissect Lead Plaintiffs' allegations and dismiss them as lacking

21  "hallmarks of scienter" misstates the governing standard. MTD at 8. Under *Tellabs*, the Court must

22  evaluate scienter "holistically," considering whether all allegations, taken together, give rise to an

23  inference of scienter that is at least as compelling as any opposing inference. 551 U.S. at 326. When

24  viewed collectively, the Complaint's allegations meet that standard.

25      Lead Plaintiffs do not ask the Court to "assume scienter" based "exclusively on the Short

26  

27  [24]  Defendants' reliance on *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867 (N.D. Cal. 2020), *aff'd sub nom. Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022), is misplaced, as the

28  defendant in that case sold only about 10% of his total Twitter holdings during the class period and did so entirely pursuant to a trading plan. *Id.* at 890.

1    Reports." MTD at 8.[25]  As discussed *supra*, the Complaint relies on Defendants' own conduct: (i) their

2    hands-on management of AppLovin's core advertising business; (ii) their repeated, detailed public

3    statements regarding AXON's purported AI capabilities to revenue growth and the scalability and

4    results of the e-commerce platform; and (iii) their significant, suspiciously timed stock sales while the

5    market remained uninformed as to the true drivers of growth.  These allegations reinforce one another,

6    and are further corroborated by post-Class Period government investigations into the very same core

7    conduct at issue.  *See* Suppl., ¶¶241-243; *VeriFone*, 704 F.3d at 706-07 (SEC complaint bolstered

8    scienter).  Even absent a final adjudication of wrongdoing, the existence of an SEC investigation itself

9    supports scienter at the pleading stage.  *See Carvana*, 759 F. Supp. 3d at 978; *In re Mylan N.V. Sec.*

10   *Litig.*, 2018 WL 1595985, at *13 (S.D.N.Y. Mar. 28, 2018).  Lead Plaintiffs also allege that Foroughi

11   had previously utilized nearly identical deceptive business practices involving silent installs and

12   deceptive advertising content, reinforcing the inference that he was aware of, if not responsible for,

13   these same practices at AppLovin.  ¶¶190-192; *see also Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d

14   1180, 1190 (D. Nev. 2009) (allegations of prior misconduct may support an inference of scienter as to

15   later-alleged improper practices).  Viewed holistically, a reasonable person would deem the inference

16   of scienter at least as strong as any opposing inference.

17          **D.    The Complaint Alleges Loss Causation**

18          To recover for securities fraud under §10(b), a plaintiff must establish "'loss causation,' *i.e.*, a

19   causal connection between the material misrepresentation and the loss."  *Dura Pharms., Inc. v.*

20   *Broudo*, 544 U.S. 336, 342 (2005).  Pleading loss causation requires "no more than the familiar test for

21   proximate cause," *i.e.*, a linkage between the alleged fraud and plaintiffs' loss.  *Mineworkers' Pension*

22   *Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018).  Courts in this Circuit have repeatedly

23   held that "loss causation 'is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to

24

_____

25   [25]   The short seller cases Defendants invoke are distinguishable.  *See In re Nektar Therapeutics*, 2020
     WL 3962004, at *10 (N.D. Cal. July 13, 2020) (discounting short seller reports where, unlike the
26   reports here, plaintiffs provided no factual allegations to establish their reliability); *Ng. v. Berkeley*
     *Lights, Inc.*, 2024 WL 695699, at *13 (N.D. Cal. Feb. 20, 2024) (finding no scienter where plaintiffs
27   failed to plead defendants' involvement in the minutiae of specific customer complaints or technical
     defect); *Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801-05 (S.D.N.Y. 2020) (short seller reports failed
28   to identify sources or include technical expert analysis).

1    dismiss.'" *Pampena v. Musk*, 705 F. Supp. 3d 1018, 1051 (N.D. Cal. 2023).

2    In the Ninth Circuit, "'[i]t is enough if the [corrective] disclosure reveals new facts that, taken

3    as true, render some aspect of the defendant's prior statement false or misleading,'" and such a

4    disclosure can "'come from any source, including knowledgeable third parties such as whistleblowers,

5    analysts, or investigative reporters.'" *Genius*, 97 F.4th at 1184. Here, the Complaint alleges that

6    AppLovin's stock price plummeted after several market disclosures, each of which at least partially

7    revealed the truth about Defendants' fraudulent scheme:

8    • An 8.9% decline following the February 20, 2025 Bear Cave Report, which was reported to
         have generated "skepticism regarding the sustainability of AppLovin's rapid growth," and

9         "introduced a new level of uncertainty for [AppLovin's] investors." ¶¶199-202. Media reports
         tied the sharp decline directly to the Bear Cave Report. *Id.*

10

11   • A 12% decline following the February 26, 2025 Fuzzy Panda and Culper Reports, each alleged
         to have revealed new information to the market regarding the Company's nonconsensual

12        installation and e-commerce attribution practices. ¶¶203-205. Media outlets like *CNBC*
         attributed the decline to the short seller reports, stating that the "reports cast doubt on the

13        integrity of the company's artificial-intelligence-powered AXON advertising software." ¶206.

14   • A 20% decline following the March 27, 2025 Muddy Waters Report, revealing additional, new
         information to the market regarding AppLovin's e-commerce incrementality rate, churn rate,

15        and user data collection practices. ¶¶207-208. *CNBC* and *Bloomberg* attributed the steep
         decline (AppLovin's "steepest drop on record") directly to the Muddy Waters Report. ¶209.

16

17   As is evident by each of the steep stock price drops and media commentary, "the 'market understood'

18   the alleged revelation[s] as 'a revelation of fraud' and responded accordingly." *Genius*, 97 F.4th at

19   1184; *Am. W.*, 320 F.3d at 948 (nature of a stock price decline "is strong evidence of how reasonable

20   investors view the significance of the information").[26]

21   Still, Defendants argue that because the authors of the reports had a financial incentive to

22   discredit the Company's operations, investors could not have viewed the reports as corrective

23

24   _____

25   [26]  These stock price declines and media commentary are the most objective measure of the market's
     reaction to the reports. Defendants' citation to the reaction of biased sell-side analysts (MTD at 5-6)—
     each of whose firms sought and/or provided investment banking services to AppLovin and whom were
     provided talking points by Defendants at an analyst group call to respond to the reports—is both
26   improper at the pleading stage and unrepresentative of the wider market reaction. *See* Lead Plaintiffs'
     Opposition to Defendants' Request for Judicial Notice, §IV.A., filed concurrently herewith. Nor did
27   AppLovin's price "quickly rebound[]" as Defendants claim (MTD at 1)—it took months for the stock
     to reach its pre-short seller (*i.e.*, February 19, 2025) value. In any event, a subsequent stock price
     rebound is not dispositive of loss causation, especially where, like here, the drop following a short
28   seller report is more than "modest." *See, e.g.*, *EHang Holdings*, 2025 WL 1242324, at *14.

1   disclosures.  MTD at 24.  Courts routinely uphold loss causation allegations even when they are

2   premised on a financially-incented short seller.  *See, e.g.*, *QuantumScape*, 580 F. Supp. 3d at 742;

3   *Equinix*, 2025 WL 39936, at *6; *Bernstein v. Ginkgo Bioworks Holdings, Inc.*, 2023 WL 11996105, at

4   *8 (N.D. Cal. Mar. 10, 2023).  Here, two of the reports are from non-anonymous sources (Bear Cave

5   and Culper), and one (Bear Cave) is not a short seller at all.  *See* ¶¶60, 67; *see also supra*, §IV.A.2.

6   Defendants also concede that the Bear Cave, Culper, and Fuzzy Panda Reports each provided ***new***

7   information to the market, and that the Company's "stock price declined following the release of the

8   Short Reports."  MTD at 1, 25 (claiming only Muddy Waters failed to provide new information).

9           The reports are not mere summaries of publicly available information (*id.* at 25), but instead

10  reflect the extensive efforts by each of the investigative teams.  *See supra*, §IV.A.2.  It is unreasonable

11  to expect market participants to conduct this level of synthesis and analysis, ***even if*** the information

12  were otherwise publicly available.  *Genius*, 97 F.4th at 1187 (finding loss causation adequately pled

13  where the disclosure of already publicly available information "did not become digestible until the

14  [short seller] synthesized it for the marketplace"); *Equinix*, 2025 WL 39936, at *6 ("a corrective

15  disclosure can be based on solely publicly available information so long as the complaint 'plausibly'

16  suggests 'that other market participants had not done the same analysis'").

17          Finally, Defendants' claim that the reports merely disclosed the ""'potential' for widespread

18  fraudulent conduct'" (MTD at 24-25) has no merit.  Setting aside the Complaint's allegations that the

19  reports did, in fact, disclose fraudulent conduct (*see* Complaint, §IV.D.) and not merely the "risk" of

20  misconduct, subsequent reports provide the further corroboration Defendants claim to be missing—

21  including that: (i) the SEC is now probing the Company's data practices (during a time of limited

22  enforcement); (ii) AppLovin shut down Array (the source of nonconsensual downloads); and (iii) its e-

23  commerce platform has failed to scale as hyped.  Suppl., ¶¶241-247.  This is sufficient at this stage.[27]

24  **V.      CONCLUSION**

25          For the reasons above, Defendants' motion to dismiss should be denied in its entirety.

26  ———————————————

27  [27]   Defendants challenge only the predicate violation requirement for §20(a) control person liability.
    MTD at 7.  Because the Complaint sufficiently alleges a primary violation of §10(b) (*supra*, §IV), it
    properly pleads liability under §20(a) as well.  As for §20A insider trading liability, Defendants do not
28  target or address these claims anywhere in their motion.

1    DATED: January 12, 2026                  Respectfully submitted,

2

3                                           */s/ Marco Janoski*

                                          J. Marco Janoski Gray (Cal. Bar Id. 306547)

4                                           Ashley M. Kelly (Cal. Bar Id. 281597)

                                          John M. Kelley (Cal. Bar Id. 339965)

5                                           ROBBINS GELLER RUDMAN & DOWD LLP

                                          655 West Broadway, Suite 1900

6                                           San Diego, CA  92101

                                          Tel.: (619) 231-1058

7                                           Fax: (619) 231-7423

8                                           Email: ashleyk@rgrdlaw.com

                                          Email: mjanoski@rgrdlaw.com

9                                           Email: jkelley@rgrdlaw.com

10                                          Shawn A. Williams (Cal. Bar Id. 213113)

11                                          ROBBINS GELLER RUDMAN & DOWD LLP

                                          Post Montgomery Center

12                                           One Montgomery Street, Suite 1800

                                          San Francisco, CA  94104

13                                           Tel.: (415) 288-4545

                                          Fax: (415) 288-4534

14                                           Email: shawnw@rgrdlaw.com

15    DATED: January 12, 2026

16                                           */s/ Karin E. Fisch*

17                                           Karin E. Fisch (admitted *pro hac vice*)

                                          Vincent J. Pontrello (admitted *pro hac vice*)

18                                           GRANT & EISENHOFER P.A.

                                          485 Lexington Avenue, 29th Floor

19                                           New York, NY  10017

                                          Tel.: (646) 722-8500

20                                           Fax: (646) 722-8501

                                          Email: kfisch@gelaw.com

21                                           Email: vpontrello@gelaw.com

22                                           M. Elizabeth Graham (Cal. Bar Id. 143085)

23                                           GRANT & EISENHOFER P.A.

                                          2325 3rd Street, Suite 329

24                                           San Francisco, CA 94107

                                          Tel.: (415) 229-9720

25                                           Fax: (415) 789-4367

26                                           Email: egraham@gelaw.com

27                                           *Counsel for Lead Plaintiffs and Lead Counsel*

                                          *for the Class*

28

1

2                            Thomas C. Michaud
                            VANOVERBEKE, MICHAUD
3                                & TIMMONY, P.C.
                            79 Alfred Street
4                            Detroit, MI 48201
                            Tel.: (313) 578-1200
5                            Fax: (313) 578-1201
                            Email: tmichaud@vmtlaw.com

6                            *Additional Counsel*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE PURSUANT TO LOCAL RULE 5-1(i)(3)**

2          I, J. MARCO JANOSKI GRAY, am the ECF User whose identification and password are

3   being used to file this document. Pursuant to Local Rule 5-1(i)(3), I attest that concurrence in the filing

4   of the document has been obtained from each of the other signatories.

5          Dated:  January 12, 2026

6                                                             */s/ Marco Janoski*
                                                          J. MARCO JANOSKI GRAY
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28